**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | 12 CV 1094 |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | Magistrate Maria Valdez |
| | ) | |
| CITY OF HARVEY, ROBERT BUCHANAN, | ) | Jury Trial Demanded |
| NEAL FRUNDLE, OSCAR PERRY, and | ) | |
| ANDREW JOSHUA, | ) | |
| | ) | consolidated with |
| Defendants. | ) | |

| | | |
|---|---|---|
| JANE DOE II and JANE DOE III, | ) | |
| | ) | |
| Plaintiffs, | ) | 12 CV 2069 |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | Magistrate Maria Valdez |
| | ) | |
| CITY OF HARVEY and ANDREW JOSHUA, | ) | Jury Trial Demanded |
| | ) | |
| Defendants. | ) | consolidate with |

| | | |
|---|---|---|
| JANE DOE IV, JANE DOE V, JANE DOE VI, | ) | |
| JANE DOE VII, and JANE DOE VIII, | ) | |
| | ) | |
| Plaintiffs, | ) | 14 CV 8424 |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | Magistrate Maria Valdez |
| | ) | |
| CITY OF HARVEY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON DOES I, II, III, AND IV**

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ......................................................................................................... i

**TABLE OF AUTHORITIES** ............................................................................................... iii

**SUMMARY OF ARGUMENT** .............................................................................................. 1

**ARGUMENT** ......................................................................................................................... 1

**I.      All Claims by Does I, II, and IV Are Barred by the Statute of Limitations** ........ 2

      A.      Plaintiffs' Claims Under § 1983 Are Barred by the Two-Year Statute of
             Limitations. ................................................................................................. 2

      B.      Doe I's Claim Under the IDVA Is Barred by the One-Year Statute of
             Limitations .................................................................................................. 5

**II.     Judgment Should Be Entered on the Equal Protection Claims Because There
       Is No Evidence of Discriminatory Effect on Females Over Males or that
       Defendants Purposely Discriminate Against Females** ....................................... 6

      A.      Plaintiffs Cannot Prove Discriminatory Effect Because Their Proffered
             Statistics Fail to Make a Comparison to the Comparator Class and Are
             Unreliable. .................................................................................................. 6

      B.      Plaintiffs Cannot Prove Discriminatory Purpose ...................................... 9

           1.      Plaintiffs' Statistics Do Not Prove Discriminatory Intent ............. 10
           2.      There is no express policy of discrimination against females ....... 10
           3.      HPD did not intentionally discriminate based on gender in Does I,
               II, III, and IV's individual cases .................................................... 11

                i.       Doe I's Assault in August 1997 ......................................... 12
                ii.      Doe II's Assault on May 24, 2007 ..................................... 14
                 iii.     Doe III's Assault on April 28, 2008 ................................... 16
                 iv.      Doe III's Assault on May 15, 2008 .................................... 18
                 v.       Doe IV's Assault on November 30, 1999 .......................... 19

           4.      Other Evidence Contradicts the Existence of a Policy of Intentional
               Gender Discrimination .................................................................... 22

**III.    Judgment Should be Entered on Doe I's Due Process Claim** .......................... 25

      A.      Defendants Did Not Affirmatively Act to Create or Increase Danger to
             Doe I. ......................................................................................................... 25

      B.      The Defendants' Actions Did Not Proximately Cause Doe I's Injuries ..... 29

      C.      Defendants' Conduct Does Not Shock the Conscience ............................. 30

**IV.    Judgment Should Be Entered in Favor of Defendants on Doe I's Claim Under the IDVA** .................................................................................31

**V.    Judgment Should Be Entered in Favor of Harvey on all *Monell* Claims** .......33

    A.    Harvey Does Not Have an Express Policy of Discrimination or Due Process Violations..........................................................................................34

    B.    Harvey Does Not Have a Widespread Practice of Discrimination ............34

    C.    The Alleged Discrimination in This Case Was not Committed by a Person With Final Policymaking Authority...........................................................35

    D.    There Is No Evidence That an Unconstitutional Policy Was the "Moving Force" of the Alleged Constitutional Violations Suffered by Plaintiffs ....36

    E.    There Can Be No *Monell C*laim if There Is No Underlying Constitutional Violation .................................................................................................36

    F.    The Evidence Proves That Harvey Has a Constitutionally Sufficient Training Program ....................................................................................36

**VI.    Joshua Has Qualified Immunity for Claims Under the Due Process Clause and Equal Protection Clause**.................................................................38

**VII.    Judgment Should Be Entered in Favor of Defendants on Doe I's Claim for Conspiracy under § 1985**..................................................................39

**VIII.    Judgment Should Be Entered on Official Capacity Claims**............................39

**CONCLUSION** .........................................................................................................40

**CERTIFICATE OF SERVICE** ...................................................................................41

# TABLE OF AUTHORITIES

**Cases**

*Abramson v. Abramson*, 772 F. Supp. 395 (N.D. Ill. 1991) .................................................... 2, 3, 4

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ........................................................1, 2

*Bond v. Atkinson*, 725 F.3d 690 (7th Cir. 2013) .................................................................. 7, 10, 22

*Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824 (7th Cir. 2009) ................................... 29

*Chavez v. Ill. State Police*, 251 F.3d 612 (7th Cir. 2001) .........................................6, 7, 8, 10, 11

*Chelios v. Heavener*, 520 F.3d 678 (7th Cir. 2008).......................................................................... 32

*Connick v. Thompson*, 131 S. Ct. 1350 (2011)........................................................................... 36, 37

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).......................................................... 9

*DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189 (1989) .................. 25, 26, 27

*Dismukes v. Admin. Office of the Illinois Courts*, No. 12-CV-8800, 2014 WL 2978173 (N.D. Ill.
    July 2, 2014)................................................................................................................................ 39

*Doe v. Montessori Sch. Of Lake Forest*, 678 N.E.2d 1082, 387 Ill. App. 3d 289 (Ill. App. Ct.
    1997) ............................................................................................................................................. 5

*Doe v. Roe No. 1*, 52 F.3d 151 (7th Cir. 1995) ............................................................................... 5

*Estate of Sims v. Cnty. Of Bureau*, 506 F.3d 509 (7th Cir. 2007)............................................ 34, 40

*Farrar v. City of Chicago*, 291 F. Supp. 2d 747 (N.D. Ill. 2003)............................................... 32

*Frake v. City of Chicago*, 210 F.3d 779 (7th Cir. 2000)................................................................ 11

*Gable v. City of Chicago*, 296 F.3d 531 (7th Cir.2002)................................................................. 35

*Hollander v. Brown*, 457 F.3d 688 (7th Cir. 2006)..................................................................... 3, 5

*Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647 (7th Cir. 2011) ........................... 25, 30, 31

*Johnson v. County of Cook*, No. 08-C-2139, 2009 WL 331531 (N.D. Ill. Feb. 10, 2009)........... 39

*Kelly v. City of Chicago*, 4 F.3d 509 (7th Cir. 1993) ..................................................................... 2

*Lacey v. Village of Palatine*, 232 Ill. 2d 349 (Ill. 2009). ........................................................ 32, 33

*Latuszkin v. City of Chicago*, 250 F.3d 502 (7th Cir. 2001 ...................................................... 34, 35

*McCauley v. City of Chicago*, 671 F.3d 611 (7th Cir. 2011) ....................................................... 22

*Miles v. Kyung Yoo, M.D.*, No. 12-CV-2015, 2014 WL 5465282 (N.D. Ill. Oct. 27, 2014)......... 2

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).............................................1, 22, 33, 34, 36

*Okunday v. City of Chicago*, 927 F.2d 607 (7th Cir. 1991) ............................................................ 2

*Palka v. City of Chicago*, 662 F.3d 428 (7th Cir.2011)................................................................ 35

*Pearson v. Callahan*, 555 U.S. 223 (2009)................................................................................. 38

*Radue v. Kimberly-Clark Corp.*, 219 F.3d 612 (7th Cir. 2000)...................................................... 7

*United States v. Armstrong*, 517 U.S. 456 (1996) ................................................................... 7, 8

*Walker v. Sheahan*, 526 F.3d 973 (7th Cir. 2008) ...................................................................... 40

*Wallace v. Kato*, 549 U.S. 384, 388 (2007).......................................................................... 2, 37

*Waters v. City of Chicago*, 580 F.3d 575 (7th Cir. 2009).......................................................... 35, 36

Wheeler v. Lawson, 539 F.3d 629, 639 (7th Cir. 2008)

*Windle v. City of Marion*, 321 F.3d 658 (7th Cir. 2003)........................................................... 25, 36

*Zorzi v. County of Putman*, 30 F.3d 885 (7th Cir. 1994) ........................................................... 38

**Statutes**

Fed. R. Civ. P. 56(c) ........................................................................................... 1
735 ILCS 5/13-215 ............................................................................................. 2
745 ILCS 10/8-101(a) ......................................................................................... 5
735 ILCS 5/13-211 ............................................................................................. 5
750 ILCS 60/304 ............................................................................................... 31
750 ILCS 60/306 ............................................................................................... 32

## SUMMARY OF ARGUMENT

Doe I brings each of the following claims against the City of Harvey and Andrew Joshua: (1) Violation of the Illinois Domestic Violence Act of 1986 ("IDVA"), (2) Fraudulent Concealment, (3) Violation of the Due Process Clause under § 1983, (4) Violation of the Equal Protection Clause under § 1983, and (5) Conspiracy under § 1985. Doe II and III each bring a claim for violation of the Equal Protection Clause under § 1983 against Harvey and Joshua. Doe IV brings a claim for violation of the Equal Protection Clause under § 1983 against Harvey. Summary judgment should be entered in favor of Defendants on all counts. Does I, II, and IV's claims are barred by the statute of limitations. The evidence proves no discriminatory effect or purpose in violation of the Equal Protection Clause. The evidence proves that HPD did not violate Doe I's Due Process rights. The evidence proves that HPD did not violate the IDVA. The evidence proves that an unconstitutional policy does not exist, so Plaintiffs' *Monell* claims and claims brought against Joshua in his official capacity fail. Joshua has qualified immunity to the federal claims. The evidence proves that Defendants did not violate § 1985.

## ARGUMENT

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court should view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party on a motion for summary judgment may fulfill its burden by showing the court there is an absence of evidence on an issue on which the non-movant has the burden of proof. *Id.* Summary judgment is

not "a disfavored procedural shortcut, but rather [it is] an integral part of the federal rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (citation omitted).

I.      All Claims by Does I, II, and IV Are Barred by the Statute of Limitations.

   A.      **Plaintiffs' Claims Under § 1983 Are Barred by the Two-Year Statute of Limitations.**

"The statute of limitations for a section 1983 action is determined by the statute of limitations for personal injury actions in the state where the incident forming the basis for the claim occurred." *Miles v. Kyung Yoo, M.D.*, No. 12-CV-2015, 2014 WL 5465282, at *2 (N.D. Ill. Oct. 27, 2014) (Coleman, J.). "In Illinois, the statute of limitations for personal injury actions is two years from the date of the action's accrual." *Id*. Courts also apply the tolling laws of the state where the injury occurred, including fraudulent concealment and the discovery rule. *Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993); *Okundaye v. City of Chicago*, 927 F.2d 607 (7th Cir. 1991); *Abramson v. Abramson*, 772 F. Supp. 395, 397–98 (N.D. Ill. 1991). Federal law determines the question of when the claim accrues and the limitations period begins. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). "Section 1983 claims accrue when the plaintiff knows or should know that his or her constitutional rights have been violated." *Kelly,* 4 F.3d at 511.

Plaintiffs allege the tolling principal in Illinois law of "fraudulent concealment" applies: "If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards." 735 ILCS 5/13-215. Since Defendants did not affirmatively conceal the cause of action, Plaintiffs rely on their expectations that police officers will investigate criminal

allegations forthright as a fiduciary of the city. (Doc. 63 in 1094 case at 3, court order denying motion to dismiss fraudulent concealment claim.)

The tolling principal in Illinois of the "discovery rule" means that "the statute of limitations starts to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused." *Abramson*, 772 F. Supp. at 397 (quotes omitted). "This rule only applies in cases where the plaintiff was not consciously aware of an injury and, not consciously aware that the injury was caused by wrongful conduct." *Id.* "The injured person does not need to be completely informed about the circumstances regarding his injury, nor does he need to know that the wrong is legally actionable." *Id.*; *Hollander v. Brown*, 457 F.3d 688, 693 (7th Cir. 2006). "Under the discovery rule, the statute of limitations begins to run when the injured person becomes possessed of sufficient information concerning his injury to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Abramson*, 772 F. Supp. at 398.

In this case, Doe I knew in the summer of 1998 that the HPD had not investigated her initial report of abuse. Under questioning from her own attorney, Doe I testified as follows:

> Q: And so would it be fair to say that when the abuse began again [in 1998], when it began you felt like you had no other options because you had already gone to your mother –
> A: Yes.
> Q: – and you had already gone to the last line of defense, the Harvey Police Department?
> A: Yes.

(SMF[1] 18.) This testimony demonstrates that Doe I did not report the subsequent abuse that began in 1998 because she had already reported it once in 1997 to her "last line of defense," the HPD. She believed that HPD had failed her in some way after the initial report and would fail

---

[1] "SMF" refers to Defendants' Statement of Material Facts filed pursuant to Local Rule 56.1.

her again if she reported the continued abuse. She viewed reporting the subsequent abuse as futile.

Doe I left Illinois in 2004 because of Robert's abuse. (SMF 18.) From 2004 until present, she has always remembered that the abuse occurred, just not some of the details. (SMF 18.) Doe I turned 18 on June 1, 2004. (SMF 2.) On June 1, 2004, Doe I knew that she had suffered continued sexual assaults by Robert, she knew that Robert had not been prosecuted after her initial report, and she believed that reporting the subsequent abuse was futile because Defendants had failed to do so the first time. (SMF 18.) She may not have been fully informed of all of the circumstances, *Abramson*, 772 F. Supp. at 398, but she knew of her injury (the subsequent abuse) and she had at least enough information to be put on inquiry to determine whether she had a claim against Defendants. She could have asked her mother. She could have sent a FOIA request to the HPD. She could have sued Robert and obtained more information.

The claims were not fraudulently concealed because Doe I possessed sufficient information as of her 18th birthday to be on notice of the claims. (SMF 18.) Also, when Teresa told Joshua that she was dropping the charges, Joshua told Teresa that she would have to live with her decision.  (SMF 15.)  Joshua did not fraudulently conceal that Teresa's dropping the charges would cause the investigation to stall. Doe I's federal claims expired on June 1, 2006.

Doe II's claim is also barred by the statute of limitations. On June 15, 2007, ASA Berg told Doe II's mother, Ms. Brown, that it was a "he-said-she-said" situation, that Doe II was too calm, and that she did not believe that Doe II had been raped. (SMF 56.) Doe II testified that she and her mother were upset after the interviews with the attorneys on June 15, 2007, and that they both believed that the case was over at that time. (SMF 57.) At that time, Doe II knew that her case was no longer being investigated, and she was "upset" about it. (SMF 57) She knew of her

injury (the case not being investigated further) and she had sufficient knowledge to make inquiry as to the reasons. Her claims accrued when she turned 18 on January 3, 2008, (SMF 52), and expired two years later.

Finally, Doe IV's claims are barred by the statute of limitations. She testified that as early as her 18th birthday on December 23, 2003, she believed that HPD was not investigating her case because she was a girl. (SMF 18.) She could not give any reasons for that belief, and she never called the HPD to inquire the status of her case. (SMF 18.) If she believed that she had been discriminated against based on her gender, then she had sufficient information to make inquiry of her claims. Her claims expired on December 23, 2005.

### B. Doe I's Claim Under the IDVA Is Barred by the One-Year Statute of Limitations.

For all of the reasons set forth in the section above, Doe I's IDVA claim is also time barred by the applicable one-year statute of limitations set forth in 745 ILCS 10/8-101(a). In addition, the Illinois doctrine of "imputed knowledge" bars this claim as untimely. Whereas federal claims accrue based on federal law, under the Erie Doctrine, Illinois claims accrue based on Illinois law. *Hollander*, 457 F.3d at 692. In Illinois, the claim of a minor accrues when the minor's parent has knowledge of the injuring event; such knowledge is imputed to the child. *Doe v. Montessori Sch. Of Lake Forest*, 678 N.E.2d 1082, 387 Ill. App. 3d 289, 299–300 (Ill. App. Ct. 1997); *see Doe v. Roe No. 1*, 52 F.3d 151, 155–156 (7th Cir. 1995) (dismissing as time-barred pursuant to Indiana's imputation rule, which is the same as Illinois's imputation rule). That claim is then tolled until the minor turns 18, 735 ILCS 5/13-211, at which time the clock starts.

In this case, Teresa knew that the HPD investigation had stalled. She knew that a rape kit had been taken and was told that the results would be sent to the HPD. (SMF 2.) She knew that Robert had been arrested and then released. (SMF 10.) She then told Doe I to lie to Joshua and to

tell Joshua that the allegations against Robert were false. She told Doe I to lie because she did not want Robert to go to jail. (SMF 14.) Teresa told Joshua that she wanted to drop the charges against Robert. (SMF 15.) Then, she let Robert move back home. (SMF 11.) Teresa had full knowledge of the investigation and the occurrences related to Robert's return home. Her knowledge is imputed to Doe I. Fraudulent concealment does not apply because Teresa had knowledge in 1997, and was even told by Joshua that she would have to live with her decision to drop the charges. Doe I turned 18 on June 1, 2004 and her IDVA claim expired on June 1, 2005.

**II.    Judgment Should Be Entered on the Equal Protection Claims Because There Is No Evidence of Discriminatory Effect on Females Over Males or That Defendants Purposely Discriminated Against Females.**

"To show a violation of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Ill. State Police*, 251 F.3d 612, 636 (7th Cir. 2001).

**A.    Plaintiffs Cannot Prove Discriminatory Effect Because Their Proffered Statistics Fail to Make a Comparison to the Comparator Class and Are Unreliable.**

"To prove discriminatory effect, the plaintiffs are required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class." *Chavez*, 251 F.3d at 636. Plaintiffs may show that they were treated differently from other similarly situated individuals by naming such individuals or through the use of statistics. *Id.* In this case, presumably because of the differences between cases, Plaintiffs attempt to use statistics to prove this element of their claim.

Although statistics are an acceptable method of proving discriminatory effect, "parties may not prove discrimination merely by providing the court with statistical analysis." *Id.* at 638.

"The statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." *Id*. "Further, statistics are not irrefutable; they come in an infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all the surrounding facts and circumstances." *Id*.

Statistics must be relevant and reliable, just as any other expert testimony. *Id*. at 641. To prove discriminatory effect, statistics must show comparatively that the suspect class was treated differently than the comparator class. *Id*. at 643 ("Without comparative racial information, [Hispanic and African American] plaintiffs cannot prove that they were stopped, detained or searched, when similarly situated whites were not."); *see United States v. Armstrong*, 517 U.S. 456, 470 (1996); *see also Bond v. Atkinson*, 725 F.3d 690, 692 (7th Cir. 2013) ("disparate impact does not violate the equal protection clause"); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616–617 (7th Cir. 2000) ("A plaintiff must show disparate treatment between comparable individuals."). In *Armstrong*, the Supreme Court rejected statistics that failed to show that the comparator class (non-black criminal suspects) could have been prosecuted but were not, even thought the statistics did show that a disproportionate number of African Americans charged with criminal violations were prosecuted. *Armstrong*, 517 U.S. at 470. Similarly, in *Chavez*, the Seventh Circuit rejected statistics that did not reliably prove that the comparator class of Caucasians were not stopped, detained, and searched *as much as* the Hispanic and African American plaintiffs, even though plaintiffs' statistics did purport to show that Hispanic and African-American motorists were issued reports at a rate of two standard deviations over the expected norm (a statistically significant variation). *Chavez*, 251 F.3d at 642–43. The statistics must make a comparison. *See Bond*, 725 F.3d at 692 (affirming dismissal of complaint because plaintiff did not allege that females were treated differently than males).

In this case, the statistics proffered by plaintiffs are irrelevant because they fail to make a comparison with the comparator class of males. Plaintiffs' expert, Dr. Lonsway, reviewed the Dataset created by plaintiffs' counsel and determined that HPD's policies and practices of investigating sexual assaults are inadequate. (SMF 86.) Dr. Lonsway also observed that "the majority of sexual assault victims are female" (which is not disputed by the Defendants). (SMF 86.) Dr. Lonsway thus concludes that HPD "denies women and girls equal opportunity to pursue justice when they have been sexually assaulted." (SMF 86.) Critically, Dr. Lonsway does not conclude that HPD investigated sexual assaults of females *differently than males*, and this deficiency is fatal to the Plaintiffs' statistical analysis. *Armstrong*, 517 U.S. at 470; *Chavez*, 251 F.3d at 642–43.

The gender-neutrality of Dr. Lonsway's opinion regarding deficient investigations of sexual assaults is highlighted in her calculation that 64% of sexual assaults were assigned a detective (a percentage that she found substandard). (SMF 85.) Dr. Lonsway arrives at that figure by calculating that 64% of her 106-case subset (which she spot checked for accuracy) were assigned a detective. She then assumed that 64% of the cases in the *entire Dataset* were not assigned to a detective, regardless of gender. (SMF 85.) The Dataset contains both male and female victims.  (SMF 83.) Thus, Dr. Lonsway's concludes that 64% of both male and female cases were not assigned a detective and not properly investigated. (SMF 85.) This conclusion is gender-neutral and does not prove that a comparator class was treated differently than the plaintiffs' class of females.

The rest of Dr. Lonsway's opinions rely on data entered in the entire Dataset (as opposed to just her subset), but, as stated, the entire Dataset contains both male and female cases. (SMF

83, 85.) Dr. Lonsway's statistics (if believed) indicate deficient investigations in both male and female cases, and do not prove that males were treated differently than females.

Aside from fatal gender-neutrality, the Dataset on which Dr. Lonsway relies is also unreliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993). Data in the Dataset was compiled and entered by Plaintiffs' counsel in this case. (SMF 83.) Dr. Lonsway's associate, Ms. Peterson, "spot checked" the accuracy of the data entered in every eighth case. (SMF 84.) As a result, Ms. Peterson spot checked the accuracy of 106 of the 859 cases, or 12.5%. (SMF 84.) Ms. Peterson only spot checked the accuracy of six data points entered in the Dataset: victim sex, victim age, victim/suspect relationship, number of (documented) victim interviews, number of (documented) suspect interviews, and number of supplemental reports. (SMF 84.) Ms. Peterson found a 10% error rate for entries related to suspect interview, 9% error rate for entries related to creation of supplemental police reports, a 4% error rate for entries related to victim interviews, a 3% error rate for entries related to the victim's age, and a 3% error rate for entries related to the victim's relationship to the suspect. (SMF 84.) Although Ms. Peterson found errors entered by Plaintiffs' counsel in five of the six categories, and an error rate in two of the categories as high as 9% and 10%, Dr. Lonsway still used the Dataset created by Plaintiffs' counsel. (SMF 85.) Dr. Lonsway even used the data in the Dataset that she *knew* to be inaccurate as a result of Ms. Peterson's spot checking the subset. When asked why Ms. Lonsway did not "spot check" all of the data, she said that she had "time constraints." (SMF 84.) Consequently, the statistics are unreliable.

### B. Plaintiffs Cannot Prove Discriminatory Purpose.

Even if the statistics prove discriminatory effect (which they do not), then Plaintiffs still must prove that Defendants intended to discriminate against females. (Doc. 159 at 9 in 2069

Case, court order citing *Bond*, 728 F.3d at 692–93); *Chavez*, 251 F.3d at 645. "Plaintiffs must show that the decisionmakers in their case acted with discriminatory purpose." *Id.* (internal quotes omitted). "Discriminatory purpose implies more than intent as awareness of consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of' its adverse effects upon an identifiable group." *Id.* (internal quotes omitted). Plaintiffs could not show that Harvey intended to discriminate against all women when they filed their Motion for Class Certification (Court's order, doc. 159 at 8 in 2069 Case), and they still cannot. Plaintiffs' statistics do not prove discriminatory intent. The evidence shows that HPD has a policy of investigating every sexual assault, the plaintiffs did not experience discrimination on individual levels, sexual assault reports are routinely investigated and solved in a timely manner, Thomas's and Dr. Lonsway's testimony supports a finding that HPD allocates resources based on crime and not on gender, Thomas did not discriminate based on gender, and witnesses, including ASAs, testified that they did not perceive discrimination.

### 1. Plaintiffs' Statistics Do Not Prove Discriminatory Intent.

It is well established that statistics do not prove intent in § 1983 cases, except in very rare cases. *Chavez*, 251 F.3d at 647; *Bond*, 728 F.3d at 692 ("disparate impact does not violate the equal protection clause"). Those rare circumstances are as proof of an equal protection violation in the selection of a jury venire in a particular district and possibly as sole proof of intent in the context of challenges to legislative redistricting. *Chavez*, 251 F.3d at 647. This is not one of those cases. Just as in *Chavez*, statistics in this case do not prove intent to discriminate.

### 2. There Is No Express Policy of Discrimination Against Females.

Since before 1997, Harvey had a Policy that each sexual assault report must be assigned to a detective, and that the detective is to investigate the case, identify and apprehend the

offender, and arrange for timely analysis and evaluation of evidence irrespective of the victim's gender. (SMF 98.) Harvey's current policy states the same. (SMF 98.) It has always been the policy of HPD to contact the CCSAO for felony review after the evidence is gathered. (SMF 100.) Detectives have the discretion to utilize the investigation techniques that they deem necessary to apprehend offenders, and the detective's decisions vary among detectives and differ based on the case presented. (SMF 97–99.) CCSAO Investigator Thomas testified that he did not have a "check-off" list when investigating a case; he determined which investigation techniques to use based on the circumstances of the case and the solvability factors. (SMF 104.) There is no cookie-cutter approach to any investigation and what is necessary for one may be irrelevant for another. (SMF 110.) HPD's Policy is that a detective's work is reviewed through discussions with a superior officer and inspection of written reports and cases submitted. (SMF 99.) There is no express policy that investigations of female victims should be treated differently than investigations of male victims based on gender.

Dr. Lonsway testified that the HPD Policy, when compared to the IACP Model Policy, falls short (SMF 112), but "the existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent." *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000). Moreover, the IACP National Model Policy Center does not set any required law enforcement standard and, in fact, most agencies do not use these policies. (SMF 112.) The IACP policies are broad based and do not, due to their nature, take into account the disparities between the varying type of agencies and jurisdictions. (SMF 112.) Just as in *Chavez*, 251 F.3d at 646, HPD's policy to assign and investigate every sexual assault is gender-neutral and constitutionally sufficient.

### 3. HPD Did Not Intentionally Discriminate Based on Gender in Does I, II, III, and IV's Individual Cases.

There is no evidence that HPD intentionally discriminated against Does I–IV during the preliminary or follow-up investigations of their cases. Considering the circumstances of each case, Defendants' actions were not gender-based.

### i. Doe I's Assault in August 1997.

On August 3, 1997, Doe I's mother, Teresa, reported to HPD that Doe I (11 years old at the time) had been sexually assaulted by Doe I's stepfather (Teresa's husband) Robert at their residence at 14610 South Lexington, in Harvey. (SMF 2.) Officer Frundle responded to the call and took the initial report. (SMF 2.) Teresa took Doe I to the hospital that night, and Frundle reported the assault to the DCFS hotline, as required. (SMF 2.) Commander Joshua received the case as a detective the next day. (SMF 3.) On August 4, Joshua interviewed Doe I and Teresa. (SMF 3.) On August 5, Joshua took Doe I and Teresa to La Rabida Hospital for a Victim Sensitivity Interview ("VSI") to determine the credibility of Doe I's allegations, as required. (SMF 4.) ASA Schultz and DCFS Investigator Pippion were present at that VSI. Doe I appeared credible at the VSI. (SMF 4.) After the VSI, Pippion interviewed Teresa in the presence of Joshua and ASA Schultz, and Teresa stated that she "was not going back to live at 14610 South Lexington, Harvey, Illinois and so, of course, will never live with [Robert] ever again, after finding out this past weekend about what he has done to her daughter, she has every intention of going forward with any action necessary to see that Buchanan is punished." (SMF 5.) Joshua believed that Doe I would be safe with Robert out of the house. (SMF 5, 44.) At that time, DCFS's investigation was escalated to "formal." (SMF 6.) Joshua was aware that DCFS could make sure that Doe I was safe. (SMF 6.) In fact, DCFS rules and procedures *mandated* that it take protective custody if it believed that Doe I was in danger. (SMF 40–41.) DCFS did not take Doe I into protective custody. (SMF 26.)

On August 6, HPD delivered Doe I's rape kit to ISP for analysis, and Joshua ordered that Robert be arrested. (SMF 7, 8.) HPD Detective Thomas arrested Robert and brought Robert to the HPD station. (SMF 8.) Joshua interviewed Robert and arranged for him to submit to a polygraph examination. (SMF 9.) On August 7, Robert was released by HPD. At that time, he moved out of the house at 14610 South Lexington and into his mother's house at 12143 S. Lowe in Chicago. (SMF 11.) Although Doe I testified that Robert did not *formally* move out of the house at 14610 South Lexington, it is undisputed that Doe I did not "cross paths" with him until over three months later on Thanksgiving 1997. (SMF 11.) Meanwhile, DCFS continued investigating and ensuring the safety of Doe I, per its mandate. (SMF 19–38.) ISP issued a report on September 19 indicating that there was unidentified semen found on the vaginal swabs of Doe I. (SMF 13.) That report is addressed to HPD and CCSAO, although neither entity acknowledges receiving it. (SMF 13.) Robert testified that he consented to a buccal swab, but Joshua did not collect a buccal swab from him. (SMF 16.)

At some point after September 10, Joshua had a conversation with Teresa at the HPD station, during which Teresa told Joshua that she wanted to drop the charges against Robert, to which Joshua responded that she would have to live with her decision. (SMF 15.)  She signed a paper indicating her decision declining to press charges. (SMF 15.) Also, at some point, Joshua met with Doe I at her school and Doe I recanted her allegations against Robert. (SMF 14.) Doe I testified that she recanted at Teresa's request. (SMF 14.) Doe I testified that Teresa requested that Doe I lie about the abuse because Teresa did not want Robert to go to jail. (SMF 14.)

These facts do not present evidence of intentional gender discrimination. Plaintiff's expert agrees that Frundle's initial report was adequate. (SMF 2.) Joshua investigated the case until the two complaining witnesses, Teresa and Doe I, stopped cooperating. Even Joe Thomas,

as a CCSAO Investigator, testified that he does not pursue cases where the complaining

witnesses refuse to cooperate or recant. (SMF 115.) Even though his investigation stalled, Joshua

could still rely on DCFS to protect Doe I, which he did. Joshua could have collected a DNA

sample from Robert in 1997, but Joshua's failure to obtain a DNA sample does not prove intent

to discriminate based on gender under these circumstances. DNA was not used to the same

degree in 1997 as it is today. (SMF 110.) The case was already stalling due to the

uncooperativeness of witnesses. Under these circumstances, the facts do not prove intent to

discriminate based on gender.

### ii. Doe II's Assault on May 24, 2007.

Doe II was assaulted on May 24, 2007 at her house by an associate. He entered her house

behind her with her permission and assaulted her. When the phone rang, he left. After the assault,

Doe II called her mother, Ms. Brown, and told her about the assault. Doe II then called and spoke

with an HPD dispatcher, who told Doe II that she would have to wait for her mother to make a

report since she was 17. Ms. Brown came home and called HPD, and an HPD Officer responded.

The HPD Officer took notes, wrote a report, interviewed Doe II and Ms. Brown, and called an

ambulance. Doe II told the name of the assailant to the officer and described the assailant. The

ambulance took Doe II to the hospital where a rape kit was taken. A medical exam at the time

showed vaginal and anal tearing. Dunbar was arrested on June 15, 2007. (SMF 52–54.)

HPD called Ms. Brown on or around June 15, 2007 and told her that Dunbar had been

arrested. HPD Detective Crocker investigated Doe II's case and picked up Ms. Brown and Doe II

at their house that same day. He took them to the HPD station, where ASA Berg, a female

attorney, interviewed Doe II and Ms. Brown separately. Berg questioned Doe II about the

assault, whether Doe II had seen Dunbar after the assault, and what Doe II did after the assault.

Doe II told Berg that a rape kit was taken, that a medical exam revealed vaginal and anal tearing, and that she bled after the assault. Detective Crocker did not interview Doe II and no other HPD officers were in the room when Berg interviewed Doe II. Ms. Brown also told Berg about the vaginal and anal tearing. (SMF 54–55.)

Dunbar was kept in jail overnight, and Crocker interrogated Dunbar the next day. (SMF 54.) Berg was present and also interviewed Dunbar. (SMF 54.) Dunbar admitted to having sex with Doe II, but claimed it was consensual. (SMF 54.) Crocker told Dunbar that after talking with Doe II and her mother, they did not feel like Dunbar committed the crime, and if they did, then he would be charged. (SMF 54.) Berg told Ms. Brown that it was a "he-said-she-said" situation, and that Doe II was "too calm." Berg told Ms. Brown that Berg did not believe that Doe II had been raped, which is a credibility determination that the ASA must make. (SMF 56.) Doe II testified that she and Ms. Brown were upset after the interviews with the attorney. Doe II and Ms. Brown both testified that they believed that the case was over at that time. Doe II did not have any interaction with anyone on June 15, 2007 other than Crocker and Berg. (SMF 57.) Doe II was not told that Dunbar was going to be released. Berg did not approve felony charges, but issued a continuing investigation number for the case. (SMF 58.)

Doe II's rape kit was submitted to ISP for testing on June 15, 2007. ISP issued a Lab Report on April 14, 2008 indicating that semen was identified in the vaginal swabs taken from Doe II, but no spermatozoa. (SMF 53.) That Lab Report was copied to the CCSAO at the Markham Courthouse. ISP Lab Reports are sent to the police department and copied, or cc-ed, to the CCSAO, at which time the CCSAO would receive the Lab Report in the mail. ISP then attempted to obtain permission from the CCSAO to consume the evidence in testing, but was not able to obtain such permission. (SMF 59.) Neither Doe II nor Ms. Brown ever contacted HPD or

the CCSAO to find out what was going on with the case until Thomas visited the house in June 2011. (SMF 60.) There is no evidence that Joshua was personally involved in Doe II's investigation. (SMF 57.)

These facts do not present evidence of intentional discrimination based on gender by HPD. The HPD investigated the case up through an arrest, at which time the ASA determined not to approve felony charges. The ASA had all of the relevant information nut did not believe Doe II. The results of the ISP analysis were immaterial due to the identity of the assailant being known. Under these circumstances, there is no evidence that any decisions were made by HPD on the basis of gender.

### iii.    Doe III's Assault on April 28, 2008.

On April 28, 2008, Doe III was sexually assaulted by an associate, Michael Nichols, by following Doe III into the girls' bathroom at school, forcing her into a stall, and sexually assaulting her. Doe III did not yell for help. Nichols ejaculated on Doe III's pants and leg. Nichols ran out, and Doe III went and found one of her teachers. The teacher took Doe III to the principal, Ms. West, and the school called Doe III's parents and an ambulance. Doe III's mother arrived at the school and called the HPD. HPD Officer Oliver arrived and spoke with Doe III and Ms. Sales. Doe III went to the hospital and a rape kit was collected. Officer Oliver arrested Nichols at the school and transported him to the police station. Detective Armstrong was assigned to the case on April 28, 2008. He interviewed Assistant Principal Rizzo on April 28, who told Armstrong that nobody had heard anything despite classrooms being in close proximity, and that Rizzo had not seen any scratches, marks, bruises, or torn clothing on either Doe III or Nichols. Armstrong was also provided two written statements from teachers at the school. That same day, Armstrong interviewed Nichols with his mother present. Nichols

admitted to having sex with Doe III, but claimed that it was consensual. Armstrong released Nichols from police custody and into the non-secure custody of his mother. He was ordered to appear at the Information Desk at Juvenile Court at the Markham Courthouse on April 29, 2008 at 9:00 a.m. to receive his courtroom assignment. (SMF 63–66.)

On April 29, Armstrong interviewed Doe III. She told him about the assault and denied that it was consensual. She told Armstrong that she had prior consensual sex with Nichols in a school bathroom earlier that month. Armstrong filled out a Juvenile 101 Information Sheet and suggested a charge to the CCSAO of criminal sexual assault. Armstrong requested approval of felony charges. ASA DiAngelo reviewed the case for felony charges and interviewed Doe III and Nichols. The ASA told Doe III that Nichols said that the sex was consensual. Armstrong told Sales that the CCSAO was not going to charge Nichols because it was his word against Doe III's word. ASA DiAngelo declined to approve felony charges. (SMF 67–68.)

After ASA DiAngelo declined felony charges, Armstrong faxed a Petition for Delinquency ("Petition") to the CCSAO Juvenile Court Division, which requested that the CCSAO prosecute Nichols as a delinquent in juvenile court. After Armstrong faxed the Petition, the ASA for the Juvenile Division, Terry McGinnis, called Armstrong and spoke to him about the case. McGinnis indicated that she would speak to ASA DiAngelo before deciding whether to pursue a finding of delinquency against Nichols. Armstrong does not know the disposition of the juvenile proceedings against Nichols. He did not cause Doe III's rape kit to be submitted for testing in April 2008 because the identity of the alleged assailant was known and the assailant admitted to sexual intercourse. (SMF 69.)

On April 11, 2012, Doe III's rape kit in the April 28 assault was submitted to ISP for testing by Barb Revalee. On October 29, 2012, ISP authored a report indicating that a DNA

profile taken from sperm found on Doe III's vaginal swabs matched the DNA profile of a third person, Marlon Minter, whose DNA was already in CODIS. The DNA profile of sperm found on upper leg swabs did not match any profiles in CODIS. Detective Armstrong went to Doe III's house in 2012 to advise Doe III that a match had been made between the sperm in the rape kit taken from the April 28 assault and Marlon Mintor. Armstrong presented Doe III with a photo array, and Doe III could not identify Mintor from the photo array. Armstrong told Doe III to contact him if she wanted to pursue her case. Doe III decided not to pursue her case and did not contact Armstrong. (SMF 70–71.)

These facts do not prove intentional gender discrimination. Officer Oliver's handling of Doe III's initial report of sexual assault was appropriate. Plaintiff's own expert on police procedure, Dennis Waller, testified that HPD requesting felony charges against Nichols and then submitting the case to the CCSAO Juvenile Division after felony charges had been declined would seem like a "fairly comprehensive" investigation.(SMF 72.) Waller testified that the only deficiency in the investigation of the April 28 assault was HPD's failure to submit the rape kit in 2008, but Waller also testified that the only reason for submitting the rape kit to ISP in the April 28 assault would have been for comparison of the DNA profile to other outstanding cases in CODIS to clear those other outstanding cases. (SMF 72.) When asked why Waller had omitted certain facts related to the April 28 assault from his report, Waller admitted that "the issue was more of the May 15 sexual assault." (SMF 72.) Under these circumstances, no Harvey employee discriminated against Doe III in relation to her April 28 assault.

#### iv.     Doe III's Assault on May 15, 2008.

Doe III was assaulted again on May 15, 2008 by a stranger. Doe III left school without permission and met the assailant in a park near the school. She had never met the assailant

before, and she did not know his name. They were walking together, when the assailant grabbed her from behind and forced her into an abandoned house. He then raped her from behind. Afterwards, she could remember what he was wearing, but could not remember what his face looked like or identifying tattoos or marks. She would not be able to identify him if she saw or heard him today. There were no witnesses. She did not yell. She does not know if he ejaculated. After the assault, Doe III returned to the school and told her teacher what had happened. Her parents were called and her father picked her up. Doe III went home with her father, where she met her mother, and then her mother took her to the hospital. At that point, the hospital contacted the police, but nobody told Doe III or Sales that the police were on their way. The HPD arrived after Doe III had left and picked up the rape kit. A couple of days later, Doe III and her mom went to the HPD station and spoke with Commander Patterson. Patterson took notes and told Doe III that an officer would come out to her house to take a report. Officer Smith then went to Doe III's house and arrived there about ten minutes after Sales. Officer Smith interviewed Doe III and Sales and took a report. (SMF 73–74.)

Doe III's rape kit was submitted to ISP for analysis on June 11, 2008. On July 23, 2008, ISP authored a report stating that no semen had been identified, but that saliva had been indicated from swabs of Doe III's neck. There was no other physical evidence or witnesses, and an offender has yet to be identified. There is no evidence that Joshua was personally involved in this investigation. (SMF 75.)

These facts do not prove intentional gender discrimination. Doe III could not identify the suspect. The rape kit was processed in a timely manner and no suspect was identified in the rape kit. Without a suspect, the investigation could not progress. This is not gender discrimination.

**v.      Doe IV's Assault on November 30, 1999.**

Doe IV was sexually assaulted on November 30, 1999 behind a house by a stranger. She was 13 years old at the time. She did not see her assailant's face or clothes. She saw the color of the skin on his hand, and knew that he was African American. Doe IV could not visually identify her assailant if she saw him today. After the rape ended, the assailant ran off. Doe IV went to a nearby church and told the pastor what happened. The pastor called HPD and then went to get Doe IV's parents, who lived a few blocks away. HPD Sergeant Soderlund and Officer Gerz (who is a female) arrived before Doe IV's parents arrived. Other officers arrived too. Gerz interviewed Doe IV and took a report. An ambulance was called and Doe IV's mother, Debra, spoke with the paramedics. The HPD collected a statement from Lamar Greenwood—a witness. Soderlund conducted a canvass of the neighborhood and asked the residents if they saw anything. Soderlund told Debra that he had gone to the scene of the assault. He checked the area for evidence. Debra took Doe IV to Ingalls Hospital. Gerz arrived at the hospital a few minutes later and continued interviewing Doe IV and taking a report. While they were at the hospital, an "all points bulletin" went out regarding Doe IV's rape. Gerz explained to Doe IV that the HPD was trying to find the attacker with the APB. Doe IV left the hospital and went home. Gerz stayed with Doe IV "from the beginning to end[.]" (SMF 76–78.)

The next day, HPD Detective Brooks and another officer came to Doe IV's house to investigate her case. Doe IV accompanied them to the scene of the rape, where Doe IV told them what had happened. On December 1, Debra gave the coat and shoes that Doe IV was wearing on the night of the rape to the HPD. Shortly thereafter, Brooks called Debra and asked her to bring Doe IV in for questioning, and Debra did so. Brooks then interviewed Doe IV about the details of the rape for 45 minutes to an hour and took notes. Within six months, Brooks called Doe IV and asked her to come to the police station and to look through a book of pictures. Doe IV went

to the station and spent 30 to 45 minutes looking through 100 or more pages, each with nine pictures on them. She was not able to identify her assailant from the pictures. At some point within 12 months of the rape, Brooks spoke with Doe IV's counselor, Kathy Brown, and requested that she authorize a hypnosis session. Brown did not authorize the hypnosis session because they would not let Brown attend. (SMF 79–80.)

Doe IV met with CCSAO Investigator Thomas on October 18, 2010 regarding her case. That same day, Thomas called Crocker and advised him to send Doe IV's rape kit to ISP for analysis, which Crocker agreed to do. Doe IV testified that in March 2011, Thomas told Doe IV that they had found her rape kit "in the basement of the police station in a corner, out of the evidence room, and if you were not looking for it, you wouldn't have never found it." On August 1, 2011, Thomas noted that ISP only found trace semen in Doe IV's rape kit and that the profile was not good enough to put in CODIS. There was not sufficient male DNA from the vaginal swabs taken from Doe IV to submit to CODIS. Doe IV testified that Thomas told her that they had a "hit" on the rape kit, but that there was not enough DNA or evidence to go after the person. Thomas denied at his deposition that he told Doe IV that there was a "hit" on the evidence. Thomas told her that there was not enough DNA to say who the assailant was. (SMF 81.)

There is no evidence that Brooks, Soderlund, or Gerz intentionally discriminated against Doe IV based on her gender. Multiple investigatory techniques were used, including photo review, interviews of witnesses, review of the crime scene, canvassing of the neighborhood, and even hypnosis was suggested. When asked to give reasons that she believed she had been discriminated against based on gender, Doe IV could give none. HPD submitted the rape kit late, but the rape kit yielded no DNA when it was submitted in 2010. There is no proof that HPD failed to submit the rape kit based on Doe IV's gender.

**4.      Other Evidence Contradicts the Existence of a Policy of Intentional Gender Discrimination.**

In addition to the statistics, the express policy, and the facts of the plaintiffs' cases failing to support a claim for intentional gender discrimination, there is other evidence that directly contradicts Plaintiffs' allegation of an intentional policy to discriminate based on gender.

First, sexual assault reports made to HPD by female victims are routinely investigated and solved in a timely manner. (SMF 109.)

Second, the evidence at most describes allocation of scarce law enforcement resources based on crime, not sex. Status as a victim of sexual assault is not a protected class. *McCauley v. City of Chicago*, 671 F.3d 611, 618–19 (7th Cir. 2011) ("Plaintiff] has alleged only that the City failed to have particularized safeguards in place for the special protection of domestic violence victims. For the reasons we have explained, this does not state a *Monell* equal-protection claim against the City."); (Doc 63 in 1094 Case, denying motion to dismiss and finding that plaintiffs stated a claim for gender discrimination). HPD's allocation of law enforcement resources, absent intentional discrimination based on gender, does not violate the Equal Protection Clause. *See McCauley*, 671 F.3d at 619 (finding that allocation of police resources does not, in and of itself, violate the Equal Protection Clause); *Bond*, 728 F.3d at 694 ("[T]he equal protection clause does not authorize the judiciary to take over priority-setting for law enforcement."). In this case, Thomas described an example where a female victim, M.M., reported a burglary and received prompt service from HPD with respect to her report of burglary, but the same female had reported a rape three weeks prior to the burglary and did not receive prompt service. (SMF 106.) Plaintiffs' expert, Waller, admitted that M.M. had been treated "in a disparate manner by the HPD *based on the type of case*." (SMF 107.) Plaintiffs' other expert, Dr. Lonsway, also observed that HPD may be acting with skepticism found consistently in our United States culture towards

reports of sexual assaults, which she admitted is skepticism based on the type of crime and *not* on the gender of the victim. (SMF 87.) The testimony of Thomas and both of Plaintiffs' experts supports a finding that Harvey allocated resources based on the type of crime, not on gender.

Third, Joe Thomas was a detective, then a sergeant-detective, and then the Commander of the Investigations for the HPD before becoming an investigator with CCASO, and the undisputed evidence is that he possessed no discriminatory intent towards females. Thomas testified that he followed HPD Policy 3.01.31 requiring assignment and investigation of sexual assault cases. While investigating reports of sexual assault, Thomas testified that there was not a "check off" list of investigation techniques to use, and that techniques must be determined on the circumstances of the cases. He assigned and investigated all sexual assaults, and every rape kit was submitted to the lab for analysis during his command. (SMF 104–05.) When Thomas was promoted to Commander of the Investigations Unit, he replaced two detectives that he did not feel were doing their jobs (and demoted them to patrol) with two detectives in which he had confidence. He kept one detective (Det. Martin) in the unit, who he had confidence in. (SMF 90.) He expected the officers under his command to also follow Policy 3.01.31, and to the best of his knowledge, they did. (SMF 104.) While he was a detective, Joe Thomas did not give cases any more attention because the victim was either a male or female. In the cases that he investigated while at the HPD, Thomas did not prioritize cases and did not investigate one case more than another case based on the gender of the victim. As Commander, Thomas is not aware of any of the detectives under his command prioritizing cases based on the gender of victims. As Commander, the cases that Thomas assigned to himself were not prioritized based on gender. (SMF 89.)  Plaintiffs' expert, Waller, described him as an exceptional officer that does the right

thing. (SMF 108.) The very existence of Thomas in the HPD decries an intentional policy of discrimination based on gender.

Fourth, several witnesses, including independent ASAs, have completely disavowed observing discrimination by the HPD toward victims of crimes based on gender. ASA Schultz testified that she did not observe anything that would indicate that the HPD discriminates against female victims of sexual assault based on gender. ASA Berg did not have any criticism of the way that HPD investigated sex crimes, and did not have any personal knowledge of Harvey failing to investigate sex crimes based on gender. Defense expert, Jack Ryan, observes that there is no evidence with respect to the manner in which the Harvey Police Department was investigating sexual assault cases to establish that there was any treatment of sexual assaults on woman differently from any other criminal investigations. Joshua testified that he did not treat Doe I, or any other crime victim in his career, differently based on gender. (SMF 89–94.)

The statistics are irrelevant and unreliable, and do not prove discriminatory impact. Plaintiffs also fail to prove discriminatory purpose because the statistics are insufficient to do so, there exists an express policy of gender-neutral investigation, each of the five assaults described in Does I-IV's cases were investigated in a manner based on the circumstances of the case, sexual assault cases are routinely investigated and solved, the evidence at most indicates allocation based on type of case and not of gender, Thomas exemplifies Harvey's gender-neutrality, and witnesses disavow any knowledge of gender discrimination. The Plaintiffs cannot identify any facts supporting their claim, and there is substantial evidence that Harvey conducts gender-neutral investigations. Plaintiffs were not intentionally discriminated against by any of the individual officers or detectives involved in their cases, let alone that they suffered a constitutional deprivation as a result of a deliberate custom or policy of Harvey.

**III.  Judgment Should Be Entered on Doe I's Due Process Claim.**

A state's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). There are two exceptions to this general rule: (1) where the state has custody of an individual and is in a "special relationship" with that person, and (2) "where the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011). Doe I pursues her claim under the second theory. (Doc. 179 at 2 in 1094 Case, court's order citing allegations that "defendants' action made [Doe I's] situation worse" in support of granting leave to add the due process claim.) Under the "state-created danger" theory, Doe I must prove that (1) HPD, "by its affirmative acts, created or increased a danger" that Doe I faced, (2) HPD's "failure to protect her from danger was the proximate cause of her injuries," and (3) HPD's "failure to protect her 'shocks the conscience.'" *Jackson*, 653 F.3d at 654.

**A.  Defendants Did Not Affirmatively Act to Create or Increase Danger to Doe I.**

The relevant inquiry is: "What actions did [the state actor] affirmatively take, and what dangers would [the victim] otherwise have faced?" *Windle v. City of Marion*, 321 F.3d 658, 661 (7th Cir. 2003). The facts in this case are virtually identical to the facts in the landmark *DeShaney* case. In *DeShaney*, a father was accused of physically abusing his son, Joshua. *DeShaney*, 489 U.S. at 192. After being admitted to a hospital for suspicious injuries, Winnebago County Department of Social Services ("DSS") obtained a court order placing Joshua in temporary custody of the hospital. After several days, DSS returned Joshua to the custody of his father subject to the father's voluntary agreement to a safety plan. *Id*. DSS visited Joshua's home for the next six months, during which time the caseworker observed suspicious injuries on Joshua's

head and that conditions of the safety plan were not being followed (e.g. Joshua was not attending school). *Id*. The caseworker recorded these incidents along with her suspicions that Joshua's father was still abusing him. *Id*. In November 1983, Joshua was again admitted to the hospital with injuries that DSS believed to be caused by child abuse and then returned home. *Id*. at 193. On the caseworker's next two visits, she was denied access to Joshua because he was allegedly sick. In March 1984, Joshua's father beat him so severely that he caused brain damage. *Id*. Joshua and his mother sued DSS for a violation of his substantive due process rights for failing to protect Joshua. *Id*. at 193. The Court found that DSS's actions in placing Joshua back in the home with the abusive father and letting him to reside there under continued suspicions of abuse did not comprise a state-created danger. *Id*. at 202.

Just like the DSS in *DeShaney*, HPD became suspicious that Robert was abusing Doe I on August 3, 1997. Just like the plaintiff in *DeShaney* claimed that the DSS failed to protect him and allowed him to reside in a house with an abuser, Doe I claims that HPD failed to protect her by failing to investigate Robert further and by allowing Robert to have access to Doe I. Just like in *DeShaney*, Robert again abused Doe I. (See Doc. 179 at 3 in the 1094 Case.) Just as the facts in *DeShaney* did not give rise to a due process violation, nor do they here. *DeShaney*, 489 U.S. at 201 ("While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.")

HPD's actions were actually less egregious than DSS's action. HPD did not take protective custody and then affirmatively place Doe I back into the house of her abuser, as DSS did. HPD contacted DCFS immediately and expected DCFS to protect Doe I (as it is permitted to do). (SMF 19, 44.) Joshua was aware that DCFS would remove a child from a home if it felt that

it was necessary, and believed that DCFS would make sure that Doe I was safe. (SMF 44.)

Joshua shared this belief with ASA Schultz. (SMF 44.) Joshua was correct in his belief: it is

undisputed that DCFS was *mandated* by DCFS Procedure 300.80(E)(3) to take protective

custody of Doe I unless it believed that the Robert was out of the house. (SMF 40–41.) Police

officers routinely rely on the state agency whose function is to protect families and children to

provide this protection to families and children in abuse, molestation, and domestic violence

situations. The HPD's actions in relying on DCFS to protect Doe I from any further abuse by

Robert was consistent with generally accepted policies, practices, and training in law

enforcement. Also, law enforcement routinely relies on a non-abusing parent to ensure that a

child is safe. Whereas in *DeShaney*, the DSS returned the plaintiff to the abuser, in this case,

Joshua believed that Doe I would reside with the non-abusing parent (as, indeed, she did). The

actions of the HPD in relying on Theresa to keep her daughter separated from Robert and safe

from further abuse were consistent with generally accepted policies, practices, training and legal

mandates. (SMF 45.)

   The only allegation that separates this case from *DeShaney* is Doe I's allegation that

Defendants stopped other agencies from investigating the sexual abuse. (Doc. 179 at 3.) This is

not true. The allegation arises from two DCFS notes, both written by Cralle and dated October

31, 1997. The first note indicates that Joshua told Cralle that Robert would be picked up or

arrested from 12143 S. Lowe, and that Teresa was being cooperative and due back in the police

station on November 4, 1997 for further information. The house at 12143 S. Lowe is not Doe I's

residence; it is the residence of Robert's mother, which is where Joshua believed Robert to be

living. The first note also read, "They'll send perp. Interview, don't want perp alert by CPI

(Cralle)." (SMF 28.) The second note stated only, "Per Harvey PD, do not intercede and interview before their arrest." It does not attribute this statement to any individual. (SMF 29.)

Assuming for the sake of this motion that HPD made the statements to DCFS contained in the notes, those statements did not place Doe I in greater danger. The requests memorialized in the DCFS notes relate only to DCFS's interview of Robert; they do not ask that DCFS stop investigating altogether. Furthermore, Defendants did not have any authority to stop DCFS from continuing its investigation or even from interviewing Robert. (SMF 42.) The perpetrator's arrest does not absolve DCFS of its independent responsibility to investigate. (SMF 30.) Although it is the policy of DCFS to cooperate with local law enforcement, the DCFS investigation is separate and DCFS can still make the decision to remove the child from the home. (SMF 42.) DCFS was *mandated* by DCFS Procedure 300.80(E)(3) and DCFS Rule 300.120 to take protective custody of Doe I if she was at risk. (SMF 40–41.) Further, three days after DCFS received and memorialized the requests from HPD, on November 3, Cralle traveled to Doe I's home at 14610 Lexington in Harvey and conducted an interview of Teresa and Doe I's two siblings. When one of the siblings told Cralle during that interview that Robert had visited the house, Cralle probed as to when and whether Doe I was present during the visit (the sibling denied that Doe I was present). (SMF 32.) On November 4, Cralle noted in her Family Assessment Factor Worksheet that Robert was no longer in the home and that he was not having contact with Doe I. She also noted that Teresa had cooperated and acted appropriately. (SMF 37.) Also, on November 4, Cralle spoke with a LaRabida employee named Brad regarding Doe I's counseling. Doe I had missed some counseling sessions. Brad told Cralle that Doe I was scheduled for counseling with Cathaline Martine. On November 19, Cralle called Teresa, and Teresa told Cralle that she had spoke with Cathaline and that counseling had been rescheduled. (SMF 34.)

In granting Doe I leave to amend her complaint, the court held that the allegation that Defendants "stop[ped] other agencies from investigating the allegations" was sufficient to state a claim for a due process violation. (Doc. 179 at 3.) The undisputed evidence, however, fails to support that allegation. Subsequent to HPD requesting that DCFS "not intercede and interview" Robert, DCFS in fact visited the home, interviewed the mother and siblings, determined that Robert was no longer in the home and that the caretaker was acting appropriately, and ensured that Doe I was scheduled for counseling. DCFS unilaterally determined that it was not necessary to take Doe I into protective custody or to seek court intervention for custody. (SMF 37–38.) Thus, HPD acts, even taken in the light most favorable to Doe I, did not increase Doe I's danger.

### B. The Defendants' Actions Did Not Proximately Cause Doe I's Injuries.

Proximate cause "is a fact specific inquiry, involving the consideration of time, geography, range of potential victims, and the nature of the harm that occurred." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 829 (7th Cir. 2009). In Doe I's case, as set forth above, the only "affirmative act" identified by Doe I is the HPD's request to DCFS not to interview Robert. That request did not proximately cause Doe I's injuries because, as set forth in detail above, DCFS continued its investigation and even visited the home after HPD made its request. DCFS also arranged, and checked in on, social services and counseling for Doe I after the HPD request. HPD reasonably relied on DCFS to protect Doe I.

Further, HPD and Joshua believed Robert to be out of Doe I's home. On August 5, Teresa told DCFS caseworker Pippion, Joshua, and ASA Schultz that she would never live with Robert again. (SMF 5.) Robert and Teresa both testified that Robert did move out of the home, and Doe I admitted that she did not "cross paths" with Robert until Thanksgiving 1997. (SMF 11.) Pippion decided not to implement a DCFS safety plan because he believed Robert to be out

of the home. (SMF 26.) On October 20, Cralle visited the home to see who was there. (SMF 27.)

On October 31, DCFS Notes indicate that HPD still believed that Robert was out of the home.

(SMF 28.) On November 3, Cralle noted that there was no proof that Robert was in the home

after he was asked to leave by DCFS and HPD. (SMF 31.) On November 4, Cralle visited the

home again and made inquiries regarding Robert's access. (SMF 32.) The undisputed facts are

that Robert was not interacting with Doe I until at least Thanksgiving 1997. Then, Teresa let him

back in the home. (SMF 11.) Teresa's actions in letting Robert back in the home were

unforeseeable to DCFS, which had closed its investigation, finding Teresa cooperative.

Likewise, they were unforeseeable to HPD. Teresa's intervening act broke the causal connection

between HPD's actions and Robert's subsequent abuse.

Further, the temporal scope of the abuse breaks the causal connection. Robert did not

begin abusing Doe I again until the summer of 2008, about a year after Doe I made her initial

report, and at least eight months after HPD requested that DCFS not interview Robert. (SMF 18.)

The eight month gap is too wide to causally connect Robert's subsequent actions to the HPD

investigation. Finally, after Robert's arrest in 2011, he was jailed 36 hours before his family paid

bond and he was released. (SMF 49.) If his bond had been posted in 1997 after being charged,

then Robert would have been out of jail and Doe I would have been in the same position.

### C.     Defendants' Conduct Does Not Shock the Conscience.

Action that "shocks the conscience" is "conduct which may be deemed arbitrary in the

constitutional sense." *Jackson*, 653 F.3d at 654. "Only the most egregious official conduct will

satisfy this stringent inquiry." *Id.* "Making a bad decision, or even acting negligently, does not

suffice to establish the type of conscience-shocking behavior that results in a constitutional

violation." *Id.* at 655. "[W]hile the 'shocks the conscience' standard lacks precise measurement,

only conduct falling towards the more culpable end of the tort spectrum of liability will be found to shock the conscience." *Id.* "Where, as here, public officials have time for reasoned deliberation in their decisions, the official's conduct will only be deemed conscience-shocking when it evinces a deliberate indifference to the rights of the individual." *Id.* "And because the state actor's conduct is evaluated along a spectrum of culpability, any analysis of potentially conscience-shocking behavior is necessarily fact-driven." *Id.* HPD's and Joshua's alleged failure to follow through with the investigation and prosecution of Robert is not conscience-shocking. HPD diligently investigated the case, and even arrested Robert and arranged for a polygraph examination three days after the initial report of abuse. (SMF 9.) HPD submitted the rape kit to the lab for analysis. (SMF 7.) Joshua interviewed Teresa and arranged for a VSI, and DCFS was contacted. (SMF 3–4.) These steps do not shock the conscience.

The investigation lost traction when Doe I recanted and Teresa stated that she was dropping charges. (SMF 14–15.) As Thomas testified, even the CCSAO does not pursue cases where the victim recants and the complaining witness is uncooperative. (SMF 115.) HPD's alleged failure to continue investigating at this point does not shock the conscience. This is particularly so in this case because HPD could still rely on DCFS to protect Doe pursuant to its Rules and Procedures. (SMF 40–41.)

## IV.     Judgment Should Be Entered in Favor of Defendants on Doe I's Claim Under the IDVA.

The IDVA provides that when a law enforcement officer "has reason to believe that a person has been abused," the officer "shall immediately use all reasonable means to prevent further abuse." 750 ILCS 60/304. Arrest is one of several means available to law enforcement officers, but the IDVA does not require officers to arrest every abusive individual; it only

requires officers to use reasonable means. *Id*; *Farrar v. City of Chicago*, 291 F. Supp. 2d 747, 755 (N.D. Ill. 2003).

Also, the IDVA does not impose a "general, open-ended duty to protect" a plaintiff who is protected by the IDVA. *Lacey v. Village of Palatine*, 232 Ill. 2d 349, 364 (Ill. 2009). The requirement that police officers "immediately use all reasonable means to prevent further abuse" indicates that the IDVA "envisioned some discrete, limited involvement by law enforcement officers and not an open-ended, general, or long-term duty to protect." *Id*. at 366–67. The Court in *Lacey* held that officers were not enforcing the IDVA and had no duty under the IDVA when, following an investigation regarding an alleged murder-for-hire plan directed against the plaintiff by her ex-boyfriend, against whom she had obtained orders of protection, the officers closed their investigation and denied the plaintiff's request to reconsider the investigation. *Id*. at 367–68. The plaintiff was subsequently murdered by her ex-boyfriend. *Id*.

The IDVA also contains a specific immunity: "Any act of omission or commission by any law enforcement officer acting in good faith in rendering emergency assistance or otherwise enforcing this Act shall not impose civil liability upon the law enforcement officer or his or her supervisor or employer, unless the act is a result of willful and wanton misconduct." 750 ILCS 60/306. "The Illinois courts have held that a police officer is not guilty of willful or wanton conduct unless he acted with actual or deliberate intention to harm or with an utter indifference to or conscious disregard for the safety of others." *Chelios v. Heavener*, 520 F.3d 678, 693 (7th Cir. 2008) (quotes omitted).

In this case, the court identified Doe I's claim as being based on Defendants' intention not to prevent further abuse, and their disregard of Doe I's complaints because of their bias against females. (Doc. 63 at 7 in 1094 Case, court order denying motion to dismiss.) The

evidence is contrary to such intention or bias. First, as demonstrated in detail in Section II, HPD does not discriminate against female victims of sexual assault. Also, Officer Frundle went to Teresa's house and took a report from her on the same night that she reported the abuse, August 3. At that time, he obtained a picture of the suspect, called an ambulance, and then ensured that Doe I was taken to the hospital, where a rape kit was taken. He also contacted DCFS. His report was adequate. (SMF 2.) On August 4, Joshua interviewed Doe I and Teresa. On August 5, Joshua transported Doe I and Teresa to a VSI, which was observed by DCFS. (SMF 3–4.) Joshua reasonably relied on DCFS to ensure the safety of Doe I. (SMF 44–45.) On August 6, Joshua had Robert arrested. Robert moved out of the house when he was released. (SMF 8, 11.) The HPD and its employees used all reasonable means to prevent further abuse. They were not willful and wanton.

At some point, Teresa told Joshua that she did not want to press charges. (SMF 15.) Also, Doe I recanted her allegations. (SMF 14.) Joshua was not willful and wanton in ceasing the investigation at the time. Thomas testified that the CCSAO also does not investigate when victims recant and complaining witnesses are uncooperative.

Finally, Robert did not abuse Doe I again until the summer of 2008, a year later. (SMF 18.) Joshua's action or inaction did not proximately cause that future abuse, and Joshua was not under a duty to protect Doe I from abuse that occurred a year later. *See Lacey*, 232 Ill. 2d at 367–68. Such abuse was unforeseeable. The conduct of HPD was not based on Doe I's gender (as set forth in Section II). The facts demonstrate that HPD intended to (and did) investigate this case until Teresa dropped the charges and Doe I recanted. Judgment should be entered in favor of Defendants on Doe I's IDVA claim.

## V.     Judgment Should Be Entered in Favor of Harvey on All *Monell* Claims.

Judgment should be entered on all *Monell* claims because there is no evidence of an intentional policy to violate either the equal protection clause or the due process clause. Harvey "cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Plaintiffs must establish a policy or custom through (1) an express policy that causes a constitutional deprivation when enforced, (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice, or that (3) the constitutional deprivation was caused by a person with final policymaking authority. *Estate of Sims v. Cnty. Of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007). Plaintiffs must establish that the policy or custom was the "moving force" behind the injury, and that some policymaker, made a deliberate choice to act or not act in a certain way." *Id*. at 514; *Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001). In this case, the Plaintiffs allege that Harvey had a policy or custom pursuant to each of the three theories. The undisputed evidence proves that no policy or custom existed and that Harvey's policies were not the "moving force" behind Plaintiffs' injuries. No policymaker made a deliberate choice to deprive females of investigations.

**A.    Harvey Does Not Have an Express Policy of Discrimination or Due Process Violations.**

As set forth in Sections II–III, Harvey does not have an express policy of discrimination or due process violations. It is the opposite. Harvey's express policy requires the investigation of all sexual assaults, regardless of gender.

**B.    Harvey Does Not Have a Widespread Practice of Discrimination.**

To succeed on a widespread practice claim, Plaintiffs must prove "facts tending to show that the City policymakers were aware of the behavior of officers, or that the activity was so persistent and widespread that City policymakers should have known about the behavior."

*Latuszkin,* 250 F.3d at 505. In addition, Plaintiffs "must show that the City policymakers were "deliberately indifferent as to [the policy's] known or obvious consequences." *Gable v. City of Chicago,* 296 F.3d 531, 537 (7th Cir.2002). The Seventh Circuit defines deliberate indifference in the context of municipal liability under a widespread practice theory to mean "a reasonable policymaker [would] conclude that the plainly obvious consequences of the City's actions would result in the deprivation of a federally protected right." *Gable,* 296 F.3d at 537.

There is no evidence of widespread, intentional discrimination. The evidence proves that HPD investigates crimes on a gender-neutral basis. There is no evidence that policymakers were deliberately indifferent to discrimination. The record is devoid of any evidence supporting a policymaker's intent to discriminate against women. Doe I is the only plaintiff to allege a due process violation, and she identifies no other cases in which the Due Process has been violated. Consequently, there can be no evidence of a widespread practice in this case.

C.     **The Alleged Discrimination in This Case Was not Committed by a Person With Final Policymaking Authority.**

A police supervisor is not a final policymaker for the purposes of § 1983 liability. *See Palka v. City of Chicago,* 662 F.3d 428, 435 (7th Cir.2011) (stating that because the police commander's "decisions were subject to review and implementation by a higher authority, he cannot be a final policymaker for the purposes of municipal § 1983 liability"). "The authority to *set* policy—i.e., to adopt rules for the conduct of government—distinguishes a 'final policymaker,' whose decisions may subject a municipality to § 1983 liability, from an official who merely possesses 'authority to *implement* pre-existing rules.'" *Waters v. City of Chicago*, 580 F.3d 575, 583 (7th Cir. 2009) (quotes omitted). "It is not enough for a plaintiff simply to show an intentional act by a policymaker that results in a constitutional deprivation." *Id*. "A §

1983 plaintiff must prove culpability, i.e., that the policymaker intentionally deprived him of a constitutional right." *Id*.

The final policy maker in the HPD is the Chief. He gives final approval on all policies. (SMF 95.) The cases of Does II–IV were investigated by detectives, whose decisions are subject to review. (SMF 99.) Doe I's case was investigated by the Commander of Investigations, but that position does not have authority to adopt the rules of conduct for the government and is also subject to review. (SMF 95.) The cases were not investigated by final policymakers.

> **D.      There Is No Evidence That an Unconstitutional Policy Was the "Moving Force" of the Alleged Constitutional Violations Suffered by Plaintiffs.**

As set forth in Section II.B., the Plaintiffs' cases were investigated by different detectives utilizing discretion based on the circumstances of each case. Because there is no overarching policy of discrimination, such policy cannot be the moving force of any constitutional violation. There is no evidence that an unconstitutional policy motivated, or was the moving force, behind any decisions made by the detectives in the Plaintiffs' cases.

> **E.      There Can Be No *Monell* Claim if There Is no Underlying Constitutional Violation.**

"[A] plaintiff must prove that the individual officers are liable on the underlying substantive claim in order to recover damages from a municipality under either a failure to train or failure to implement theory." *Windle*, 321 F.3d at 663. Since there are no underlying constitutional violations in this case, Plaintiffs' *Monell* claims must fail.

> **F.      The Evidence Proves That Harvey Has a Constitutionally Sufficient Training Program.**

 "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson,* 131 S. Ct. 1350, 1359 (2011).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id*. "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of the persons with whom the [untrained employees] come into contact." *Id*. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id*. "Thus, when city policy-makers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id*. "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id*.

In this case, HPD's training is not constitutionally deficient. All officers attend basic police training either at the Chicago Police Academy or at the Illinois Police Training Institute. After graduation, they are trained on the HPD Operations Manual, including all updates. New officers then have three to six months of field training, where a field training officer rides along with the new officer for on-the-job training. Field training includes topics such as responding to reports of sexual assault. (SMF 116.) Officers also get periodic on-site and in-service training and training provided by the Illinois Training and Standards Board. All investigators must attend the state's required 40-hour investigator's course, at which investigations of sexual assaults are addressed in greater detail. Many investigators attend the juvenile officer course. (SMF 117.)

A number of investigators attended training specific to domestic violence and sexual abuse and assault at NEMRT, including Detective Wallace (Child Abuse and Awareness for Patrol on 4/16/2002), Detective Barbee (Investigation of Domestic Violence on 11/11/2008 and Sex Crime Investigations on 6/7/2011), Detective Coleman (Domestic Violence/Crisis

Intervention on 3/12/2009), and Detective Crocker (Advanced Sex Crimes Investigations on 1/10/2008). Thomas, too, had training on investigating sexual assaults. Also, Joshua received an eight-hour course on sex crime investigations provided by the NEMRT in December 1995, in addition to his initial training and his training in investigations. Armstrong completed a 40-hour juvenile specialist program in August 2005, and a 40-hour program on Investigation & Prosecution of Child & Adolescent Sexual Abuse in October 2006. (SMF 123.) Even as recently as March 2013, HPD held two mandatory training sessions for Juvenile and Field Training Officers regarding Criminal Sexual Assault of a Child. (SMF 122.)

There is no evidence of Harvey employees, officers, or detectives that do not meet the state's minimum requirements. Nor is there proof that additional training, would have resulted in the investigations of the Plaintiffs' cases concluding any differently. The evidence is contrary to a "failure to train" claim and judgment should be entered on that claim.

## VI. Joshua Has Qualified Immunity for Claims Under the Due Process Clause and Equal Protection Clause.

The court's consideration of the qualified immunity defense involves two distinct steps: (1) the court must determine whether a plaintiff has presented the deprivation of a constitutional right; and (2) the court must consider whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The sequence in which the court addresses these two steps is left to the discretion of the court. *Pearson*, 555 U.S. at 236. But, once the qualified immunity defense has been raised, it becomes the plaintiff's burden to defeat it. *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008). Plaintiff's burden is to establish both the existence of a constitutional violation and that the constitutional right was clearly established. *Zorzi v. County of Putman*, 30 F.3d 885 (7th Cir. 1994). As set forth above, Sections II–III, the evidence is contrary to a finding of a constitutional violation in this case. Even if the

underlying constitutional violation were found, then Joshua would be entitled to qualified immunity because it was not clearly established in 1997 that Joshua could not rely on DCFS to protect Doe I. Also, DNA analysis was not used as routinely as it is now, and it was not clearly established that in 1997 Joshua was required to submit DNA evidence considering the circumstances of the case. (SMF 110.) Further, it was not clearly established that Joshua was not entitled to prioritize crimes based on the resources of the department. These factors require a finding that Joshua has qualified immunity for both the due process and equal protection claims.

**VII.    Judgment Should Be Entered in Favor of Defendants on Doe I's Claim for Conspiracy Under § 1985.**

Section 1985(3) "creates a cause of action against 'two or more persons' who conspire 'for the purpose of depriving . . . any person or class of persons of the equal protections of the laws, or of equal privileges and immunities under the laws." *Johnson v. County of Cook*, No. 08-C-2139, 2009 WL 331531, at *7 (N.D. Ill. Feb. 10, 2009) (quotes omitted). "[M]ere allegations of . . . conspiracy . . . are not sufficient to state a cause of action[.]" *Id*. (quotes omitted). Doe must show (1) a conspiracy, (2) a purpose of depriving, directly or indirectly, any person or class of persons the equal protection of the laws, or of equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) an injury. *Id*.  "Even under notice pleading, a complaint must indicate the parties, the general purpose, and approximate date of the agreement to form a conspiracy so that the defendant has notice of the charges against him." *Dismukes v. Admin. Office of the Illinois Courts*, No. 12-CV-8800, 2014 WL 2978173, at *5 (N.D. Ill. July 2, 2014) (Coleman, J.) (quotes omitted). In this case, the undisputed facts prove that the Defendants did not intend to discriminate based on gender. Because there is no evidence that Joshua conspired with another person, Doe I's claim fails.

**VIII.   Judgment Should Be Entered on Official Capacity Claims.**

"Actions against individual defendants in their official capacities are treated as suits brought against the government entity itself." *Walker v. Sheahan,* 526 F.3d 973, 977 (7th Cir. 2008). Because there is no basis for municipal liability against the City, it follows that there is no basis for official capacity claims against the individual defendants. *Estate of Sims,* 506 F.3d at 514–15. Summary judgment accordingly should be granted on all official capacity claims against Joshua.

## CONCLUSION

For the reasons above, Defendants' Motion for Summary Judgment should be granted on all counts.

**CITY OF HARVEY and ANDREW JOSHUA**

By:     *s/Benjamin M. Jacobi*
One of their attorneys

Benjamin M. Jacobi, #6296811
Gail L. Reich, #6279564
O'Halloran Kosoff Geitner & Cook, LLC
650 Dundee Road, Suite 475
Northbrook, Illinois 60062
Telephone: (847) 291-0200
Fax: (847) 291-9230
e-mail: bjacobi@okgc.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | 12 CV 1094 |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | Magistrate Maria Valdez |
| | ) | |
| CITY OF HARVEY, ROBERT BUCHANAN, | ) | Jury Trial Demanded |
| NEAL FRUNDLE, OSCAR PERRY, and | ) | |
| ANDREW JOSHUA, | ) | |
| | ) | consolidated with |
| Defendants. | ) | |

| | | |
|---|---|---|
| JANE DOE II and JANE DOE III, | ) | |
| | ) | |
| Plaintiffs, | ) | 12 CV 2069 |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | Magistrate Maria Valdez |
| | ) | |
| CITY OF HARVEY and ANDREW JOSHUA, | ) | Jury Trial Demanded |
| | ) | |
| Defendants. | ) | consolidate with |

| | | |
|---|---|---|
| JANE DOE IV, JANE DOE V, JANE DOE VI, | ) | |
| JANE DOE VII, and JANE DOE VIII, | ) | |
| | ) | |
| Plaintiffs, | ) | 14 CV 8424 |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | Magistrate Maria Valdez |
| | ) | |
| CITY OF HARVEY, | ) | |
| | ) | |
| Defendant. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on March __, 2015 I electronically filed ***Defendants City of Harvey and Andrew Joshua's Memorandum of Law in Support of Their Summary Judgment on Does I, II, III and IV*** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following registered CM/ECF participant(s):

Yao O. Dinizulu
dinizulu@dinizululawgroup.com

George Jackson III
gjackson@wackerlawllc.com

Todd L. McLawhorn
tmclawhorn@siprut.com

**CITY OF HARVEY and ANDREW JOSHUA**

By:     *s/Benjamin M. Jacobi*
        Benjamin M. Jacobi
        O'Halloran Kosoff Geitner & Cook, LLC
        650 Dundee Road, Suite 475
        Northbrook, Illinois 60062
        Telephone:  (847) 291-0200
        Facsimile:  (847) 291-9230
        E-mail:  bjacobi@okgc.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | 12 CV 1094 |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | Magistrate Maria Valdez |
| | ) | |
| CITY OF HARVEY, ROBERT BUCHANAN, | ) | Jury Trial Demanded |
| NEAL FRUNDLE, OSCAR PERRY, and | ) | |
| ANDREW JOSHUA, | ) | |
| | ) | consolidated with |
| Defendants. | ) | |

| | | |
|---|---|---|
| JANE DOE II and JANE DOE III, | ) | |
| | ) | |
| Plaintiffs, | ) | 12 CV 2069 |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | Magistrate Maria Valdez |
| | ) | |
| CITY OF HARVEY and ANDREW JOSHUA, | ) | Jury Trial Demanded |
| | ) | |
| Defendants. | ) | consolidate with |

| | | |
|---|---|---|
| JANE DOE IV, JANE DOE V, JANE DOE VI, | ) | |
| JANE DOE VII, and JANE DOE VIII, | ) | |
| | ) | |
| Plaintiffs, | ) | 14 CV 8424 |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | Magistrate Maria Valdez |
| | ) | |
| CITY OF HARVEY, | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2015 I electronically filed Defendants' Memorandum of Law in Support of Defendants Motion for Summary Judgment on Does I, II, III, and IV with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following registered CM/ECF participant(s):

| | |
|---|---|
| Yao O. Dinizulu | Todd L. McLawhorn |
| Jeffrey M. Brown | tmclawhorn@siprut.com |
| dinizulu@dinizululawgroup.com | |

jbrown@dinizululawgroup.com

George Jackson III
gjackson@wackerlawllc.com

**CITY OF HARVEY and ANDREW JOSHUA**

By: *s/Benjamin M. Jacobi*
Benjamin M. Jacobi
Attorney for Defendant
O'Halloran Kosoff Geitner & Cook, LLC
650 Dundee Road, Suite 475
Northbrook, Illinois 60062
Telephone:  (847) 291-0200
Facsimile:  (847) 291-9230
E-mail:  bjacobi@okgc.com