IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:12-CV-01094 |
| vs. | ) | |
| | ) | |
| THE CITY OF HARVEY, et al | ) | |
| | ) | |
| Defendants. | ) | Consolidated with |

| | | |
|---|---|---|
| JANE DOE II, et al, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:12-CV-2069 |
| vs. | ) | |
| | ) | |
| THE CITY OF HARVEY, et al | ) | |
| | ) | Consolidated with |
| Defendants. | ) | |

| | | |
|---|---|---|
| JANE DOE IV, et al, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:14-CV-8424 |
| vs. | ) | |
| | ) | |
| THE CITY OF HARVEY, a municipal corporation, | ) | |
| | ) | |
| Defendant | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

I.      Introduction ............................................................................................................ 1

II.     Standard on Summary Judgment ........................................................................... 1

III.    Statute of Limitations ............................................................................................. 6

        A. Constitutional claims ...................................................................................... 6
        B. Illinois Domestic Violence Act ...................................................................... 9

IV.     Equal Protection ................................................................................................... 11

        A. HPD has a widespread custom, policy, and practice of intentionally discriminating
           against female sexual assault victims. ........................................................ 11
           1. HPD's policies, customs and practices, or lack thereof, with respect to the
              investigation of sexual assault disproportionately affects women....................... 12
           2. Omissions or Policies of the HPD: HPD has no policies or training in place to
              ensure Harvey's officers and personnel appropriately investigate and handle
              sexual assault crimes. ............................................................................. 14
              a.  HPD's Operation Manual ............................................................ 15
              b.  Training of HPD personnel ......................................................... 16
           3. Historically, HPD has a custom and practice of failing to investigate Sexual
              Assault- thereby disparately treating women. ................................................ 19
              a.  HPD systematically failed to send and follow-up on DNA Evidence. ........... 20
              b.  HPD systemically failed to assign Sexual Assault Cases to Investigators. .... 23
              c.  HPD obstructed and discouraged Minor Female Sexual Victims from
                  reporting sexual assault crimes. ............................................. 24
              d.  HPD systemically failed to interview female Sexual Assault Victims........... 25
              e.  Female sexual assault victims are met with hostility and indifference by HPD.
                  ........................................................................................ 26
              f.  HPD systemically failed to track female sexual assault cases and evidence.. 26
              g.  HPD systemically underreported female Sexual Assault Crimes to the Illinois
                  State Police ............................................................................ 28
              h.  HPD failed to document female sexual assault investigations. ...................... 30
              i.  HPD failed in its investigation of even easy statutory cases. ...................... 31
              j.  HPD has knowingly and intentionally hired officers with a bias. ................. 33
        B. HPD's excuses for its failures are pretextual. ............................................. 35
           1. Doe I.......................................................................................... 35
           2. Doe II ......................................................................................... 38
           3. Doe III's Assault of April 28, 2008 ................................................ 39
           4. Doe III's Assault on May 15, 2008.................................................. 42
           5. Doe IV .......................................................................................... 44

6.  Wright v City of Philadelphia, 2005 U.S. Dist. LEXIS 28332 (E.D. PA November 17, 2005)(Ex 55) is illustrative of the case at hand..............................................45

C.  There was a total lack of Supervision and Accountability by the decision-makers, who in turn ratified the officer's actions....................................................................47

1.  Andrew Joshua is the policy-maker for Plaintiffs' Claims...................................47

2.  Andrew Joshua knew about the conduct of the Harvey Police Officers, and turned a blind eye to the constitutional deprivation of female sexual assault victims.....48

V.    Due Process Clause................................................................................................51

A.  Risk of Retaliation and the threat of harm was apparent to Defendants....................52

B.  HPD created a risk that Buchanan would retaliate, and placed Doe in a heightened danger by cutting off alternative avenues of aid, specifically through DCFS, the Courts, and to the State's Attorneys Office. ..........................................................54

1.  HPD wrongfully placed Doe I in the care of Teresa Buchanan, after having reason to believe that Teresa and/or Robert Buchanan would endanger the child...........55

2.  HPD cut off protection of the courts, by failing to secure a protective order.......56

3.  HPD cut off protection of DCFS, by instructing DCFS not to interfere in the investigation and failing to report Teresa Buchanan. ...........................................58

4.  Defendants cut off protection of the CCSAO. .....................................................60

C.  HPD's failure to protect was the proximate cause of the harm to Jane Doe, including the physical and psychological abuse by Robert Buchanan and the psychological abuse by Teresa Buchanan. ..........................................................................................61

VI.    Illinois Domestic Violence Act................................................................................64

VII.  Conspiracy under Section 1985 ...............................................................................68

VIII.  Conclusion ..............................................................................................................70

CERTIFICATE OF SERVICE ..........................................................................................71

## **TABLE OF AUTHORITIES**

**CASES**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986) ........................................ 6

*Bond v. Atkinson*, 728 F.3d 690 (7th Cir. Ill.2013)........................................................ 11

*Bond v. Walsh*, 2011 U.S. Dist. LEXIS 119778 (C.D. Ill. Sept. 8, 2011)(Ex 65) ........ 66

*Brokaw v. Mercer County*, 235 F.3d 1000, 1024 (7th Cir. Ill. 2000) ............................ 69

*Buchanan-Moore v. City of Milwaukee*, 576 F. Supp. 2d 944, 951 (E.D. Wis. 2008) ................ 53

*Celotex Corp. v. Catret*t, 477 U.S. 317, 323 (1986) ........................................................ 6

*Chavez v. Illinois State Police*, 251 F.3d 612 (7th Cir. 2001) ...................................... 13

*Chicago Miracle Temple Church v. Fox*, 901 F. Supp. 1333, 1345 (N.D. Ill. 1995) .................. 12

*City of Canton v. Harris*, 489 U.S. 378, 388 (1989)...................................................... 17

*Cumings v. Dekalb County*, 2013 U.S. Dist. LEXIS 130415, 21 (N.D. Ind. Sept. 12, 2013) ...... 62

*Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. Ill. 2009)............................. 11

*Davis v. Barber*, 853 F.2d 1418 (7th Cir. Ind. 1988)........................................................ 9

*Doe v. Board of Educ.*, 833 F. Supp. 1366, 1375 (N.D. Ill. 1993) ............................ 6, 7

*Doe v. Cahokia Sch. Dist.*, 2014 U.S. Dist. LEXIS 175455, 3 (S.D. Ill. Dec. 19, 2014) ............. 41

*Doe v. Hinsdale Twp. High Sch. Dist. 86*, 388 Ill. App. 3d 995, 999 (Ill. App. Ct. 2d Dist.2009) 9

*Doe v. Vill. of Arlington Heights*, 2012 U.S. Dist. LEXIS 43197 (N.D. Ill. Mar. 29, 2012).. 52, 55

*Dunn v. City of Elgin, Illinois*, 347 F.3d 641, 646 (7th Cir.2003) ................................ 17

*Guerrero v. Piotrowski*, 2014 U.S. Dist. LEXIS 128942, 11-12 (N.D. Ill. Sept. 16, 2014)......... 52

*Hall v. City of Chicago*, 2012 U.S. Dist. LEXIS 182546, 21-22 (N.D. Ill. Dec. 28, 2012) ... 17, 47

*Hare v. Zitek*, 414 F. Supp. 2d 834, 861 (N.D. Ill. 2005) ............................................ 48

*Harrell v. City of Chicago Heights*, 945 F. Supp. 1112, 1119 (N.D. Ill. 1996)......................... 52

*Hobert v. Covenant Children's Home*, 309 Ill. App. 3d 640, 644 (Ill. App. Ct. 3d Dist.2000)...... 9

*House v Belford*, 956 F.2d 711, 721 (7th Cir. 1992) ...................................................... 69

*Ingram v. NWS, Inc.,* 1997 U.S. Dist. LEXIS 17190, 36-38 (N.D. Ill. Oct. 21, 1997)................ 14

*James v. Vill. of Willowbrook*, 2012 U.S. Dist. LEXIS 102191, 19 (N.D. Ill. July 19, 2012) ..... 69

*Jefferson v. City of Harvey*, 1999 U.S. Dist. LEXIS 20158, 2-4 (N.D. Ill. Dec. 30, 1999).......... 35

*Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)................................... 49

*King v. Board of Regents of University of Wisconsin System*, 898 F.2d 533 (7th Cir. Wis. 1990)
.................................................................................................................... 14

*Lacey v Village of Palatine*, 904 N.E.2d 18, 28 (2009) ............................................................. 65

*Lewis v. City of Chicago,* 2005 U.S. Dist. LEXIS 7482, 13 (N.D. Ill. Apr. 26, 2005) ................ 17

*Lytle v. Household Mfg., Inc.,* 494 U.S. 545 (1990) ...................................................................... 6

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (U.S. 1978) .......................................................... 11

*Monfils v. Taylor*, 165 F.3d 511, 513 (7th Cir. 1998) ................................................................. 52

*Mosley v. Moran*, 798 F.2d 182, 186 (7th Cir. Ill. 1986) ............................................................. 9

*Obrycka v. City of Chicago*, 2011 U.S. Dist. LEXIS 70018, 29 (N.D. Ill. June 29, 2011) .......... 12

*Okin v. Village of Cornwall-On-Hudson Police Department,* 577 F.3d 415, 428 (2d Cir. 2009) 62

*People v. Hetzel*, 176 Ill. App. 3d 630, 635 (Ill. App. Ct. 2d Dist.1988) ..................................... 65

*People Who Care v. Rockford Bd. of Educ., Sch. Dist. # 205*, 851 F. Supp. 905 (N.D. Ill. 1994) 11

*Pulliam v. City of Chicago*, 2010 U.S. Dist. LEXIS 82795, 21(N.D. Ill. Aug. 12, 2010) ........... 52

*Pyke v. Cuomo*, 258 F.3d 107 (2d Cir. N.Y. 2001) ...................................................................... 13

*Rice v. Corr. Med. Servs.* (In re Estate of Rice), 675 F.3d 650, 675 (7th Cir. 2012) .................. 11

*Simmons v. Chi. Bd. of Educ.*, 289 F.3d 488, 494 (7th Cir. Ill. 2002) .......................................... 11

*Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029-30 (7th Cir. 2006) ..................... 17, 47

*Sobilo v. Manassa*, 479 F. Supp. 2d 805, 818 (N.D. Ill. 2007) ................................................... 62

*Suzik v. Sea-Land Corp.*, 1993 U.S. Dist. LEXIS 2004, 9 (N.D. Ill. Feb. 23, 1993) ................... 62

*Thomas v. Sheahan*, 499 F.Supp.2d 1062, 1095-96 (N.D. Ill. 2007) .......................................... 17

*United States v. Armstrong*, 517 U.S. 456 (1996) ....................................................................... 13

*Walden v City of Chicago*, 755 F.Supp.2d 942, 954 (N.D. Ill. 2010) ........................................... 6

*Williams v. City of Harvey*, 1994 U.S. Dist. LEXIS 6164, 1-3 (N.D. Ill. May 10, 1994) ........... 35

*Woods v. Ill. Dep't of Children & Family Servs.*,710 F.3d 762, 766(7th Cir. Ill.2013) ................. 9

*Wright v City of Philadelphia*, 2005 U.S. Dist. LEXIS 28332 (E.D. PA November 17, 2005) .. 45, 46, 47

**STATUTES**

325 ILCS 5/3 .......................................................................................................................... 56, 67

325 ILCS 5/7 .......................................................................................................................... 55, 69

42 U.S.C. § 1985 ........................................................................................................................ 68

720 ILCS 5/12-12 ...................................................................................................................... 32

720 ILCS 5/12-17 ...................................................................................................................... 32

725 ILCS 202/10 ..................................................................................................... 20

735 ILCS 3-202.2 ...................................................................................................... 9

745 ILCS 10/8-101(a) ............................................................................................... 9

750 ILC 150/60-102 ................................................................................................ 65

750 ILCS 60/102 ................................................................................................ 64, 65

750 ILCS 60/304 ........................................................................................... 9, 56, 65

**RULES**

Federal Rule of Evidence 412 .................................................................................. 41

## I.  Introduction

The *Doe* Plaintiffs have been victimized twice, first by the men who raped them, and second by a police department that utterly failed to fulfill its sworn oath to serve and protect the public, including the Plaintiffs.  The Harvey Police Department ("HPD") neither served nor protected when it came to female rape victims.  The HPD failed the *Doe* Plaintiffs on multiple levels.  The HPD failed to:  (1) implement adequate procedures and policies for sexual assault investigations; (2) provide the necessary training for sexual assault investigations; (3) track the status of sexual assault cases; (4) impose any discipline for repeated failures to investigate female complaints; (5) implement any procedures concerning the handling of sexual assault evidence; and (6) failed to even assign a detective to investigate the reported sexual assault in nearly one third of the cases.  The HPD's failures have been well chronicled outside this litigation, by, among others, the U.S. Department of Justice, the Illinois Association of the Chiefs of Police, and the Chicago Tribune.  Of note, despite the scrutiny placed on HPD's inadequacies as a result of numerous outside reviews and this litigation, HPD has only taken minimal steps to revise its policies concerning sexual assault investigations.

In fact, of the seven Plaintiffs represented by counsel in this case, following the Cook County State's Attorney's ("CCSAO") takeover of the investigations of those Plaintiffs' rapes, there have now been five criminal prosecutions, with four rapists now serving time in prison (one case is pending).  The HPD did not fail to bring these rapists to justice because the cases were tough to solve, the HPD failed because they were deliberately indifferent to the rights of women rape victims.  As former HPD Detective Joseph Thomas testified:  "When I was at Harvey I had phone call after phone call.  Their cases weren't getting worked on."  (Plf SMF ¶¶30, 37-39, Def Ex U, Thomas Tr. at 263.)    Thomas reported those problems up the chain of command, but

nothing was done; Thomas subsequently quit. Nor had matters improved several years later when Thomas coincidentally was the CCSAO Investigator who was assigned approximately 165 sexual assault cases from the HPD to investigate: "There was either a poor investigation or no investigation whatsoever." (*Id*. at 206.)

Notwithstanding the overwhelming evidence to the contrary, HPD boldly asserts as an undisputed fact in support of summary judgment that "Cases of sexual assault are routinely solved in a timely manner." (HPD Rule 56.1, ¶ 109) That statement is a lie, and a multifaceted one at that. Of the ten cases that HPD identified as solved for the years 1997 through 2012 (out of 859 cases), each of the ten cases had a common theme—Investigator Thomas or a confession. In other words, HPD's pathetic 1.5% solve rate drops to 0% if you exclude the work done by Investigator Thomas and confessions. And if it's unfair to measure the HPD's effectiveness by the solve rate (the HPD's professional expert will no doubt provide excuses for these startlingly low statistics), an examination of the most basic data reveals the same indifference. From 2008 to 2012—which was after the CCSAO took over the prior sexual assault investigations that the HPD had botched and when the HPD presumably would be on high alert--the HPD reported to the Illinois State Police (which was required by law), that there were only 75 sexual assaults reported during this time; in fact, the HPD files contain 263 sexual assault reports. (Plf SMF ¶71, Ex 23) HPD was thus only reporting about 1 out of every 4 sexual assaults. It is hard to imagine how the HPD ever investigated complaints that it refused to recognize were made.

A belatedly produced document by the HPD highlights the attitude and the discriminatory conduct that permeates the HPD. HPD Detective Armstrong investigated Doe III's case. On October 25, 2011, Chief Eaves reprimanded Detective Armstrong for failing to investigate "an Aggravated Criminal Sexual Assault of a child, in which an eleven year old child was allegedly

sexually assaulted by her grandfather and threatened with a handgun by him." (Plf SMF ¶74, Ex 25, HPD 30606). Detective Armstrong's reasons for failing to investigate are chilling—and completely consistent with what Plaintiffs have long contended. Detective Armstrong (and there are only four Detectives at the HPD) told his superiors that he "did not think the case was a priority over [his] other cases because the case was delayed two years," the case "got mixed up in with all of [his] other cases," "the Harvey Police Department is outdated" and he was "tired of being harassed about such minute things as of which case [he is] doing first." (Plf SMF ¶75)

Of course, one rogue officer does not prove a department-wide practice, and the HPD's reaction to Armstrong's failures could perhaps provide the HPD some cover. Thus, the HPD might argue that it fired Armstrong immediately for such a gross dereliction of his duties, that it immediately initiated a review of his cases to determine if his other assigned sexual assault investigations languished, and that it issued written procedures designed to ensure this could not reoccur—only the HPD did no such thing. Following the precedent set by his predecessor, former Chief Joshua, Chief Eaves took no serious disciplinary action, initiated no further review, and issued no new procedures. Instead, Chief Eaves issued a written reprimand, which is the same punishment doled out for petty infractions.

The failure to take any remedial action with respect to its officers and detectives ignoring issues affecting females is typical of the HPD. Even today—after all that has happened with respect to the HPD's failure to submit sexual assault evidence kits to the Illinois Crime Lab— including a CCSAO takeover of sexual assault cases that has resulted in at least 19 convictions (Plf SMF ¶109, Ex 49, CCSAO 1576), and front page coverage from the Chicago Tribune, not a single person from the HPD was disciplined or held accountable. Sergeant Gordan responded, when asked for an explanation how the HPD could have failed to submit sexual assault evidence

kits to the Illinois Crime Lab: "There is no explanation for that." (Plf SMF ¶109, Def Ex J, Gordan Tr. 145.) Sergeant Gordan is wrong. There is a simple explanation, and the jury is entitled to reach that conclusion: Harvey is deliberately indifferent to female crime victims.

To make matters worse, Detective Armstrong's callous attitude towards females is no surprise to the HPD. When it hired Armstrong in 2004, the HPD knew that Armstrong had a previous domestic violence incident, yet hired him anyway. Detective Armstrong's hiring was not an anomaly. Although the HPD was able to successfully avoid producing most of its hiring and personnel information in discovery, the limited discovery that was produced is illuminating—Harvey had officers and detectives investigating sexual assault cases who had cases involving crimes against women and domestic violence against *them*. Harvey even hired at least one Detective who had been *convicted* of sexual assault, another officer with multiple accounts of sexual abuse, and yet another officer who had been sentenced to prison for pressuring a woman he pulled over for a traffic violation into performing a sex act. Per Dr. Lonsway, from the non-profit End Violence Against Women International, the academic research in this area is unequivocal—applicants with histories of domestic abuse or sexual harassment should not be investigating sexual assaults. (Plf SMF ¶¶77-78). Even Chief Joshua and the HPD expert Jack Ryan appear to agree with this. (Plf SMF ¶¶87,90-91). While Plaintiffs' case is not dependent upon proving that the HPD's male-dominated police force was full of misogynists with outdated attitudes towards females and rape allegations, the limited information Plaintiffs have points strongly in that direction.

As a close to this sorry story, HPD now comes before this Court and submits an affidavit from—of all people—Detective Armstrong in support of its summary judgment argument that it does everything by the book. This Court should not take such arguments seriously. If the

subject matter were not so painful—Plaintiffs have each been raped, were mistreated by the police system, and now have been forced to relive and retell their rapes in order to vindicate their constitutional rights—it would be laughable that the HPD would base summary judgment on such testimony.

The HPD's failures and deliberate conduct has led to catastrophic results for females. In the case of Doe I, the HPD deliberately placed an 11 year old rape victim back into the home of the stepfather she identified as her rapist, and who had left semen in her vagina, despite her pleas that her stepfather was the rapist. Rather than take a buccal swab from the stepfather in order to confirm or refute Doe I's claims, which was a routine and simple investigatory step, the HPD closed the investigation and waived off DCFS efforts to intervene. The result was predictable and horrific—Doe I was raped *over 100 times* by her stepfather over the next several years. (Plf SMF ¶¶115-116). It was not until the CCSAO took over Doe I's case that the stepfather, Robert Buchanan, was arrested, prosecuted and subsequently convicted and sentenced to prison.

The HPD's failure to provide services to a protected female class is the paradigm of an equal protection violation. It is no different from the bigoted white police forces of the old South refusing to provide police protection to blacks, and that practice should meet the same fate—it should be identified, condemned and eliminated. The HPD's deliberate indifference and willful disregard of the complaints of the *Doe* plaintiffs permitted rapists to remain free, subverted the justice system, and further damaged the *Doe* plaintiffs by denying them justice. Each Plaintiff has suffered severe emotional distress and other injuries as a result of the HPD's knowing failure to protect them from the spectre of their rapists returning to rape again.

Plaintiffs are entitled to have a jury decide whether the HPD's conduct rises to the level of constitutional violations. Hopefully a jury verdict will open the HPD's ears to the cries of those female rape victims that it has refused to hear.

## II.      Standard on Summary Judgment

The Court must consider all evidence in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). The Court may not make credibility determinations or weigh the evidence. *Lytle v. Household Mfg., Inc.,* 494 U.S. 545 (1990). If the moving party is unable to demonstrate the absence of any genuine issue of material fact, the Court must deny the motion for summary judgment. *Celotex Corp. v. Catret*t, 477 U.S. 317, 323 (1986).

## III.      Statute of Limitations

## A.      Constitutional claims

Plaintiffs' complaints were timely. Each complaint was filed within two years from when Plaintiffs knew or should have known that Defendants Harvey and Andrew Joshua (hereinafter collectively, "HPD") discriminated against them because of their gender in violation of their constitutional rights.[1]

A Section 1983 claim accrues when a plaintiff knew or should have known that her constitutional rights have been violated. *See Walden v City of Chicago*, 755 F.Supp.2d 942, 954 (N.D. Ill. 2010); *Doe v. Board of Educ*., 833 F. Supp. 1366, 1375 (N.D. Ill. 1993). In *Doe v Board of Educ.*, plaintiff was sexually assaulted by a teacher in 1986. Plaintiff did not file suit within two years of her 18th birthday. Defendants argued that plaintiff was time barred. The court, however, found that the statute was tolled. The court held that although the plaintiff knew

---

[1] Doe III was 17 years old when the complaint was filed on March 21, 2012. HPD concedes her complaint is timely.

she was abused, she had no reason to know of the Board's constitutional violation, and it was not reasonable to expect her to discover such efforts. Consequently, plaintiff's case was not barred by the statute of limitations. *Id.* at 1375-1376.

The alleged constitutional violation in this case is discrimination against female sexual assault victims. Plaintiffs had no reason to suspect that that HPD had improperly investigated and/or that HPD discriminated against them because they were females, until there was evidence of a visible and widespread pattern and practice of discriminatory treatment. As HPD itself agues, to establish a widespread practice, one must look at the inner workings of the HPD. Plaintiffs, who are individual victims, have no privy to the workings of the HPD, or to HPD investigations of other victims in sexual assaults. Consequently, Plaintiffs could not become aware of HPD's pattern and practice of discrimination against sexual assault victims until they were notified by authorities that CCSAO had reopened the investigation and determined that HPD had failed to investigate.

As an initial matter, HPD's claim that "Defendants did not affirmatively conceal the cause of action" is simply wrong (Def. Mem. at 2). HPD offers no citation or support for its naked assertion. As explained below, the facts are to the contrary: (1) HPD did not inform victims of the status of investigations, and refused to provide copies of police reports to them; (2) HPD did not accurately report sexual assaults to the Illinois State Police as required by law; and (3) HPD took no corrective measures following the raid by the CCSAO or the Audit Report by the ISP to inform victims of their botched investigations.

The complaints filed in this case are timely. Doe I filed on February 7, 2012. She learned of her claims on May 17, 2011. (Plf SMJ ¶127, Ex 32, CCSAO Harvey 531). The result was that her assailant was sent to prison on May 2, 2013. (Plf SMJ ¶129, Ex 36, HARVEY PD 11277-

11288). Doe II filed on March 21, 2012. She learned of her claims in August 2011, when she was informed by the authorities of the investigation. (Plf Resp ¶¶61-62, Ex 13, Doe II 7). The result was that in December 2013, her assailant was sent to prison. (Plf Resp ¶62, Ex 37, HPD 25956-25968).

Doe IV first became aware of HPD's discrimination of female sexual assault victims through articles she read about the filing of the *Doe I* and *Doe II* cases, published in 2012. (Plf Resp ¶82, Def. Ex H, Doe IV, 140:22-141:16). Even if she suspected HPD discriminated at an earlier date, Doe IV had no reason to know she was a member of that class who was discriminated against until March 2011, when CCSAO Investigator Joe Thomas informed her that her sexual assault kit had been mishandled. (Plf Resp ¶82, Def Ex H, Doe IV, 61:17-66:21). After the 2007 raid of the HPD, Doe IV's mother and Doe IV spoke with Thomas, who was assigned to investigate 165 mishandled Harvey's sexual assault cases on October 2010.[2] (Plf Resp ¶¶82, 113, Def Ex H, Doe IV, 61:17-66:21). Doe IV inquired as to her case. (Plf Resp ¶82, Def. Ex U, Thomas, 189-190, Def Ex H, Doe IV, 61:17-66:21).

Because of the poor record keeping at HPD, it was not easy to locate Doe IV's case. In March 2011, Thomas returned Doe IV's call and told her that he had located the rape kit. (Plf Resp ¶82, Def Ex H, Doe IV, 63:19-65:16). "They found my rape kit in the basement of the police station in a corner, out of the evidence room, and if you were not looking for it, you wouldn't have never found it." (Plf Resp ¶82, Def Ex H, Doe IV, 65:14-16). Consequently, until March 2011 Doe IV had no knowledge that HPD had mishandled her case. Prior to that time, Doe IV believed that the case had been worked and no one had been identified. Under HPD's theory, Doe IV's claim was barred in 2003, but as of October 2010 even the CCSAO did not

---

[2] Joe Thomas noted in the file that Doe IV's mother was the second person calling him to find out about the status of a HPD cases, within days of having them assigned to him to investigate. (Plf Resp ¶82, Def Ex U, Thomas, 262).

know that Harvey had failed to investigate. If the CCSAO did not know until 2010 or 2011, it is not possible for Doe IV to have known.

## B.    Illinois Domestic Violence Act

The Childhood Sexual Abuse Act ("CSA" Act), 735 ILCS 5/13-202.2 applies to Doe I's causes of action under the Illinois Domestic Violence Act ("IDVA").[3]

The CSA Act provides a 20 year statute from the age the child reaches 18 years old.[4] The Illinois Courts have held that the statute not only applies to the abuser, but those who have a duty to protect the child, including municipalities. *Doe v. Hinsdale Twp. High Sch. Dist. 86*, 388 Ill. App. 3d 995, 999 (Ill. App. Ct. 2d Dist.2009); *Hobert v. Covenant Children's Home*, 309 Ill. App. 3d 640, 644 (Ill. App. Ct. 3d Dist.2000); *Woods v. Ill. Dep't of Children & Family Servs.*,710 F.3d 762, 766 (7th Cir. Ill.2013). Similarly, the CSA Act is applicable to a victim's claim against HPD, non-abusers having a duty to protect under the IDVA.

The IDVA imposes an affirmative duty on law enforcement to "**<u>use all reasonable means to prevent further abuse when they believe a person is a victim of domestic abuse</u>**." 750 ILCS 60/304. Because HPD had a state legal duty to protect her from domestic sexual abuse, the appropriate statute of limitations in this case is 20 years from when Doe I turned 18, or within 20 years of the date the Doe I discovers both (i) that the act of childhood sexual abuse occurred and (ii) that the injury was caused by the childhood sexual abuse; which ever is later. Doe I's birth date is June 1, 1986. Doe I turned age 18 on June 1, 2004. The statute of limitation

---

[3] The Child Sexual Abuse Statute is the more specific statute for this specific cause of action. *Mosley v. Moran*, 798 F.2d 182, 186 (7th Cir. Ill. 1986)(It is a principle of statutory construction "that a more specific statute will be given precedence over a more general one.")

[4] The Statute 735 ILCS 5/13-202.2 originated in 1990, and was amended in 2003 and 2010. The amendments are applicable when Doe I's action would not have been time barred under any statute of limitations or statute of repose prior to the effective date of the 2003 and 2010 Amendatory Act. (735 ILCS 3-202.2(e)). Plaintiff was 17 years old at the time of the 2003 amendment, and therefore her claim was not barred at that time. Moreover, Plaintiff's claim was not barred in 2010, when under the 2003 amendment her cause of action needed not be filed for 10 years after she turned 18 (at the age of 28). In 2010, Doe I was 24 years old. Under the statute, Doe I's action is tolled until she reaches the age of 38 (20 years from the age of 18).

runs as of June 1, 2024, at its earliest.

Moreover, even if the statute of limitation is a year, Doe I's claim is tolled by the "discovery rule." Doe I, 11 years old, had no reason to know that HPD did not "use all reasonable means to prevent further abuse." Doe I had been told from the age she was a child that there was simply no evidence because Robert Buchanan's lie detector test was inconclusive. (Plf SMF ¶114, Def Ex E, Doe I, 90:19-92:25). Doe I had no reason to think otherwise.

Doe I also was not cognitive of the injury resulting from HPD's wrongdoing – the subsequent assaults. According to the expert Dr. Medlin, Doe I's memory is disjointed. Doe I only remembers bits and pieces of the abuse. (Plf Resp ¶47, Ex 30, Medlin's Report, page 29). Doe I blocked out most of her memories of the sexual abuse, but her memories were triggered when she was contacted by the investigator in 2011. (Plf Resp ¶47, Ex 30, Medlin's Report, page 29; Def. Ex E, Doe I, 147:3-10, 174:6-9).

HPD argues that Teresa Buchanan's knowledge should be imputed to Doe I. This argument fails for two reasons: (1) it is a question of fact whether Teresa had such knowledge, and (2) if the jury believes Teresa knew, Doe I's claim fits the exception to "imputation" because Doe I asserts an injury from the intentional felonious act of a parent, Teresa – who wrongfully interfered in an investigation. Teresa denies any knowledge or requesting that the investigation be stopped:"I thought that maybe they didn't find anything" in the rape kit. (Plf Resp ¶26, Def. Ex T, T. Buchanan, 99:3-100:20). Teresa's testimony suggests that she had no knowledge of any wrong doing by Defendants. On the other hand, if the jury believes that Teresa asked Andrew Joshua to drop the charges, her knowledge is not imputed to Doe I. An exception to the imputation rule is where the child victim asserts an injury from the intentional felonious act of a parent. Teresa's wrongful interference in an investigation and request to Andrew Joshua to drop

10

the charges, is such an act. *Doe v. Roe No. 1*, 52 F.3d 151, 154 (7th Cir. 1995). Doe I's claim

under the IDVA is timely.

## IV.     Equal Protection

Under *Monell*, a municipality's violation of the Equal Protection Clause can be proven by

**either** a widespread practice that constitutes a "custom or usage" **or** a constitutional injury

caused or ratified by a person with final decision making authority. *Rice v. Corr. Med. Servs*, 675

F.3d 650, 675 (7th Cir. 2012); *Darchak v. City of Chi. Bd. of Educ*., 580 F.3d 622, 629 (7th Cir.

Ill. 2009); *Simmons v. Chi. Bd. of Educ.*, 289 F.3d 488, 494 (7th Cir. Ill. 2002); *City of St. Louis

v. Praprotnik,* 485 U.S. 112, 127 (1988); *Monell v. Dep't of Soc. Servs*., 436 U.S. 658 (U.S.

1978). Plaintiffs have alleged both.

## A.     HPD has a widespread custom, policy, and practice of intentionally discriminating against female sexual assault victims.

Adoption of a policy that bears more heavily on women than on men, yet lacks any

apparent justification, could support an inference that the defendants chose the policy because of

its adverse effect on women. *Bond v. Atkinson*, 728 F.3d 690 (7th Cir. Ill.2013).

HPD argues there is no direct evidence of intent; however, it is extremely rare where

there is direct evidence – a "smoking gun" - of intent/deliberate indifference.[5] *People Who Care

v. Rockford Bd. of Educ., Sch. Dist. # 205*, 851 F. Supp. 905, 932 (N.D. Ill. 1994). Circumstantial

evidence is sufficient to establish intent. The types of proof which support an inference of intent

include: statistics; foreseeable impact of decisions; discriminatory impact of acts, omissions or

policies of the defendant; the absence of training; and the history of events leading to conduct

maintaining or exacerbating discriminatory imbalance. *Id*. If the same problem has arisen many

times and the municipality has acquiesced in the outcome, it is possible to infer there is a policy

---

[5] HPD conflates the elements of Plaintiff's claim with the type of evidence used. That HPD denies that it discriminated does not make it so; it just means that circumstantial evidence is needed for intent.

at work. *Obrycka v. City of Chicago*, 2011 U.S. Dist. LEXIS 70018, 29 (N.D. Ill. June 29, 2011)(Ex 44). Discriminatory intent need not be the sole purpose motivating the challenged conduct, as long as the discriminatory purpose was a motivating factor in the decision. *Chicago Miracle Temple Church v. Fox*, 901 F. Supp. 1333, 1345 (N.D. Ill. 1995).

In this case, there is sufficient circumstantial evidence that HPD engaged in a pattern and practice of intentionally discriminating against female sexual assault victims by systemically failing to conduct even the basic elements of an investigation.

1. **HPD's policies, customs and practices, or lack thereof, with respect to the investigation of sexual assault disproportionately affects women.**

HPD admits that sexual assault victims are disproportionally female. (Plf Resp ¶26). Commander Shane Gordan testified "the overwhelming majority of complaints of sexual assault are brought by females." (Plf Resp ¶87, Def. Ex J, Gordan, 39:8-13). Andrew Joshua estimated that 75% of all sexual assault victims were female. (Plf Resp ¶87, Def Ex K, Joshua, 241:14-17). According to the data from Harvey's documents, as well as those produced by CCSAO and ISP Crime Lab, of 859 victims between the years of 1997 through 2012, 660 were female, 69 were male, and 160 were of unknown gender.[6] Of the 729 victims with known gender, 90.5% were female. (Plf Resp ¶83, Def. Ex 11, Coding Spreadsheet). Harvey's deficient sexual assault policies, customs and practices almost exclusively impact women. In fact, 99 percent of the 165 Harvey sexual assault cases assigned to CCSAO Investigator Joe Thomas as a result of the 2007 raid were for women. (Plf Resp ¶87, Def. Ex U, Thomas, 204:13-205:3). Remarkably, although HPD quibbles about the statistics, HPD offers no rebuttal or statistics of its own.

Instead, HPD argues that Plaintiffs have not provided statistics and evidence of a comparator class. Statistics are not necessarily required in this case. Intent can be inferred from

---

[6] That is not a typo—Harvey's records are so poor and its investigations so lax that the gender of the victim cannot be determined in nearly 20% (160/859) of the cases.

the unexplainable and deliberate actions of HPD in failing to investigate each of the female Plaintiffs sexual assault cases, as well as from HPD's lack of training and policies. A plaintiff alleging violation of equal protection under a theory of discriminatory application of the law, or under a theory of discriminatory motivation underlying a facially neutral policy or statute, generally need not plead or show the disparate treatment of other similarly situated individuals. *Pyke v. Cuomo*, 258 F.3d 107 (2d Cir. N.Y. 2001)(Ex 45).

HPD relies on *United States v. Armstrong*, 517 U.S. 456 (1996), and *Chavez v. Illinois State Police*, 251 F.3d 612 (7th Cir. 2001), in support of its argument.  But those cases both involved selective prosecution, *i.e.*, plaintiffs alleged that they were being singled out for special treatment.  Here, Plaintiffs' claim is analogous to that of selective withdrawal of police resources, only it is based on gender rather than the historical paradigm of race. In *Pyke*, the Court explained that the *Armstrong* rule (as cited by HPD in the present case) is not applicable when plaintiffs alleged that defendants discriminatorily refused to provide police protection. *Armstrong* is limited to a claim of "selective prosecution," because courts grant special deference to the executive branch in the performance of the "core" executive function of deciding whether to prosecute. In *Pyke* and this present case, however, plaintiffs did not make a claim of selective prosecution. The court held that the *Armstrong* rule has no application to their claim -- "So long as they allege and establish that the defendants discriminatorily refused to provide police protection because the plaintiffs are Native American, plaintiffs need not allege or establish the disparate treatment of otherwise similarly situated non-Native American individuals." *Pyke* at 109. Similarly, Plaintiffs need only provide sufficient circumstantial evidence that a jury could infer that HPD failed to investigate the claims of female rape victims because they were female.

Moreover, HPD should be barred from arguing that Plaintiffs have not provided evidence

of disparate treatment to an otherwise similarly situated class, when HPD repeatedly refused to provide Plaintiffs with such evidence and this Court found requiring HPD to do so would be overly burdensome.[7] In defense of its practices, HPD cites to the singular investigation where HPD responded to the burglary of a woman, and conclude that based on that single event there is no evidence woman were not discriminated against – just sexual assault victims. This conclusion is simply unconvincing. An equal protection plaintiff need not prove a discriminatory policy against an entire class (every female); discrimination against the plaintiff because of her membership in the class is by itself enough. *King v. Board of Regents of University of Wisconsin System*, 898 F.2d 533, 539 (7th Cir. 1990).

Similarly, HPD's argument that Thomas did not discriminate is unconvincing. One good officer/investigator does not defeat a pattern and practice of discrimination. In fact, Thomas (who resigned in 2002) complained to his superiors that the cases were not being investigated, and his actions went unheeded. That Thomas tried and failed to counteract the well embedded discrimination that female sexual assault victims experienced does not support a finding of no discrimination. It supports the opposite conclusion.

**2.** **Omissions or Policies of the HPD: HPD has no policies or training in place to ensure Harvey's officers and personnel appropriately investigate and handle sexual assault crimes.**

---

[7] As explained in Plaintiff's motion to compel and subsequent Rule 72 Motion, there are no male sexual assault victims for 1997, the year of Doe I's sexual assault. There are three male victims for 1999, the year of Doe IV's sexual assault. There are three male victims for 2007, the year of Doe II's sexual assault. There are no male victims for 2008, the year of Doe III's sexual assault.

As a result, any attempt to compare male to female sexual assault victims is statistically unreliable. Because the sample size is virtually nonexistent for male victims of sexual assault, the comparator of male victims to female victims is suspect - the smaller the size of the sample, the greater the possibility that any disparities are due to chance. As a general matter, statistics drawn from smaller samples are suspect and evaluated with caution. *Ingram v. NWS, Inc.,* 1997 U.S. Dist. LEXIS 17190, 36-38 (N.D. Ill. Oct. 21, 1997)(Ex 46). For that reason, Plaintiffs requested discovery on Aggravated Assault cases – a similar class of victims, who also happened to be mostly male. This Court, however, held that Defendants need not produce these documents, because doing so would be overly burdensome. Summary Judgment cannot now rest on Defendant's refusal to provide this evidence. (Case No. 1:12-CV- 2069, Docket No 138, 140, 143, 144, 145, 150, 154, 155, 162).

Sexual Assault Investigations necessitate clear policies and training. Policies and procedures are the primary means by which police departments communicate their standards and expectations to their officers. Clear, well-drafted policies are essential to ensuring constitutional police practices. Police managers need policies to guide their work and hold officers accountable. Accordingly, it is essential that HPD's policies be comprehensive, comprehensible, up-to-date, and consistent with relevant legal standards and contemporary police practices. Outdated policies and ineffective external oversight can exacerbate a police department's failure to ensure constitutional policing and erode the public confidence in its efforts. (Plf SMF ¶11, Ex 3, HPD 24329). HPD's failure to provide sufficient guidance, training, and support to its officers, as well as its failure to implement systems to ensure officers are wielding their authority effectively and safely, have created an environment that permits and promotes constitutional harm. (Plf SMF ¶12, Ex 3, HPD 24328).

### a. HPD's Operation Manual

Andrew Joshua, the former Commander and Chief of Police for Harvey, testified that he did not know whether there was a policy on following up with sexual assault investigations or submitting sexual assault kits to the crime laboratory. (Plf SMF ¶20, Def. Ex K, Joshua, 235:19-236:5).

Yet, HPD could have easily adopted policies. In 1996, Illinois Law Enforcement and Training Board published a "Model Guidelines and Sex Crimes Investigation Manual for Illinois Law Enforcement." (Plf SMF ¶23, Ex 1). The Model Guidelines, a 141 page document, included clearly outlined policies on emergency responses, preliminary investigation, continuing investigation, interviewing suspects, indentifying and apprehending suspects, collection and testing of evidence, including DNA evidence, as well as the documentation of evidence and the

investigation. Joshua admitted that ILETB's standards were available to Harvey. In fact, Joshua testified that the "Harvey Police Department had to follow these standards and training practices." (Plf SMF ¶2, Def Ex K, Joshua, 62:19-63:15; Def. Ex L, Lonsway, 38.24-39:6, 101:9-15). But Harvey did not. (Plf SMF ¶¶8-27, Ex 5).

HPD's expert Jack Ryan authored an article in which he states: "public safety agencies cannot avoid liability by simply avoiding written policies. Doing so, will leave the department open to liability base upon the custom or practice of the department." (Plf SMF ¶8, Ex 75).

Shockingly, HPD's Operation Manual is intentionally devoid of identifiable written policies for sexual assaults. Barbara Revalee, evidence custodian in charge of submitting rape kits, testified that she could not recall ever seeing a procedure for what was supposed to happen with rape kits. (Plf SMF ¶19, Ex, 6, Revalee, 78:1-10). Moreover, there are no policies regarding (a) what documentation should be included in the filling system for criminal sexual assault cases for the period of time between 2000 through 2009 (Plf SMF ¶18, Ex 6, Revalee, 77:2-5); (b) the manner in which investigators should contact the State's Attorney (Plf SMF ¶18, Def. Ex J, Gordan, 95:5-11); (c) how to respond to victims who make an inquiry about their case (Plf SMF ¶18, Def. Ex J, Gordan, 159:10-20); and (d) obtaining, documenting, storage, retention and disposal of evidence (Plf SMF ¶18, Ex 7, 2011 Audit Report, 18). HPD's deficient policies on the investigation of sexual assaults reflect an almost total lack of supervisory oversight and accountability, which tacitly endorses the failure of HPD personnel to properly investigate and document sexual assaults. (Plf SMF ¶¶14, 21, Ex 2, Lonsway's Report, 4).

**b.    Training of HPD personnel**

Inadequacy of police training may serve as a basis for § 1983 liability where the failure to train amounts to deliberate indifference to constitutional rights. To show deliberate indifference,

16

a plaintiff must show that the need for more or different training is so obvious and the inadequacy so likely to result in constitutional injuries, that the city policymakers were deliberately indifferent to the need. *Lewis v. City of Chicago,* 2005 U.S. Dist. LEXIS 7482, 13 (N.D. Ill. Apr. 26, 2005)(Ex 47), citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

Deliberate indifference can be established in one of two ways. "First, a municipality shows deliberate indifference when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation." *Thomas v. Sheahan*, 499 F.Supp.2d 1062, 1095-96 (N.D. Ill. 2007) citing *Dunn v. City of Elgin, Illinois*, 347 F.3d 641, 646 (7th Cir.2003). "Second, a municipality shows deliberate indifference if it fails to provide further training after learning of a pattern of constitutional violations by the officers." *Id.* citing *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029-30 (7th Cir. 2006); see also *Hall v. City of Chicago*, 2012 U.S. Dist. LEXIS 182546, 21-22 (N.D. Ill. Dec. 28, 2012)(Ex 48).

In *City of Canton*, the Supreme Court provided an example of deliberate indifference:

city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be so obvious,' that failure to do so could properly be characterized as deliberate indifference' to constitutional rights. *City of Canton*, 489 U.S. at 390 n. 10.

Similarly, training is necessary for female sexual assault cases, which have historically been mistreated. Thomas testified that detectives working in criminal sexual assault cases need some type of training to properly investigate these cases because "If they have no training or experience, yes that would hurt you." (Plf SMF ¶24, Def. Ex U, Thomas, 231:24-232:13). According to ILETB's 1996 Model Policy for Sexual Assaults, any member of a police department who handles a sexual assault case should go through specialized training. Training

17

should include sexual assault laws, offender motivation, victim responses, interviewing techniques, investigative strategies, evidence recognition and collection, and interrogation techniques. (Plf SMF ¶23, Ex 1, ILETB Model Policy, 159).

At the time of Plaintiffs' sexual assault reports 1997 through 2008, *no* mandatory training was required or provided to HPD personnel on effective techniques for investigating and documenting sexual assault reports.[8] (Plf SMF ¶19, Ex 2, Lonsway's Report, 22). In fact, Shane Gordan said that he does not have any knowledge of training offered by HPD related to sexual assaults, including "handling sexual assault victims" or the "submission of sexual assault evidence kits." (Plf SMF ¶26, Def. Ex J, Gordon, 81:9-14, 92:14-24). The fact that Former Commander and Chief of Police, Andrew Joshua testified that he did not know whether there was a policy on following up with sexual assault investigations or submitting sexual assault kits to the crime laboratory is certainly telling. (Plf SMF ¶20, Def. Ex K, Joshua, 235:19-236:5).

Defendants name four Detectives employed by HPD between 1997 and 2012, who received training – Wallace, Barbee, Coleman, and Crocker. However, Detective Wallace, Barbee, and Coleman were not investigators assigned to any of the Plaintiffs' cases. (Plf Resp ¶123, Ex 12-19). Moreover, Wallace and Coleman did not receive sexual assault training, but rather domestic abuse training. Barbee received training on sex crime investigations in 2011, long after the last of Plaintiffs crimes had been reported in 2008. (Plf Resp ¶123, Ex 12-19).

This leaves Detective Crocker. Detective Crocker was the investigator assigned to Doe II's sexual assault, which was reported on May 24, 2007. (Plf SMF ¶¶52-53, Ex 13). Detective Crocker had not yet received sex crime investigation training at that time. His training did not

---

[8] Defendants argue that Detectives must take an additional 40-hour investigations course, at which investigations of sexual assault are addressed in greater detail. At the time of the deposition in 2013, Gordan testified that Detectivesmust take an additional 40-hour investigative course, that includes a sexual assault component. (Plf Resp ¶124, Def. Ex J, Gordan, 90:8-13). However prior to 2011 (the time of all of Plaintiffs' reported cases), the only mandatory training within Harvey was firearms training (Plf Resp ¶¶117, 124, Def. Ex J, Gordan, 149:9-15).

occur until January 10, 2008. Had he received training earlier, it may have made a difference in the outcome of Doe II's case.

Joshua, Thomas and Armstrong were the only other named HPD personnel who received sexual assault training. As explained later in this response, both Joshua and Armstrong intentionally mishandled Plaintiffs Doe I and/or Doe III's cases in such an egregious manner that the training they received is just proof that they knew better, and chose to discriminate against the female Plaintiffs.

There is no legitimate reason HPD did not require mandatory training on the investigations of sexual assaults. There are many available courses through police organizations that provide this training – including North East Multi-Regional Training, Inc (NEMRT), of which Harvey was a member. (Plf Resp ¶¶ 94, 117, 123, Def. Ex K, Joshua, 63:9-64:1; Def. Ex J, Gordan, 86:10-19).

**3. Historically, HPD has a custom and practice of failing to investigate Sexual Assault- thereby disparately treating women.**

HPD argues that sexual assault reports made to HPD by female victims are routinely investigated and solved in a timely manner. This is contrary to the evidence. In 2007, the HPD was audited in connection with suspicions related to HPD's handling of murders. The audit uncovered something especially disturbing unrelated to murders - the discovery of over 200 rape kits that had been ignored. As a result of the audit, CCSAO subpoenaed and assigned 165 Harvey's sexual assault cases to CCSAO Inv. Joe Thomas in October 2010, wherein 99% of them involved female victims. (Plf Resp ¶109, Def. Ex U, Thomas, 204:13-205:3, 205:14-205:16). These cases were re-assigned to CCSAO because Harvey systematically failed to investigate cases of female sexual assault victims – "There was either a poor investigation or no investigation whatsoever." (Plf Resp ¶109, Def. Ex U, Thomas, 253:15-254:18).

Joshua testified that the way in which HPD treated sexual complaints negatively affected women. (Plf Resp ¶94, Def. Ex K, Joshua, 245:21-246:4). Although sexual assault cases may be difficult, HPD did not even accomplish the easy steps, such as assigning the case to an investigator, interviewing victims, sending and following up on DNA evidence, appropriately documenting the investigations and tracking cases and evidence. In each of the Plaintiffs' cases, HPD failed to do these basic steps of an investigation. The best evidence however is what happened after CCSAO took over the cases: in the seven Plaintiffs before this court, five went to prosecution after CCSAO became involved, three of which pled guilty. (Plf Resp ¶109, Ex 49, CCSAO 1564-1565). Each Plaintiff's case is discussed below in more detail in connection with what can only be described as a systemic practice by HPD to discriminate against female sexual assault victims.

**a. HPD systematically failed to send and follow-up on DNA Evidence.**

The lab results are necessary for the approval of charges. (Plf Resp ¶56, Def. Ex B, Berg, 37:4-11). According to ILETB's 1996 Model Guideline, "DNA analysis can be the most discriminating test in forensic biology. It can be performed on small amounts of a variety of body fluids, stains, tissues and hair. Results can greatly narrow the number of potential donors possible in the general population." (Plf SMF ¶41, Ex 1, ILETB Model Guideline, 242). Yet until December 12, 2012, well after the filing of this lawsuit, HPD did not have a written policy concerning the submissions of sexual assault evidence kits.[9] (Plf SMF ¶22, Def. Ex J, Gordan, 46:7-47:21).

Despite the necessity of submitting sexual assault evidence kits, many sexual assault

---

[9] The Illinois Sexual Assault Submission Act, 725 ILCS 202/10, adopted by Illinois on September 1, 2010 (two years earlier), requires rape kits to be submitted in 10 days. Prior to December 12, 2012, HPD personnel were to submit the sexual assault evidence kit "as soon as possible." (Plf SMF ¶22, Def. Ex J, Gordan, 46-47).

evidence kits were not sent until years later, until Harvey was directed by CCSAO to send the kit. Attached as Exhibit 11 is a list of 53 of those cases where sexual assault kits (all female victims) were collected but not sent to the lab until years later. Among those are: Doe III's 1st case and Doe IV's case. (Plf SMF ¶45). Doe III's sexual assault kit was collected and placed in evidence at the HPD on **April 30, 2008**, but not sent to the lab until **April 11, 2012**. (Plf SMF ¶43, Ex 14, Doe II 13, P.109-P.110). Doe IV's sexual assault kit was collected and placed in evidence at the HPD on **November 30, 1999**, but not sent to the lab until **October 27, 2010**. (Plf SMF ¶44, Ex 16, Harvey PD 6827, 11007).

Moreover, when there was a suspect identified, HPD had a practice of failing to obtain DNA evidence from the suspect to confirm or deny the allegations. Joshua agreed that a DNA standard should be obtained as soon as possible – even "immediately". (Plf SMF ¶46, Def. Ex K, Joshua, 74:19-75:15). Despite this fact, Joshua testified that he never "had to get a swab" from a suspect in his entire career. (Plf SMF ¶46, Def. Ex K, Joshua, 78:9-79:10). He estimated that he investigated approximately 30 sexual assault cases. (Plf SMF ¶46, Def. Ex K, Joshua, 78:20-22).

HPD's investigation of Doe I's sexual assault is perhaps the most egregious example of HPD's deliberate indifference. Robert Buchanan, Doe I's stepfather and the suspect in her sexual assault, twice consented to a buccal swab/DNA sample in 1997. (Plf Resp ¶94, Def. Ex P, R. Buchanan, 51:11-52:14, 76:5-77:24). HPD, however, never obtained a sample from Buchanan despite knowing that semen was identified in an 11 year old female's sexual assault kit on September 10, 1997. (Plf Resp ¶10, Ex 29, Def.'s Response to Request to Admit, Def. Ex P, R. Buchanan, 101:6-102:24).

Consequently, Doe I experienced over 100 additional sexual assaults by her stepfather and a newly strained relationship with her mother from the ages of 12-18. (Plf SMF ¶¶115-122,

Ex 30, Medlin's Report). Her case sat uninvestigated until 2007 when the HPD was audited. At the Audit, the task force discovered Doe I's sexual assault kit among other sexual assault investigations that had not been properly investigated. These investigations were subpoenaed and taken over by CCSAO. In October 2010, 165 Harvey Sexual Assault Investigations were assigned to Thomas, including Doe I's case. (Plf SMF ¶109, Ex 32, CCSAO Harvey 529).

On August 22, 2011, Robert Buchanan consented and submitted DNA evidence, which was sent to the lab on August 22, 2011 by CCSAO Investigator Joe Thomas. (Plf SMF ¶48, Ex 32, CCSAO Harvey 538-539). On September 12, 2011, the Lab notified Thomas that the male DNA profile identified on the vaginal swabs of Doe I from 1997 matched the DNA profile of Robert Buchanan. (Plf SMF ¶49, Ex 32, CCSAO Harvey 542). On May 2, 2013, Buchanan pled guilty to sexual assault. (Plf SMF ¶49, Ex 36).

There is no legitimate reason for not sending the sexual assault kits to the lab, or collecting DNA evidence from known suspects. HPD does not argue and there is no testimony or evidence to support that sexual assaults were ignored because of the financial burden of investigating them. Any expense of investigating sexual assaults is clearly pretext.

Illinois ranks sexual assault second in seriousness in its crime hierarchy (murder being first). (Ex 50). Any reported costs in sending a rape kit is justifiable considering the results of a DNA match alone can result in convictions or exonerations of criminal suspects. Conducting DNA analysis can be the sole means of keeping sex offenders off the streets and protecting the public. Joshua admitted that sexual offenders are more often than not repeat offenders. (Plf Resp ¶94, Def Ex K, Joshua, 239:2-240:3). HPD's failure to follow up allowed criminals to walk free to endanger others, and inhibited other police departments from resolving their cases, such as Doe VII's case where the suspect had been arrested 8 times for sexual assaults. (Plf SMF ¶153,

Ex 34, CCSAO 1414).

**b. HPD systemically failed to assign Sexual Assault Cases to Investigators.**

HPD's written policy requires that sexual assault cases be assigned to an Investigator. (Plf SMF ¶16, Ex 5, DOE II 319). Yet, thirty-six percent (36%) of sexual assaults cases reported to HPD were **<u>never</u>** assigned to an investigator. (Plf Resp ¶85, Ex 2, Lonsway, 25; Def. Ex 11, Coding Spreadsheet; Ex 8; Ex 9). Of the total 859 sexual assault cases reported to HPD from 1997 to 2012, a total of 312 were not assigned.[10] (Plf Resp ¶85, Plf SMF ¶29).

Thomas testified that while at HPD, he recognized that sexual assault cases were not getting assigned an investigator. (Plf Resp ¶¶ 30, 37-39, Def. Ex U, Thomas, 288:9-17). Thomas testified that he received numerous complaints from sexual assault victims while he was working at HPD, indicating that their reports were not being investigated: "When I was at Harvey I had phone call after phone call. Their cases weren't getting worked on." (Plf SMF ¶38, Def. Ex U, Thomas, 262:24-263:5).

HPD never assigned Doe III's sexual assault documented in CRN 4522 B 08 to a Detective, and it was never recorded on a Harvey "Incidental & Supplement Assignment Report." (Plf SMF ¶133, Ex 9, HARVEY PD 11290-13235). To this day, it has gone under investigated when HPD failed to provide the Lab with the necessary authorization to run the DNA analysis.

Moreover, HPD never re-assigned the investigations of Doe VI and VII to an Investigator after Thomas left HPD. Thomas was the investigator originally assigned to both sexual assault

---

[10] Each criminal investigation is assigned a Criminal Report Number (CRN). It is how the department identifies a case. In discovery, HPD produced all Sexual Assaults Reports in its possession. Those Sexual Assault Reports were logged into a spreadsheet, together with Sexual Assault CRNs produced by CCSAO and the ISP, Joliet Crime Lab. (Plf Resp ¶85, Def. Ex 11; Ex 8). The "Incidental & Supplement Assignment Reports" (the logbook) document what investigator is assigned to a case. All sexual assault cases reported to Harvey are required to be recorded in the logbook. (Plf Resp ¶85, Def. Ex J, Gordan, 117:18-118:4). The Sexual Assault CRNs logged in the spreadsheet then were compared with the CRN recorded in HPD's logbook, bate-stamped HPD 11290-13235. (Plf Resp 85, Ex 9).

cases; however, Thomas resigned from HPD in March 2002, while both cases waited for results

from the lab. (Plf SMF ¶139, Ex 33, HPD 29604). HPD received the results and match in Doe

VI's case on April 17, 2006, but no one followed up to arrest the suspect and submit the case to

felony review, in part because there was no one assigned to do so. (Plf SMF ¶¶139-140, Ex 17,

CCSAO 1181-1182; Ex 17). Similarly, HPD received the results and match in Doe VII's case on

February 18, 2003, but no one followed up to arrest the suspect and submit the case to felony

review, because there was no one assigned to do so. (Plf SMF ¶¶150-151, Ex 18, HARVEY PD

2691; Ex 18). There is no legitimate reason for not assigning or re-assigning the cases.

### c. HPD obstructed and discouraged Minor Female Sexual Victims from reporting sexual assault crimes.

HPD also has a custom and practice of obstructing and discouraging minor female sexual

victims from reporting sexual assault crimes. HPD's practice violates proper policing standards.

The appropriate response would be to take the report to best protect the interests of minor

victims, who may be improperly influenced by parents, guardians or other adults. (Plf SMF ¶32,

Ex 2, Lonsway's Report, 26; Def Ex L, Lonsway, 260:17-20; Def. Ex U, Thomas, 223:23-

224:16).

HPD, however, would not allow a minor to report sexual assaults without a parent or

guardian. For example, HPD told 17 year old victim, Jane Doe II, that she could not report the

sexual assault without a parent or guardian. (Plf SMF ¶33, Ex 2, Lonsway's, 25-26; Def. Ex F,

Doe II, 68:13-22; Ex 10, Harvey PD 6822). Immediately after being sexual assaulted, Doe II

called HPD. The suspect had just fled the residence. She was injured. Yet, Doe II was told she

had to wait for her mother to come home from work to report the crime. (Plf Resp ¶52, Def. Ex

F, Doe II, 68:13-22). There is no legitimate reason HPD could not have responded to Doe II's

report. After HPD did start the initial investigation, HPD then failed to follow through after

being instructed by the State's Attorney to obtain the medical records. (Plf Resp ¶54, Def. Ex B, Berg 63:3-5; Ex 13). As a result, HPD did not submit her case for felony review until after Plaintiffs' filed this case. Subsequently, the suspect has pled guilty. (Plf Resp ¶52, Ex 37).

**d. HPD systemically failed to interview female Sexual Assault Victims.**

The most fundamental component of any investigation is a victim interview. IACP Model Policy specifies that "sexual assault investigations will typically include both a preliminary and subsequent in-depth interview with the victim… The officer must understand … that the preliminary interview is not intended to be a comprehensive or final interview. Additional interviews will be needed as the investigation develops." (Plf SMF ¶¶35-36, Ex 4, IACP Model Policy, p.3)

In over a third (34%) of the sexual assault cases, there is no evidence that a single victim interview had been conducted. (Plf SMF ¶36, Ex 2, Lonsway, 28-29). Thomas testified that many of the victims had never been contacted by an investigator at all: "A lot of women told me they never talked with an investigator ever. The only person they talked to was the officer at the hospital, collecting rape kit and taking the initial report. Other than that, nothing was done." (Plf SMF ¶37, Def. Ex U, Thomas, 255:1-6). Thomas made several complaints to HPD's Deputy Chief about detectives failing to investigate reports of sexual assault. (Plf SMF ¶38, Def Ex U, Thomas, 327-332, 334-340, 242-343). But it fell on deaf ears.

HPD's failure to interview is evident in Doe III's 2nd case. Jane Doe III, 13 year old female, was taken to the hospital as a result of a sexual assault on May 15, 2008, and Harvey was called. By the time an officer had arrived Doe III had been discharged. (Plf Resp ¶73, Ex 15, DOE II 8). Yet no one from Harvey followed up with Doe III regarding her assault until May 20, 2008 (4 days later) when Doe III's mother called Harvey. (Plf Resp ¶74, Ex 15, DOE II 10).

When writing the initial police report, the officer lied and stated Doe III refused to speak to the police. But according to her mother, neither Doe III nor her mother knew police were even on their way. (Plf Resp ¶73, Def. Ex Q, Sales, 96:5-97:21). There was no legitimate reason for not interviewing Doe III immediately thereafter. Each day that went by the offender remained at large and could easily disappear. Harvey, having Doe III's contact information, could have easily sought out Doe III but chose not to. As of today, the suspect remains at large.

### e. Female sexual assault victims are met with hostility and indifference by HPD.

Each of the Plaintiffs in this case were met with hostility and indifference. The level of insensitivity is shocking. Doe IV's mother testified that Detective Brook asked 13 year old Doe IV, "When he made you perform oral sex what did it feel like?" (Plf SMF ¶98, Def. Ex O, Mourer, 82:1-9). Doe II, 17 years old, was told they wouldn't allow her to report the crime until her mother got home. (Plf SMF ¶33, Def Ex F, Doe II, 68:18-22). Doe III testified that she was told that they did not believe her. (Plf Resp ¶71, Def Ex G, Doe III, 96:18-20). Doe IV described the officers as "callous" and "very unprofessional." (Plf SMF ¶93, Def Ex H, Doe IV, 145:3-9).

Doe II's mother testified: "Just if anything happens, nine times out of ten they'll take the man's version or their side before they do the woman;" and "Women rape victims …[are] not taken seriously as far as rape, domestic violence or any -- or any claim that a woman has in Harvey." (Plf SMF ¶94, Def. Ex C, Brown, 80:20-24, 82:1-3). Such victim blaming within sexual assault can have a traumatic effect on a rape victim. Moreover, it can affect the cooperation level of that victim, and ultimately the investigation.

### f. HPD systemically failed to track female sexual assault cases and evidence.

There is a particular need for computerized information management systems, or at least some system, to record the status, progress, and outcomes of all reported sexual assaults and their

associated evidence. (Plf SMF ¶56, Ex 2, Lonsway's Report, 63; Ex 7, HPD 24301-24306). Yet, HPD does not track female sexual assault cases.

HPD argues that it records the disposition of the cases in a logbook entitled "Incidental & Supplement Assignment Reports." It did not. A large percentage of sexual assault cases are not included in the logbook - 312 of 859 sexual assaults cases reported to HPD from 1997 to 2012 were **never** recorded in the logbook. (Plf SMF ¶57, Ex 8). Moreover, of those recorded, disposition codes are often left blank. Of the sexual assaults recorded into the logbook, the disposition code of 226 of the sexual assault cases were left blank. (Plf SMF ¶57, Ex 8).

According to the Audit Report, "the case assignment log is indicative of poor record keeping of investigations." (Plf SMF ¶57, Ex 7, HPD 24305). Gordan advised the auditors that the disposition field on the form was not accurate due to it frequently being left blank, that a hand search of each file (contained in approximately 12 file cabinets) would have to be made to determine that status. (Plf SMF ¶58, Ex 7, HPD 24306).

In addition, HPD had no reliable way to determine whether evidence is submitted in a sexual assault case, or to track the status of that evidence in relation to the investigation, making it impossible for supervisors to provide meaningful oversight of individual investigations and the professional performance in sexual assault cases. (Plf SMF ¶59, Ex 2, Lonsway's Report, 65). Revalee testified that if she wanted to find out how many sexual assault kits had been submitted by Harvey to the ISP Crime Laboratory, as well as the date when they were submitted, she would need to look in the files of the Illinois State Police. To search for any such information at Harvey would require looking at every individual case file. (Plf SMF ¶60, Ex 6, Revalee, 210:2-211:6).

An example of Harvey's intentional and reckless disregard of sexual assault evidence is in the case of Doe IV. Harvey had misplaced Jane Doe IV's sexual assault kit for a period of 10

*years*. Doe IV's mother testified that she dropped off a bag of Doe IV's clothes as evidence. (Plf SMF ¶61, Def. Ex O, Mourer, 75:11-76:7). Two day later, when "Doe IV and I went into the room and Detective Brooks' office. Along the wall were all of these paper bags.  Inside of the paper bags was obvious evidence.  That he had names written on the bags, evidence and dates. One of the bags was of my daughter's belongings." (Plf SMF ¶61, Def. Ex O, Mourer, 75:11-76:7). Doe IV's mother testified: "remember seeing the bag with [Doe IV]'s jacket in it because it wasn't sealed. There was a whole wall with -- and the bags came out two, three deep." (Plf SMF ¶61, Def. Ex O, Mourer, 122:21-24). That evidence was misplaced. In March 2011, CCSAO Investigator told Doe IV that her rape kit had been located "in the basement of the police station in a corner, out of the evidence room, and if you were not looking for it your wouldn't have found it." (Plf SMF ¶61, Def. Ex O, Doe IV, 65:14-16).

### g. HPD systemically underreported female Sexual Assault Crimes to the Illinois State Police.

All Illinois police departments report crime statistics to the ISP. Inaccurate statistics can create a false sense of security by suggesting that the rate of sexual assaults in the community is lower than it really is, and/or clearance rates are higher than they actually are. This can diminish the sense of urgency felt by a law enforcement agency as well as the community to address the problem of sexual violence. Artificially low numbers can also undermine efforts to increase the allocation of resources to sexual assault investigation. (Plf SMF ¶72, Ex 2, Lonsway's Report, 60).

HPD historically underreports sexual assaults cases, as seen in Exhibit 23. Of the 263 sexual assault case reported to Harvey for the years 2008 through 2012, only 75 sexual assaults were reported. (Plf SMF ¶71, Ex 23). In contrast, of 983 aggravated assaults and batteries (which primarily involve male victims), 834 aggravated assaults and batteries were reported. (Plf SMF

¶71, Ex 23). HPD offers no competing statistics, and this will be unrebutted to the jury.

HPD was intentionally oblivious to the problems of sexual assaults in Harvey. When investigating Doe IV's rape in 1999, Debra Mourer testified that Sergeant Sonderlund "said, "I don't understand. It doesn't make sense, Debbie. It doesn't make any sense." He says, "There aren't any current rapists in our area." He said, "I don't know where this guy came from." (Plf SMF ¶97, Def. Ex O, Mourer, 53:11-8). However, there were 43 sexual assaults in 1999 alone. (Plf SMF ¶97, Def. Ex 11).

Revalee, HPD's record custodian, is responsible for reporting crime statistics for the Harvey Police Department to the ISP under the Uniform Crime Report Program. Revalee does not apply the same methodology for reporting sexual assaults as she does for aggravated assaults, nor does she apply the appropriate methodology required by the UCR Program. Revalee testified that with aggravated assaults, she will report it as is, but with sexual assaults it is different. (Plf SMF ¶¶66-69, Ex 6, Revalee, 208-209).

The use of different "methodology" for criminal sexual assault cases is indicative of a level of skepticism for these reports that is not seen for other cases. (Plf SMF ¶70, Ex 2, Lonsway's Report, 58). Police who respond to and investigate sexual assault must be able to reject the myths and stereotypes about the crime and its victims. (Plf SMF ¶3, Ex 1, ILETB Model Policy, 145). "[S]exual assault reports rarely involve false allegations. **There is no legitimate evidence to suggest that sexual assault victims lie any more than victims of other crimes**." (Plf SMF ¶3, Ex 1, ILETB Model Policy, 145). There is a substantial body of research literature documenting a cultural attitude of skepticism toward sexual assault reports. This skepticism can lead personnel within law enforcement agencies to view sexual assault report as false or unfounded because a victim delays reporting or cannot be located, the suspect cannot be

identified, the victim does not cooperate with the investigation, there are discrepancies or factual errors in the victim's statements, the victim was drunk or used drugs at the time of the assault, the victim has a sexual history, or uncertain of certain events, is belligerent, or recants the original report. Yet there is no research indicating that such factors are legitimate predictive of a sexual assault report being false. (Plf SMF ¶4, Ex 2, Lonsway's Report 58).

### h. HPD failed to document female sexual assault investigations.

HPD argues that the lack of documentation does not mean an investigation did not occur. However, Chief Joshua testified to the contrary -- the expectation in policing is that important things should be documented in the case file, and if it is not documented, it would typically be assumed that it was not done. (Plf SMF ¶47, Def. Ex K, Joshua, 59:19-60:2). In other words, if it was not documented, it was never done.

HPD's Operations Manual 3.0.31 provides: "A supplemental report must be prepared by each officer who works on the case, but not necessarily for each occasion he works on it. New information developed as the results of the follow-up investigation shall be recorded and submitted to the record section at the conclusion of the officer's tour of duty." (Plf SMF ¶48, Ex 5, DOE II 316, 320). Thomas described the importance of such documentation: "Whether I made an arrest or not, I had to report on what I did. That – the reason I write a report if there was no arrest to the next person that gets it --- or when there is finally a DNA hit, the next investigator can pick it up and make an arrest." (Plf SMF ¶49, Def. Ex U, Thomas, 207:15-23). A Harvey police file should include: the initial police report, supplemental police reports, and statements of witness, victims, and suspects. If a lab report comes back or there is some major issue in the case, the assigned investigator must supplement the police file with a supplemental police report. (Plf SMF ¶50, Def. Ex K, Joshua, 66:9-12, 68:2-69:24; Def. Ex J, Gordan, 42:11-15).  Joshua

30

noted that even if the crime was solved on the spot, "there would still have to be a follow-up report for that – for the arrest." (Plf SMF ¶51, Def. Ex K, Joshua, 268:2-17).

However, in 51% of HPD's sexual assaults cases from 1997 through 2012, there are *no* supplemental reports.[11] (Plf SMF ¶47, Ex 2, Lonsway's Report, 50). This creates a problem for any investigator or prosecutor seeking to work the case. As the Investigator for CCSAO assigned to review and investigate the sexual assault cases from HPD, Thomas said it was not typically clear what investigation, if any, had been conducted, because of the lack of documentation. (Plf SMF ¶52, Def. Ex U, Thomas, 206:13-208:7). Once again, HPD offers no statistical evidence to the contrary.

This failure to document is clearly evident in Doe I's case. In her case, the only supplemental police report for CRN 9040 A 97 is dated August 22, 2011 – 14 years later. (Plf SMF ¶¶53-54, Ex 12, DOE I 1-42). Between the time of the initial police report of August 4, 1997 and the supplemental police report dated August 22, 2011, there is no documentation of the following police investigative actions: (a) There is no documentation or recordings of Defendants' interviews of Jane Doe, Teresa Buchanan, or Robert Buchanan; (b) There is no documentation that CCSAO was contacted for felony review or notified that Robert Buchanan was in custody; and (c) There is no documentation that DCFS was contacted regarding updates on the investigation, including any alleged recantation or non-cooperation by Teresa Buchanan. (Plf SMF ¶¶53-54, Ex 12, DOE I 1-42).

### i. HPD failed in its investigation of even easy statutory cases.

---

[11] The expectation in policing is that important things should be documented in the case file, and if it is not documented, it would typically be assumed that it was not done. (Plf SMF ¶47, Def. Ex K, Joshua, 59:19-60:2). In approximately one-quarter (25%) of the case files produced in this case by Defendants, there was no documentation at all other than for a Case Report Number. Then in more than another quarter of case files (26%), no supplemental reports were completed. (Plf SMF ¶47, Ex 2, Lonsway's Report, 50). Consequently, in 51% of sexual assault cases, there is no documented supplemental report. (Plf SMF ¶47, Ex 2, Lonsway's Report, 50).

Not all sexual assaults are difficult to investigate. There are a class of female victims (minors) where simply the act of sex alone is sufficient for felony approval of charges. In this case, all but two of the Plaintiffs were minors: Doe I was 11; Doe III was 13; Doe IV was 13; Doe VI was 16; and Doe VIII was 14. These victims were children.

Under Illinois law, a child under the age of 17 cannot consent to sex. 720 ILCS 5/12-12, et seq.[12] Consent will never be a defense in those cases. Attached to this motion is exhibit 22, a list of 40 cases where the victim was under the age of consent, and HPD failed to properly investigate.[13] (Plf SMF ¶62). Five of these cases were discussed by Dr. Lonsway at her deposition, and in each case she found HPD's investigation lacking. (Plf SMF ¶62, Def. Ex L, Lonswasy, 320:21-323:24).

In CRN 6622 A 03, Victim Doe VIII, 14 years old, was sexually assaulted by a 20 year old man. The suspect was identified byphotograph by both the victim and a witness. (Plf SMF ¶63, Ex 19, HARVEY PD 3796, 3797). When the police approached to apprehend the suspect on August 20, 2003, he fled and hid in a closet. (Plf SMF ¶63, Ex 19, HARVEY PD 3800). On October 7, 2003, HPD received a laboratory report with a finding of semen identified. (Plf SMF ¶63, Ex 19, HARVEY PD 3817). There is no evidence that the suspect was interviewed or that a DNA sample was obtained from the suspect. (Plf SMF ¶63, Ex 19). On November 22, 2006, HPD received a lab report indicating that DNA match was made through running the DNA through the offender database, and that the male DNA in Doe VIII's matched the suspect identified in 2003. (Plf SMF ¶63, Ex 19, CCSAO 1227). No further work by HPD was done. As it turned out, Chad Maynie was convicted for Murder in 2004. (Plf SMF ¶63, Ex 51, 29-30).

---

[12] The only defense is where the suspect reasonably believes the child is 17. (720 ILCS 5/12-17).
[13] Defendants previously attacked the evidence of these cases. (Docket Report No. 115). Plaintiff's filed a response addressing Defendant's objections. (Docket Report No. 122).

At the very latest, there is no excuse for failing to in 2006 submit Doe VIII's case for felony review. All the evidence was there. Yet nothing was done until CCSAO assigned the case to Thomas in 2010 as one of the 165 sexual assault cases that had been subpoenaed as a result of the 2007 audit. (Plf SMF ¶63, Ex 51, CCSAO File for Doe VIII, 2-5, 29-30, 85-98,). Consequently, the suspect in Doe VIII pled guilty. (Plf SMF ¶63, Ex 49, CCSAO 1565).

**j. HPD has knowingly and intentionally hired officers with a bias.**

Hiring officers with biases creates a culture to breed within a police department that not only will affect that officer's work but may spill over and influence otherofficers' investigations. Joshua testified that hiring officers that were involved in either domestic violence or sexual misconduct tends to show an indifference to sexual assault crimes. (Plf SMF ¶87, Def. Ex K, Joshua, 48:9-18). Yet HPD did just that.

For the HPD to risk hiring sworn officers with a criminal background places the community in a position of intolerable vulnerability to positional abuse. (Plf SMF ¶77, Ex 2, Lonsway's Report, 70). Law enforcement agencies must have rigorous selection procedures to ensure that the people assigned to handle sex crimes. These investigators will inevitably communicate their attitude to victims, and this will undermine their ability to conduct a successful interview and investigation. (Plf SMF ¶78, Ex 2, Lonsway's Report, 70). Even Harvey's expert agrees. As explained by HPD expert Jack Ryan: "A major problem that has long plagued law enforcement over the last two decades is sexual misconduct. The long-standing men's culture of law enforcement may have played a role in this pervasive problem. In order to address this issue, law enforcement must first acknowledge the existence of sexual misconduct in the profession and then take active steps to address the culture." (Plf SMF ¶91, Ex 75). Jack Ryan wrote that sexual misconduct can effect a police's interaction with the public – "including

the misuse of police power by officers to gain sexual favors from citizens with whom they come into contact." (Plf SMF ¶90, Ex 75). As such, Jack Ryan testified that he would not hire officers who committed sexual assaults or domestic violence crimes. (Plf SMF ¶¶89-91, Ex 76, Ryan, 54:5-56:5)

Nevertheless, HPD and Joshua hired several officers despite knowing the dangers in hiring officers with sexual assault or domestic violence background, including – Eric Armstrong, Andrew Jeleniewski, David Shaffer, Tyrone Johnson[14], and Derrick Muhammad.[15]

At the time of Armstrong's hire in 2004, Chief Joshua knew Armstrong (the Detective assigned in Doe II's case) had a domestic violence incident. Yet Harvey hired Armstrong anyway and Chief Joshua later recommended him for full civil service status on December 29, 2006. (Plf SMF ¶79, Ex 25, HPD 30597-30596, 30891; Ex 28, HPD 25903).

Jeleniewski was convicted of sexually assault, but then was hired by Hardiman, who said he was aware of the charges but said the officer "just got caught in the switches."[16] Jeleniewski was then assigned by Commander Joshua as Detective to at least 6 sexual assault cases in 1997. (Plf SMF ¶¶80-81, Ex 9).

Joshua received Shaffer's background check in 2003. It showed multiple accounts of sexual abuse and attempted sexual abuse. Chief Joshua nevertheless retained him, and he was a patrol office to sexual assault cases through at least September 2005.[17] (Plf SMF ¶¶82-84, Ex 41,

---

[14] Johnson had been sentenced to prison for pressuring a woman he pulled over for a traffic violation into performing a sex act in exchange for ignoring her outstanding arrest warrant. (Plf SMF ¶85, Def. Ex K, Joshua, 44:9-19).

[15] Muhammad's background check showed that he has a domestic violence arrest. (Plf SMF ¶86, Def. Ex K, Joshua, 46:19-6).

[16] Pamela Cytrynbaum, Police Sex Abuse Tears At Code Of Silence, Chicago Tribune, February 29, 1996 http://articles.chicagotribune.com/1996-02-29/news/9603010058_1_police-officers-police-power-police-sexual-assaults (Ex 40).

[17] David Shaffer was the patrol officer dispatched to the following sexual assault cases in 2003 and 2005 (after the testimony given by Joshua on : 2545 A 03 (Ex 43, HPD 28441-28442), 7988 A 03 (Ex 43, HARVEY PD 6638-6639), 13340 A 03 (Ex 43, HARVEY PD 6565-6567), CRN 9956 C 05 (Ex 43, HPD CCSAO 846-848).

HPD 25830, 25853-25855; Ex 43, HPD CCSAO 846-848).

Joshua admitted that hiring officers like Armstrong, Jeleniewski, Johnson, Shaffer, and Muhammad would impede or limited the effectiveness of the prosecution of suspects for sexual assaults. (Plf SMF ¶87, Def. Ex K, Joshua 44:24-45:6, 47:20-24, 47:7-12). Moreover, Joshua testified that such hiring practices have a "chilling effect" on the investigation of sexual assaults and would tend to show indifference to sexual assault crimes. (Plf SMF ¶87, Def. Ex K, Joshua, 35-39, 44-50). Nevertheless, these officers, and possibly more, were knowingly hired. HPD created a culture of deliberate indifference.

HPD's failure to implement policies, failure to train its officers, and historical and blatant mishandling of sexual assault cases is evidence that Harvey intentionally discriminated against female sexual assault victims, including the named Plaintiffs in the consolidated cases.[18]

## B. HPD's excuses for its failures are pretextual.

HPD argues that in each case, there are alternative reasons why the Plaintiff's cases were not properly investigated. That argument does not support summary judgment.

## 1. Doe I

HPD argues that a buccal sample from Buchanan was never obtained, because Teresa Buchanan and Doe I failed to cooperate, not because of gender discrimination. HPD's argument is mere pretext.

First, it is a question of fact for the jury whether Teresa Buchanan and Doe I failed to cooperate. Although Joshua testified that Teresa told him she would like the charges against

---

[18] This is not the first time sexual abused or sexually assaulted women have made an equal protection claim against the city of Harvey. See *Jefferson v. City of Harvey*, 1999 U.S. Dist. LEXIS 20158, 2-4 (N.D. Ill. Dec. 30, 1999)(Ex 52)(allegations that Harvey failed to properly investigate and arrest a serial rapist); *Williams v. City of Harvey*, 1994 U.S. Dist. LEXIS 6164, 1-3 (N.D. Ill. May 10, 1994)(Ex 53)(allegations that current Chief Eaves allegedly drew a gun and searched the plaintiff, putting his hands underneath her clothing and underwear, while threatening to shoot her).

Robert dropped, Teresa denies making that request. (Plf Resp ¶15, Def. Ex T, T. Buchanan, 84:10-86:5). Furthermore, Joshua denies that Doe I ever recanted. (Plf Resp ¶14, Def. Ex K, Joshua, 288:15-289:13).

Even if either or both are true, HPD still had a duty to proceed with the investigation. (Plf Resp ¶¶14, 15, 26, Def. Ex K, Joshua, 93:21-94:16, 97:11-98:1, 280:16-24; Def. Ex U, Thomas, 249:4-22, 265:5-18). Joshua, without any hesitation, testified that at no time during his investigation did he question the credibility of Doe I's allegations. Joshua testified that he believed that Robert Buchanan had sexually assaulted Buchanan's stepdaughter Doe I, an 11 year old child. (Plf SMF ¶113, Def. Ex K, Joshua 288:10-289:13). Yet, Joshua acted inconsistent with his position to protect Doe I.

At the time of Buchanan's arrest and despite Teresa Buchanan's statement that there would be no contact between Doe I and Robert Buchanan at the VSI on August 5, 1997, Robert Buchanan was arrested on August 6, 1997 at the same residence that he had been living with Doe I – 14610 South Lexington. (Plf Resp ¶26, Ex 12, DOE I 7). Such an arrest should have prompted a red flag – a necessity for a protective order. One was never obtained. (Plf SMF ¶105, Ex 12).

Another red flag arose when Teresa Buchanan allegedly asked Joshua to drop the charges.[19] Joshua testified that Teresa asked him to drop the charges against her husband, to which his response was "you have to live with this." (Plf Resp ¶26, Def. Ex K, Joshua, 229:21-230:13). Thomas testified that Teresa's alleged attempt to stop the investigation is an obstruction of justice. (Plf Resp ¶26, Def. Ex U, Thomas, 251:12-252:22)

Joshua testified irrespective of any purported consent by Teresa the case against Robert

---

[19] Defendants argue that Teresa Buchanan signed an affidavit to drop charges. No affidavit was ever produced in discovery. Teresa Buchanan also denies having requested dropping the charges. She states she thought Buchanan was not arrested because there was not enough evidence.

Buchanan could have and should have been fully investigated:

> Q. So irrespective of any purported consent signed by Ms. Buchanan, the case against -- the case involving Jane Doe I and the despicable acts of Mr. Robert Buchanan could have and should have been fully investigated, correct?
> A. That's correct. (Plf Resp ¶15, Def Ex K, Joshua, 280:16-24).

A number of actions should have been taken when Teresa made this request. HPD was required to (1) investigate whether there was intimidation or retaliation going on by Mr. Buchanan; (2) to determine whether or not Ms. Buchanan was being a fit mother; (3) report Teresa Buchanan to DCFS. (Plf Resp ¶15, Def. Ex U, Thomas, 251:12-252:22, 268:4-269:20; Def. Ex K, Joshua, 228:23-229:14, 243:7-245:8, 280:16-24). If anything, Teresa's alleged request that Joshua drop the charges created a red flag necessitating HPD to take further action.

Moreover, HPD were responsible for investigating any alleged recantation of 11 year old Doe I. Joshua denies that Doe I ever recanted. (Plf Resp ¶14, Def. Ex K, Joshua, 288:15-289:13). Doe I, however, testified that she was told by her mother to recant her allegations against her stepfather. (Plf Resp ¶14, Def. Ex E, Doe I, 76:20-83:13). If true, HPD had a duty to investigate the credibility of that recantation.

As Thomas testified, the purpose of an investigation is to determine the truth and to use every reasonable means to uncover the truth. (Plf Resp ¶115, Def. Ex U, Thomas, 265:5-11). Joshua testified that simply because a victim recants does not automatically mean that the report of sexual assault is false. (Plf Resp ¶14, Def. Ex K, Joshua 89:24-90:8). Joshua testified that after a recantation it is important to investigate and clarify the recantation, including interviewing witnesses and looking at the DNA evidence, and by reviewing all the evidence. (Plf Resp ¶14, Def. Ex K, Joshua, 93:4-19; 94:18-95:11, 273:15-23). Moreover, in a case of a child, it is also important to review the motivation behind the recantation, including whether there was undue influence by the child's parents, which includes interviewing the family members about the

recantation and involving the multidisciplinary team who were involved in the initial investigation. (Plf Resp ¶115, Def. Ex K, Joshua, 93:21-94:16, 97:11-98:1).

DNA evidence is utilized not only to convict but also to exonerate. (Plf Resp ¶115, Def Ex U, Thomas, 265:5-18). Investigator Thomas testified that proper procedure required Joshua to obtain a buccal swab from Buchanan and the kid, to prove or disprove the DNA evidence – " What I would have done is buccal swab the father or stepfather and then have her tell me who the kid at school was … if she said it was a kid at school, let's buccal swab the kid then. Let's prove that it's his DNA, not the stepfather." (Plf Resp ¶115, Def Ex U, Thomas, 249:4-22). Consequntly, if a jury found that a recantation did occur, Andrew Joshua was required to investigate that recantation, including moving forward and obtaining a DNA sample from Robert Buchanan, interviewing the classmate of Doe, whom she alleged she had sex with, and conducting a second victim sensitivity interview.

There is no legitimate reason why HPD failed to obtain a buccal sample from Buchanan, to secure a protective order, to report Teresa Buchanan to DCFS for interfering in an investigation, and to submit the case to felony review in 1997. A reasonable jury could infer that HPD acted instead consistent with their widespread policy and practice of discriminating against female victims of sexual assault.

## 2.    **Doe II**

HPD argues that the State's Attorney had all the relevant information, but simply did not charge the suspect because she did not believe Jane Doe. HPD misstates the evidence.

In 2007, Detective Crocker did contact felony review. However, State's Attorney Desiree Berg specifically requested Harvey continue the investigation. Berg testified that she required both the rape kit results and the medical records – "In the specific case of Jacquez Dunbar there

is an entry made by myself indicated we need medical records, rape kit." (Plf Resp ¶56, Def. Ex B, Berg 63:3-5). Berg testified that she needed some facts to support force or threat of force to support approval for felony charges – "Some abnormality, as you indicated previously bleeding, tearing, rupture, signs of defensive aggressiveness, bruising, redness." (Plf Resp ¶56, Def. Ex B, Berg 63:7-20).

Harvey was responsible for obtaining those records and forwarding them to the State's Attorney's Office. (Plf Resp ¶56, Def. Ex B, Berg, 79:22-16). But Defendants never did. There is no legitimate reason why Harvey failed to obtain those records.

Doe II's mother signed an authorization for the release of the records to HPD on May 24, 2007. (Plf Resp ¶56, Ex 13, HARVEY PD 11085) These records noted the presence of vaginal tears, bleeding, anal fissures (tears), which are traumatic and acute. (Plf Resp ¶56, Ex 13, HARVEY PD 10665). Had Harvey obtained them and followed through, the suspect would have been arrested, charged and pled in 2007, instead of on December 9, 2013, after Plaintiff filed this lawsuit. (Plf Resp ¶56, Ex 13; Ex 37). HPD, however, simply chose not to proceed, consistent with their widespread policy and practice of discriminating against female victims of sexual assault.

**3. Doe III's Assault of April 28, 2008**

With respect to Doe III's sexual assault of April 28, 2008, HPD heavily relies on the investigative decisions made by Detective Armstrong, who was assigned to the case. Detective Armstrong, however, was admittedly by Joshua predisposed to bias and not a good hire.

In HPD's employment file for Armstrong is a court's protective order against Armstrong, suggestive of domestic violence. The protective persons were his wife and daughter. He was ordered not to communicate in any way with his wife and daughter. He was prohibited from

physical abuse, harassment, willful deprivation, stalking, intimidation of a dependent or interference with the liberty of his wife or daughter. He was prohibited from entering or remaining at the residence inhabited by his wife or daughter. He was prohibited from entering the place of employment and/or school of his wife or daughter. The order was to expire in April 2004. Despite evidence of domestic abuse, HPD hired Armstrong in August 2004 and he was promoted by Joshua in 2006. (Plf SMF ¶79, Ex 25, HPD 30597-30596; Ex 28, 25903).

HPD's expert Jack Ryan testified that hiring persons who had committed domestic violence or sexual assault has a negative effect on a law enforcement agency. (Plf SMF ¶89, Ex 76, Ryan, 54:5-56:4). Jack Ryan was correct. Armstrong was nota good hire.  In a disturbing internal document, Chief Eaves issued a written reprimand to Detective Armstrong on October 25, 2011, when Armstrongfailed to investigate an Aggravated Criminal Sexual of a child, in which an eleven year old child was allegedly sexually assaulted by her grandfather and threatened with a handgun by him.  Armstrong's response showed clear deliberate disregard for the female sexual assault victim. In his letter of explanation, Armstrong stated he "did not think the case was a priority over his other cases because the case was delayed two years." He stated the Harvey Police Department "is outdated and [he] was tired of being harassed about such minute things as of which cases you are doing first." Armstrong clearly chose not to investigate the sexual assault of a child by her grandfather, because he did not think it important. HPD's response is even more alarming. HPD simply wrote him up. He was not fired, suspended or provided training. (Plf Resp ¶113, Ex 25, HPD 30606-30608)

Armstrong's bias was also evident in his investigation of Doe III's April 28, 2008 sexual assault. Doe III's mother testified: "Detective Armstrong stated to me that we're not going to arrest an innocent boy based on what [Doe III] said because we can send this child to prison for a

long time, and it wouldn't be fair." (Plf SMF ¶99, Def. Ex Q, Sales, 130:15-18).   Armstrong made the conclusion that Doe III was not credible. HPD points to the fact that (1) no one heard her scream, and (2) she had a prior sexual relationship with Michel Nichols. HPD's reasons are pretext.

Doe III was not heard because when Doe III said no and "began **to get loud but he covered her mouth with his hand**, and kept going until he ejaculated." (Plff Resp ¶63, Ex 14, DOE II 16). Any noise she would have made would have been muffled.

Second, that Doe III had engaged in consensual sex with Nichols previously is irrelevant to this motion and to trial, and should be stricken. As Joshua testified, simply because the victim has had a sexual history does not mean that the report of sexual assault would be false. (Plf Resp ¶63, Def. Ex K, Joshua, 88:24-3). Federal Rule of Evidence 412 prohibits evidence of a victim's predisposition and sexual history. The rule aims to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the factfinding process. *Doe v. Cahokia Sch. Dist.*, 2014 U.S. Dist. LEXIS 175455, 3 (S.D. Ill. Dec. 19, 2014)(Ex 54)("Allowing Plaintiff's sexual history into evidence would promote precisely the type of stereotypical thinking Rule 412 was meant to prevent and would lead to prejudice to Plaintiff. The probative value of the evidence does not substantially outweigh the danger of harm to any victim or of unfair prejudice to any party.")

Had HPD moved forward with the investigation – which includes submitting the rape kit and securing the DNA sample from Michel Nichols, the case may have gone to prosecution. HPD readily admits that Doe III's rape kit had not been sent for testing for a period of four years. However, HPD argues that sending the rape kit was not necessary because Michel Nichols

admitted to having sex with 13 year old Doe III. This is simply untrue. ASA Desiree Berg testified that, even when there is a confession, the lab results are necessary for the approval of charges. (Plf Resp ¶68, Def. Ex B, Berg, 37:4-11). Moreover, HPD never secured a DNA sample from Michel Nichols. (Plf Resp ¶68, Ex 14). The lack of follow through is appalling. And reading Detective Armstrong's response to his superiors, in connection with his failure to investigate the sexual assault and Harvey's feeble reaction, reveals why—Harvey does not care about females.

**4.     Doe III's Assault on May 15, 2008**

HPD argues that the rape kit was sent to the lab, and no suspect has been identified. HPD's argument fails. The reason a suspect has not been identified is because HPD failed to (1) provide approval for the lab to consume the evidence so that the evidence could be analyzed, (2) immediately interview Doe III and her mother after the incident and (3) assign Doe III's case to a detective. (Plf SMF ¶133, Plf Resp ¶75, Ex 15).

On May 16, 2008, a rape kit was collected by Harvey. (Plff Resp ¶75, Ex 15, DOE II 8-9) Doe III's rape kit was sent to the lab on June 11, 2008. (Plff Resp ¶75, Ex 15, DOE II 59-60). On July 23, 2008, the Lab sent to Defendant HPD a report of its findings. The Lab Report noted that saliva was indicated in miscellaneous bite marks from the left and right side of Doe III's neck. The Lab Report states: "Portions of Exhibits 1A, 1B, 1G and 1H will be submitted for DNA analysis upon consumption approval."[20] (Plff SMF ¶132, Ex 15, DOE II 59-60) Authorization was specifically required to conduct analysis – which includes submitting the DNA found in the saliva into a DNA index to run for possible matches to suspects in the system. To this day, Defendants have not provided that authorization. (Plff SMF ¶132, Ex 15). Consequently, a match

---

[20] Because there was minimal DNA evidence, this analysis would consume this evidence. Yet without running it through the database, the suspect may never be found.

has never been made.

Moreover, a suspect may have been identified if HPD had properly interviewed Doe III after the hospital reported the assault. On May 16, 2008, Officer Rolfe was called to the hospital in response to the sexual assault of Doe III. (Plf Resp ¶73, Ex 15, 8-9). When the officer arrived, however, Doe III, 13 years old, had been discharged. According to South Suburban Hospital's Medical Record, Doe III was discharged at 22:58 on May 15, 2008. (Plf Resp ¶73, Ex 15, HPD 24174). Instead of seeking Plaintiff out at her home, the officer simply retrieved the evidence. Nothing more was done.

On May 20, 2008, after waiting for the police to respond to the report, Doe III's mother contacted the HPD about the sexual assault report. Doe III's mother testified that when her daughter was discharged from the hospital, she was not aware that the officer was on his way. (Plf Resp ¶73, Def. Ex Q, Sales, 96:5-97:21). It was nearly midnight, her 13 year old daughter had been sexually assaulted, and underwent a rape kit. Her already emotionally fragile daughter had suffered two sexual assaults within a month's time. Doe III's mother felt it was in the best interest of her daughter to take her home. (Plf Resp ¶73, Def. Ex Q, Sales, 96:5-97:21).

Doe III's mother fully expected, however, that the police department would follow up, and became upset when they failed to do so. (Plf Resp ¶73, Def. Ex Q, Sales, 141:16-21). After four days had passed, Doe III's mother made a complaint to Commander Patterson and was informed that a report had already been made. When she contacted Commander Patterson about the report, he refused her a copy of the report, but allowed her to read it at his desk. (Plf SMF ¶95, Def. Ex Q, Sales, 142:14-22). Doe III's mother testified: "He told me he couldn't give me a copy of ·that report.· And I asked him why?· He said, "Well, if you wasn't there, then why would you want a copy of this report?"· So I said, "Well, can I get a report done?"· So he said, "Yes."·

43

So he said, "You go back home, and I'm going to send an officer to your home." Officer Smith was then dispatched to her home. A second report was made, and Doe III was finally interviewed. HPD's investigation, however, ended there. Doe III's mother testified that she followed up regarding the  sexual assault report, but no one ever returned her calls. – "I called a few times.· I got voicemails. ·I left voicemails in the detective department, but nobody ever gotten back with me." (Plf SMF ¶95, Def. Ex Q, Sales, 151:12-21).

Each day that passed from the initial report taken at the hospital resulted in the loss of evidence and gave the suspect more time to disappear. Officer Rolfe had Doe III's address and a Sergeant was informed of the incident, but no one followed up. Despite two reports, to this date, the case was never assigned to an investigator,[21] no one searched the area of the attack, and HPD never authorized for the saliva evidence from bite marks to be analyzed.

It is unknown if a suspect could be identified because HPD simply refuses to investigate the allegations, consistent with their widespread policy and practice of discriminating against female victims of sexual assault.

**5.     Doe IV**

HPD argues that because the rape kit (when it was finally sent 11 years later) did not have sufficient DNA evidence to identify a suspect, Doe IV was not discriminated against.

Whether or not the rape kit had sufficient evidence, HPD misplaced and failed to submit evidence to the lab. HPD had no reason to believe the evidence would not lead to a suspect. Such conduct is egregious and beyond explanation.

Doe IV's rape kit was collected on November 30, 1999 by HPD. (Plf Resp ¶81, Ex 16).

---

[21] Harvey failed to assign Jane Doe III's allegations of sexual assault documented in CRN 4522 B 08 to a Detective, and it was never recorded on a Harvey "Incidental & Supplement Assignment Report." (Plf SMF ¶133, HARVEY PD 11290-13235).

Doe IV relied upon the HPD to properly investigate and handle the rape kit, and to investigate her case. The sexual assault evidence kit, which contained the rape kit along with Doe IV's clothing, was somehow "misplaced." After the 2007 raid of the HPD, which uncovered over 200 uninvestigated sexual assault cases, Doe IV became concerned that her case had also not been investigated. She was correct. In March 2011, CCSAO Investigator told Doe IV that her rape kit had been located "in the basement of the police station in a corner, out of the evidence room, and if you were not looking for it you wouldn't have found it." (Plf SMF ¶61, Doe IV, 65:14-16). The rape kit had never been sent to the lab.

6.    ***Wright v City of Philadelphia*, 2005 U.S. Dist. LEXIS 28332 (E.D. PA November 17, 2005)(Ex 55) is illustrative of the case at hand.**

   *Wright v City of Philadelphia*, 2005 U.S. Dist. LEXIS 28332 (E.D. PA November 17, 2005)(Ex 55), is illustrative and provides some guidance here. On December 16, 1999, the female plaintiff was sexually assaulted by two unknown men. The rape was reported to the Philadelphia Police Department, who conducted an investigation, which included collecting the rape kit, conducting four interviews and submitting urine samples for testing – which tested positive for cocaine and alcohol. The City also submitted medical releases to the hospital, obtaining records which revealed that the plaintiff had told hospital staff that she had been raped vaginally by two people and possibly orally and anally, and had discharge and a foul odor. The City conferred with the Assistant District Attorney "who advised that due to the fact that [plaintiff] denies any sexual contact and the results of the Rohypnol tests (date rape drug) were negative the case should be carried as unfounded."

   Prior to closing the case, however, the City did not (a) receive the results from the rape kit, which was positive for the presence of semen or (b) interview and/or attempt to secure blood or saliva samples for DNA testing from the suspect, despite knowing his address and a telephone

number.

The plaintiff asserted that the officer told her that she was closing her sexual assault case as "unfounded" because her rape kit came back negative, and because the plaintiff is a drug and alcohol abuser. Thereafter, an Internal Affairs investigation was initiated into the handling of the plaintiff's case and the case was re-opened. Additional interviews were conducted, and DNA samples were obtained from both suspects. The DNA lab report identified one of two known suspects as the source of the semen. On August 1, 2001, the suspects were arrested and charged with rape and related offenses in connection with the sexual assault of the plaintiff. Both suspects pled guilty.

The plaintiff filed an equal protection claim alleging the City had a policy, custom and practice of discriminating against female sexual assault victims. The City filed a Motion for Summary Judgment. The court denied the motion, finding sufficient evidence to defeat summary judgment. The court found the plaintiff had proffered sufficient evidence of discrimination as a motivating factor. In the case, the plaintiff (like the Plaintiffs in the present case) was just one of many women who complained that their sexual assault complaints were not being investigated. In connection with the concerns about the handling of the sexual assaults, the police commissioner ordered the special victim's unit to review 1,999 sexual assault complaints brought in the years 1995-1997. Of the cases reviewed, a total of 1/3 had been improperly closed. **Because sexual assaults were predominately women, the court held that there was sufficient evidence for a reasonable jury to conclude improper motive and disparate treatment.** *Wright* at 37-44.

*Wright* is similar to the case at hand. Harvey cannot establish, as a matter of law, that there is insufficient evidence for a jury to conclude that Harvey violated the Plaintiff's equal

protection rights..

**C.**    **There was a total lack of Supervision and Accountability by the decision-makers, who in turn ratified the officer's actions.**

In addition to the failure to train, a municipality's deliberate indifference can also take the form of the failure to act in response to repeated complaints of constitutional violations. *Sornberger*, 434 F.3d at 1029-30; *Hall v. City of Chicago*, 2012 U.S. Dist. LEXIS 182546, 22 (N.D. Ill. Dec. 28, 2012)(Ex 48). In other words, equal protection is violated where a municipal official with final policymaking authority ratifies a subordinate's unconstitutional act. *Barth v. Village of Mokena*, 2006 U.S. Dist. LEXIS 19702, 79 (N.D. Ill. Mar. 31, 2006)(Ex 56). In this case, the person with final policy making authority is Andrew Joshua, former Commander and Chief of Police.

**1.**    **Andrew Joshua is the policy-maker for Plaintiffs' Claims.**

"When a supervisor fails to provide accurate information, a proper example, and an atmosphere of compliance with policy, the policy is more likely to be ignored. In that instance, common practice takes precedence regardless of written policy." (Ex 24, HPD 24334).

According to HPD's Operations Manual, the Chief of Police is responsible for: (1) "the efficient operation of the police department through … **the selection, training, assignment, supervision and discipline of all department members**." (Plf Resp ¶95, Ex 5, DOE II 208); (2) for executing the policies of the corporate authorities and managing the affairs of the Department. (Ex 5, DOE II 200); and  (3) formulating and prescribes general work methods and procedures to be followed by members of the department, appraises conditions of work in the department; takes necessary steps to improve police operations. (Plf Resp ¶95, Ex 5, DOE II 208). *See Hare v. Zitek*, 414 F. Supp. 2d 834, 861 (N.D. Ill. 2005) (the court found Chief of Police had final policy making authority).

In addition, the Commander of Investigations also has prescribed supervision authority. According to Section 3.11.00 of HPD's Operation Manual, the Division Commander is responsible (1) to keep himself currently and completely informed as to the operational capabilities and efficiency of the units under his command; (2) to ensure that all cases are investigated for the purpose of apprehending, questioning, and prosecuting offenders; and (3) to maintain proper and sufficient records required for case preparation, crime investigations, and completion of reports. (Plf Resp ¶95, Ex 5, DOE II 325).

The Division Commander and Chief of Police during this period is Andrew Joshua. Joshua was Commander of Investigations from 1996 to August 1, 2001 and Chief of Police from April 10, 2003 to October 12, 2007. (Plf Resp ¶94, Ex 26, HARVEY PD 9401, 9397, 9416; Ex 27, HPD 25720).

- Doe I: Joshua was both the Commander and the Investigator in charge of the investigation. (Plf Resp ¶94, Ex 12)
- Doe II: Joshua was active Chief of Police at the time of her report on May 24, 2007, and Defendants' failure to obtain the Medical Exam on June 16, 2007. (Plf Resp ¶94, Ex 13)
- Doe III: Joshua hired and appointed Detective Armstrong, the Detective assigned to her April 2008 sexual assault case, despite knowing his background involving domestic abuse involving his wife and daughter. (Plf Resp ¶94, Ex 14; Ex 28; Ex 25).
- Doe IV: Joshua was the Commander of Investigations and was informed of the sexual assault when Doe IV's report was made on November 30, 1999. Plf Resp ¶94, (Ex 16; Def. Ex O, Mourer: 81:21-24).
- Doe VI: Joshua was Commander at the time of her initial report on July 26, 2000, and was Chief when Harvey was notified on April 17, 2006 of the DNA match, but failed to ensure the case was assigned, the suspect was arrested, and felony review was conducted. (Plf Resp ¶94, Ex 17).
- Doe VII: Joshua was Chief after Harvey was notified on February 18, 2003 of the DNA match, but failed to ensure the case was assigned, the suspect was arrested and felony review was conducted. (Plf Resp ¶94, Ex 18)
- Doe VIII: Joshua was Chief at the time of the initial report on July 7, 2003, and on November 22, 2006 was notified of the DNA match, but failed to ensure the case was assigned. (Plf Resp ¶94, Ex 19).

**2.  Andrew Joshua knew about the conduct of the Harvey Police Officers, and turned a blind eye to the constitutional deprivation of female sexual assault victims.**

An official satisfies the personal responsibility requirement under Equal Protection if the supervisor knows about the conduct and facilitates it, approves it, condones it, or turns a blind eye for fear of what he might see. In other words, the supervisor is responsible if he acts either knowingly or with deliberate, reckless indifference. *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988).

There is circumstantial evidence that Joshua knew and/or turned a blind eye to the constitutional deprivation of female sexual assault victims. Unlike most investigators and officers at Harvey, Joshua had sexual assault training, and knew the proper procedure for investigating sexual assault crimes. Joshua was certified after an 8 hour course in sex crime investigation on December 4, 1995. (Plf Resp ¶94, Ex 26, HARVEY PD 9220). Yet he did nothing to resolve the problems within the department. In fact, as described about, he hired, retained and assigned cases to officers who he knew would have a chilling effect on sexual assault cases.

During his tenure at the HPD, Thomas testified that women complained that their cases were not being investigated. Thomas quickly realized that sexual assault cases were not getting assigned. (Plf SMF ¶30, Def. Ex U, Thomas, 287:13-16). Thomas described the problem as systemic:

> Q. At what point did you come under the impression that there was a systemic problem in the Harvey Police Department?
> A. I would say there was a problem when I had people calling me wanting their case investigated because nothing was done. (Plf SMF ¶30, Def. Ex U, Thomas 286:9-18).
> …
> Q. Your perception that there was a systemic problem, did that perception develop prior ·to you becoming the commander of detectives?
> A. Yes. (Plf SMF ¶30, Def. Ex U, Thomas 289:10-13).

First, Joshua failed to assign the cases, and failed to ensure the final disposition of the

cases. Joshua was Commander of Investigations from 1996 to August 1, 2001. He was responsible for case assignment during this period. According to the Operation Manual, case assignment in the investigative section shall be made by the supervisor of that section. (Plf Resp ¶¶95, 96, Ex 5, DOE II 319). The supervisor of the Investigation Section is the Division Commander. The Division Commander will ensure that all cases should be investigated for the purpose of apprehending, questioning, and prosecuting offenders. (Plf Resp ¶¶95, Ex 5, DOE II 325). As Commander, Andrew Joshua was also responsible for assignment and the final disposition of the cases. (Plf Resp ¶¶95, 96, Ex 5, DOE II 327). Because Commander Joshua did not assign sexual assaults, Thomas testified that he was assigning cases to himself. (Plf SMF ¶30, Plf Resp ¶94, Def. Ex U, Thomas, 337:16-18).

Second, Joshua, as Joe Thomas' commander, was privy to citizen complaints. (Plf Resp ¶¶94, 109, Def Ex U, Thomas, 18:23-19:1). If Thomas was hearing these complaints from women, a jury could easily find that Joshua was aware as well and turned a blind eye.

Moreover, as Chief, Joshua ignored the problems of the department. Despite the failures in the investigation and documentation of sexual assault cases and the number of complaints by women that their cases were not being investigated, no one was ever disciplined for the failure to properly investigate sexual assault cases. (Plf SMF ¶74, Def. Ex K, Joshua, 238:14-18; Def Ex U, Thomas, 275:18-21; Def. Ex J, Gordan, 129:21-130:2, 190:4-9). Despite having the sexual assault training himself, Joshua never implemented any mandatory training, adopted any policies, or made any effort to change the department.

Joshua's failure to address the constitutional violations is also evidenced by his reaction to the 2007 raid. It is not typical or normal that a Police Department undergoes an audit that results in the seizure of evidence. It is quite serious. (Plf SMF ¶100, Def. Ex U, Thomas, 253:6-

50

13). Yet Joshua testified that he was not aware whether or not any sexual assault evidence kits were seized during the 2007 raid. He said he did not inquire about what was seized or what was being done as a result of the raid. In fact, he said only that: "I read about it in the paper." Joshua testified he did not follow up on the matter because, "I didn't think it was my place." (Plf Resp ¶94, Def. Ex K, Joshua 2:2-13). This is true despite that fact he was personally present on the day of the raid. Chief Joshua instead defended HPD against criticism, including the findings of the audit. (Plf Resp ¶94, Ex 2, Lonsway's Report, 67).

Furthermore, Revalee testified about the cavalier attitude in the department towards the audit. When she was asked about the audit and the fact that HPD cases were assigned to CCSAO to investigate, she described it as Chief Joshua "shooting the breeze" with Joe Kozeman, the supervisor at that time for CCSAO. Her understanding that it was merely a question of "Hey, why don't you … let us come help you work some of your old CSA [criminal sexual assault] cases, find some closures for the victims.' I never knew it was an investigation." For the evidence custodian to lack any awareness that an external agency was investigating Harvey for their failure to properly investigate sexual assault cases – in fact, to describe it as the result of two friendly colleagues "shooting the breeze" – indicates that agency leadership did not communicate the seriousness of the effort or any intention to implement reforms. (Plf Resp ¶94, Ex 2, Lonsway's Report, 66; Ex 6, Revalee, 154:9-55:12). Moreover, Commander Gordan, HPD's Rule 30(b)(6) representative designated for testifying to HPD's policies, testified he was unaware of changes made to policies and procedures as a result of the audit. (Plf Resp ¶94, Def Ex J, Gordan, 134:4-2).

## V. Due Process Clause

To state a substantive due process claim under a state-created danger theory, a plaintiff must demonstrate that: (1) the defendant, "by its affirmative acts, created or increased a danger"

51

that the plaintiff faced; (2) the defendant's "failure to protect her from danger was the proximate cause of her injuries; and (3) the defendant's failure to protect her must "shock the conscience." *Guerrero v. Piotrowski*, 2014 U.S. Dist. LEXIS 128942, 11-12 (N.D. Ill. Sept. 16, 2014)(Ex 57).

HPD has a duty to protect its citizens "if the state disables people from protecting themselves" and/or takes affirmative action that either creates or greatly increases a danger of private violence. *Doe v. Vill. of Arlington Heights*, 2012 U.S. Dist. LEXIS 43197, 13-14 (N.D. Ill. Mar. 29, 2012)(Ex 58). Common cases where state-created danger cases succeeded were: (1) where there is an apparent and real risk of retaliation by a known suspect, *Monfils v. Taylor*, 165 F.3d 511, 513 (7th Cir. 1998); or (2) where the police have cut off other avenues of aid. *Harrell v. City of Chicago Heights*, 945 F. Supp. 1112, 1119 (N.D. Ill. 1996) (The Seventh Circuit has held that, "when the state puts a person in danger, the Due Process Clause requires the state to protect him to the extent of ameliorating the incremental risk. When the state cuts off sources of private aid, it must provide replacement protection.")[22]

In this case, HPD was fully aware of the dangers of retaliation Doe I, an 11 year old minor, would suffer. Yet HPD knowingly and affirmatively created the danger by cutting off all avenues of protection and aid to Doe I, including the protection from the courts via a protective order, the protection of Department of Child and Family Services, (hereinafter, "DCFS"), and the protection of the Cook County State's Attorney's Office (hereinafter, "CCSAO"). As a result, Doe I suffered retaliation by physical and psychological abuse of Robert Buchanan and the psychological abuse of Teresa Buchanan.

## A.    Risk of Retaliation and the threat of harm was apparent to Defendants.

"The state-created danger theory contemplates some contact such that the plaintiff was a

---

[22] A state can, however, be held to have violated due process by placing a person in a position of heightened danger without cutting off other avenues of aid. *Pulliam v. City of Chicago*, 2010 U.S. Dist. LEXIS 82795, 21(N.D. Ill. Aug. 12, 2010)(Ex 59).

foreseeable victim of a defendant's acts in a tort sense." *Buchanan-Moore v. City of Milwaukee*, 576 F. Supp. 2d 944, 951 (E.D. Wis. 2008). It is without dispute that the harm (risk of retaliation) to Doe was foreseeable and apparent to Defendants in this case.

First and foremost, Joshua testified he believed the allegations that Robert Buchanan had sexually assaulted 11 year old Doe at any time. (Plf SMF ¶113, Def. Ex K, Joshua, 288:15-20). In fact, Joshua found Doe "strongly credible." (Plf SMF ¶113, Def. Ex K, Joshua, 173:3-7).

Second, the risk of retaliation by a suspect who is accused and knows the identity of the accuser is real and apparent to investigators of sexual assault crimes. Joshua admitted that the risk of retaliation by Robert Buchanan was apparent to him. (Plf SMF ¶113, Def. Ex K, Joshua, 124:1-13). Yet Buchanan was allowed the freedom to interact with Teresa, with Doe, and even so far as return home – which there is direct evidence of on August 6, 1997 (Buchanan was arrested at his shared home with Doe). (Plff Resp ¶5, Ex 12, DOE I 7). Still HPD did nothing to secure Doe's safety.

It is instructive to compare HPD's actions in 1997 with that of CCSAO in 2012. CCSAO Inv. Thomas testified that there is a real risk and threat of allowing Buchanan access to Doe. He testified that in 2012, he became concerned when Buchanan contacted Doe and told her that he was planning to visit. Even when Buchanan was not in the same state as Doe and not a direct threat to Doe, Thomas understood the real dangers of Buchanan being free, interpreted it as a "threat" and took immediate and direct action. (Plf SMF ¶128, Def Ex U, Thomas, 118:11-119:3).

Unlike HPD, CCSAO Inv. Thomas took it seriously. He contacted the police in Atlanta; and contacted the CCSAO. (Plf SMF ¶128, Def Ex U, Thomas 118:11-120:19). He did not delay. Thomas followed up the very day Thomas found out Buchanan told Doe that he was making a

trip to visit her. Thomas testified: "We were working on trying to get her to where she's not going to be harmed." (Plf SMF ¶128, Def Ex U, Thomas 120:17-19). That day, both Thomas and Atlanta police contacted Doe; and ASA Fournier obtained a judge's approval for an arrest warrant. (Plf SMF ¶128, Def Ex U, Thomas, 199:11-19, 121:16-122:11). From September 12, **when Thomas learned the results of the DNA evidence**, until September 21, the police were actively looking for Buchanan. (Plf SMF ¶128, Def Ex U, Thomas, 125:12-127:12 (Thomas testified, "we had people out all night long."). On September 21, when Thomas arrived at work, he witnessed Buchanan standing in front of the 6th District Courthouse. Thomas testified, "I … kept my eye on him because I was afraid he might shoot me. So I went to the sheriffs, called a couple sheriffs, and we went outside and he was arrested." (Plf SMF ¶129, Def Ex U, Thomas, 125:24-126:17). Thomas understood the immediate need for a response, and the dangers in allowing Buchanan to walk free. Unfortunately, Defendants ignored the known apparent risks and threats of allowing Buchanan to walk free.

**B.     HPD created a risk that Buchanan would retaliate, and placed Doe in a heightened danger by cutting off alternative avenues of aid, specifically through DCFS, the Courts, and to the State's Attorneys Office.**

According to Section 3.11.00 of HPD's Operations Manual, as **Commander, Joshua was responsible to coordinate the bureau's efforts to protect Jane Doe and investigate, arrest and prosecute Robert Buchanan with inter- and infra-departmental agencies**, concerned with crime prevention and prosecution of offenders, including DCFS and CCSAO. (Ex 5, DOE II 325). Moreover, as assigned investigator, Joshua was responsible for the following: (1) Identification and apprehension of the offender, (2) Arrange for the timely analysis and evaluation of evidence, (3) Recovery of stolen property and submission to the Property Control Officer, (4) Interviewing victims and witnesses, (5) Interrogation of suspects,

(6) Determining if other crimes may have been committed by the suspect, (7) Recording information obtained, and (8) Preparation of case for court presentation. (Plf Resp ¶45, EX 5, DOE II 317-318).

HPD seeks to shift blame, stating that it was DCFS's responsibility to protect Doe I and not HPD. As explained below, HPD's failure to cooperate and communicate with DCFS and the State's Attorneys office caused Doe I to go unprotected. "The Constitution …demand[s] protection if the state disables people from protecting themselves; having rendered someone helpless, the state must supply the sort of defenses that the person could have provided on his own." *Doe v. Vill. of Arlington Heights*, 2012 U.S. Dist. LEXIS 43197, 24-25 (N.D. Ill. Mar. 29, 2012). HPD knowingly and affirmatively created the danger by cutting off all avenues of protection and aid to Doe, including the protection from the courts via a protective order, the protection of DCFS, and the protection of the CCSAO. As a result, Doe I was left helpless by Defendants in a toxic and harmful environment.

**1.      HPD wrongfully placed Doe I in the care of Teresa Buchanan, after having reason to believe that Teresa and/or Robert Buchanan would endanger the child.**

According to the Illinois Abuse and Neglect Statute, "**an officer of a local law enforcement agency**, designated employee of the Department, or a physician treating a child may take or retain temporary protective custody of the child without the consent of the person responsible for the child's welfare, if (1) he has reason to believe that the child cannot be cared for at home or in the custody of the person responsible for the child's welfare without endangering the child's health or safety; and (2) there is not time to apply for a court order under the Juvenile Court Act of 1987 for temporary custody of the child." 325 ILCS 5/7. Jane Doe was an "abused child", under the Act:

"Abused child" means a child whose parent or immediate family member, or any person

responsible for the child's welfare, or any individual residing in the same home as the child, or a paramour of the child's parent… **creates a substantial risk of physical injury** to such child by other than accidental means which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function" 325 ILCS 5/3

As described above, HPD, however, knowingly placed Jane Doe, a minor, in the care and watch of Teresa Buchanan, who allegedly wrongfully interfered in the investigation, so as to protect her husband, Robert Buchanan, over her daughter – the victim of domestic sexual assaults. (Plf Resp ¶¶5, 15, 26, 115, Def. Ex U, Thomas, 251:12-252:22, 268:4-269:20; Def. Ex K, Joshua, 228:23-229:14, 243:7-245:8, 280:16-24). HPD has the authority to remove Doe I from the home. In fact, according to DCFS Procedures 300.80(a) – "**The police have much broader powers of custody**" than DCFS. (Plf Resp ¶41, Ex 67). Instead, HPD knowingly placed Doe in an unsafe environment, and cut off any and all protection for the 11 year old child.

**2.      HPD cut off protection of the courts, by failing to secure a protective order.**

HPD cut off protection of the courts, by failing to secure a protective order. The IDVA requires "Whenever a law enforcement officer has reason to believe that a person has been abused, neglected, or exploited by a family or household member, the officer shall … after the close of court business hours, providing or arranging for transportation for the victim (and, at the victim's request, any minors or dependents in the victim's care) to the nearest available circuit judge or associate judge so the victim may file a petition for an emergency order of protection under subsection (c) of Section 217." 750 ILCS 60/304

HPD should have used reasonable means in this case, including arranging for the victim to file a petition for an emergency order of protection. HPD's position is that HPD was not aware that Robert Buchanan was still residing with Teresa Buchanan and Doe I, and therefore a protective order was unnecessary. Circumstantial evidence suggests otherwise, when (1) Robert

Buchanan was arrested at his residence on August 6, 1997; and (2) Joshua testified that Teresa Buchanan asked him to drop the charges.

On August 3, 1997, Teresa Buchanan made a report to the HPD. The VSI took place on August 4, 1997, at that time Mrs. Buchanan stated that she was not going to allow her husband back into the home. Nevertheless, on August 6, 1997, 11:30 am, Thomas arrested Buchanan at his home address (the same residence that Doe was residing). (Plff Resp ¶8, Ex 12, DOE I 7). Joshua admitted that the evidence indicated that Robert Buchanan was still living with Doe. (Plff Resp ¶8, Def. Ex K, Joshua, 283:18-284:1). Nevertheless, Joshua was released on August 7, 1997, without a protective order in place. (Plf Resp ¶9, Plf SMF ¶105, Def. Ex K, Joshua 117:1-16).

Moreover, Robert Buchanan testified that HPD never told him he could not return home. (Plff Resp ¶ 5, Def. Ex P, Buchanan, 61:24-62:8). Buchanan testified that as a result he moved out for 3-6 months "just to give the situation some air," but then he returned home. (Plff Resp ¶ 5, Def. Ex P, Buchanan, 63:10-19). During that period when he was staying with his parents, Buchanan was free to visit his home, his wife, and Doe. (Plff Resp ¶¶ 5, 11, Def. Ex E, Doe I, 110:4-20). Doe testified that Buchanan was back in the home by Thanksgiving 1997. (Plff Resp ¶11, Def. Ex E, Doe I, 110:4-20).

DCFS Worker Margo Cralle testified that once there was a finding of "indicated" that her work was complete. (Plf Resp ¶30, Def Ex D, Cralle 33:1-16). Cralle gave a finding of indicated on October 31, 1997. (Plf Resp ¶30, Ex 20, 74, 82). Cralle testified that it is the police department's responsibility, and not DCFS's responsibility, to ensure the suspect is barred from the home. (Plf Resp ¶25, Def Ex D, Cralle, 71:20-72:24). In fact, DCFS Ann Marakis explained, "We cannot remove an adult from the home." (Plf Resp ¶25, Def Ex M, Marakis, 125:1).

3.  **HPD cut off protection of DCFS, by instructing DCFS not to interfere in the investigation and failing to report Teresa Buchanan.**

The purpose of DCFS and mandatory reporting is to provide additional safe-guards against abuse. Defendants, however, cut off the protection of DCFS, by instructing DCFS not to interfere in the investigation, and by not keeping DCFS informed of the developments of Harvey's investigation.

HPD argues that law enforcement cannot instruct and interfere with a DCFS investigation. This is simply untrue. Marakis testified if instructed not to intercede into the investigation by the police, DCFS must defer to local law enforcement. (Plf Resp ¶6, Def Ex M, Marakis, 95:12-15). DCFS Procedures, Section 300.50 provides: "In some instances a law enforcement agency … may be investigating the incident or circumstances which form the basis of a CA/N report received by the Department. The Department's investigation may be preempted by the other investigating agency if the situation is such that it constitutes a serious criminal investigation, and the other investigating agency directs the Department to refrain from interviewing certain report subjects, or to delay interviewing report subject past required time frames." (Plf Resp ¶6, Ex 68). Moreover, Section 300.80 provides "The Department may delegate the investigation of the child abuse or neglect report a) local police … when they are concurrently conducting a criminal investigation of the same incidents and allegations." (Plf Resp ¶6, Ex 60).

HPD spoke to DCFS twice after the VSI of August 6, 1997. On October 24, 1997, DCFS Cralle spoke with Harvey Officer Neal stating that the case was assigned to Joshua, and the status was unknown. (Ex 20, 60, 74). On October 31, 1997, DCFS Cralle was told by Andrew Joshua that (1) Teresa was due back at the Police Department on November 4, 1997 for further information at 4:00 pm, (2) Robert Buchanan was to be arrested, and (3) not to interview and

intercede in the investigation. (Plf Resp ¶44, Ex 20, 75-76).

As Commander, Joshua was responsible to coordinate the bureau's efforts to protect Doe and investigate, arrest and prosecution Robert Buchanan with inter- and infra-departmental agencies, DCFS. (Plf Resp ¶44, Ex 5, DOE II 325). However, Joshua intentionally failed to report and cooperate with DCFS.

DCFS can only make determinations based on the evidence that is shared with them by HPD. On November 3, 1997, Cralle met with Teresa and Doe I's siblings. Teresa continued to be cooperative in the investigation with DCFS. (Plf Resp ¶26, Ex 20, 77-80). That date, DCFS closed their investigation with a finding of indicated.

Neither time did HPD, **mandatory reporters**, tell DCFS that Teresa was no longer cooperating with the investigation. (Plff Resp ¶¶6, 15, EX 12; Ex 20). As explained above, Teresa's alleged request that Joshua drop the investigation (and/or if she asked Doe to recant) is obstruction of an investigation. HPD was required to report her to DCFS. (Plf Resp ¶¶6, 15, Def Ex U, Thomas, 251:12-252:22, Def Ex K, Joshua, 243:7-245:8). Joshua, however, testified that he did not report her to DCFS. (Plf Resp ¶6, Def Ex K, Joshua, 243:7-13). Consequently, DCFS had no knowledge that Teresa subsequently attempted to interfere. Armed with the knowledge that 11 year old Doe's mother was no longer cooperating, DCFS could have re-opened the investigation, and removed Doe from the environment. Marakis testified if DCFS believed that a spouse was protecting an abusive spouse, DCFS would have implemented a safety plan which may include protective custody. (Plf Resp ¶6, Def. Ex M, Marakis, 140:9-23). However, they had no reason to know, because Joshua intentionally deprived DCFS of the information he was required to provide to them.

Furthermore, HPD never informed DCFS that Buchanan was not arrested or charged.

According to the records, the last communication with HPD of October 31, 1997 notes that HPD was to arrest Buchanan. Marakis testified that it is not DCFS's responsibility to oversee what the police do. (Plf Resp ¶22, Def. Ex M, Marakis, 144:24-145:1). Ms. Marakis testified:

> Q.      Was there ever any follow-up or any – first of all was there ever any follow-up to see whether he, in fact, had been arrested?
> A.      That's not DCFS's responsibility. We were told by the police that he was going to be arrested, and that was accepted. (Plf Resp ¶22, Def Ex M, Marakis, 143:17-22).

There is no record of when the arrest was to occur. There is no record of when Defendants ultimately chose not to arrest him. As far as DCFS was aware, Doe I was protected by Harvey's arrest and what they  assumed would be the prosecution of Buchanan. If Buchanan was in jail, there was no need to further ensure Doe I was living in a safe environment.

Doe I was injured because HPD chose not to cooperate with DCFS. Defendants obstructed DCFS was from conducting an investigation and protecting Doe.

**4.      Defendants cut off protection of the CCSAO.**

By not completing the investigation and submitting the findings to the CCSAO, Defendant cut off the last of Doe I's avenues for protection. Only after all the evidence is received will the State's Attorney approve charges. (Plf Resp 56, Def Ex B, Berg. 83:4-20). All that was needed was to complete HPD's investigation for purposes of prosecution were to obtain and send a buccal sample from Robert Buchanan. (Def. Ex U, Thomas, 255:7-24). Joshua testified that as of September 10, 1997, HPD had a responsibility to intervene and seek prosecution of Robert Buchanan. (Plf SMF ¶111, Def. Ex K, Joshua, 240:23-241:2).

It was HPD's responsibility to obtain that DNA sample. HPD, however, never obtained and submitted a sample of Buchanan's DNA to the lab. (Plf SMF ¶110, Ex 29, Defendant Response to Requests to Admit, 41). Robert Buchanan testified that he told Defendants twice that he was willing to submit to a DNA buccal swab in 1997, but it was never obtained by HPD.

(Def. Ex P, Buchanan, 54:2-14, 77:12-24). Moreover, Joshua testified that had he sought a warrant for a buccal swab, he was 100% sure the judge would have provided such a warrant to obtain DNA evidence from Robert Buchanan. (Plf Resp ¶13, Def Ex K, Joshua, 291:23-293:21).

Defendants argue that Joshua was unaware of the DNA evidence. Defendants' argument is unsupported by the evidence. Harvey was unequivocally aware of a finding of DNA evidence and the forensic laboratories request for DNA evidence from Robert Buchanan as of September 10, 1997. On September 10, 1997, the Lab spoke with Joshua. The Lab "notified that semen was ID'D in the kit." (Plf Resp ¶¶ 13, 110, Ex 12, HPD 10536).

In addition, the Lab Report dated September 19, 1997 addressed to the Harvey Police Department, attention of Commander Andrew Joshua, provided that semen was identified in the vaginal swabs as well as her underwear. Blood was also indicated in her underwear. The Forensic laboratory requested: "At such time as a known whole blood standard from the suspect is submitted, a possible source of the semen located on the evidence may be determined. At such time as fifty known pulled head hairs and twenty-five known pulled pubic hairs from the victim and suspect are submitted, comparisons with evidence hairs may be conducted." (Plf Resp ¶¶ 13, 110, Ex 12, HARVEY PD 10530-10532). Based on his years of experience, Joshua testified that if he had some DNA evidence from Buchanan, they could have determined whether or not there is a match. (Plf Resp ¶ 16, Def Ex K, Joshua, 203:21-204:4). HPD's failure to obtain the DNA sample is simply unjustifiable, shocking and indefensible.

**C.** **HPD's failure to protect was the proximate cause of the harm to Jane Doe, including the physical and psychological abuse by Robert Buchanan and the psychological abuse by Teresa Buchanan**.

"Explicit approval of violence is but a subset of the affirmative conduct by state actors that can enhance the danger to a victim. The affirmative conduct of a government official may

give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence." *Cumings v. Dekalb County*, 2013 U.S. Dist. LEXIS 130415, 21 (N.D. Ind. Sept. 12, 2013)(Ex 61), citing *Okin v. Village of Cornwall-On-Hudson Police Department*, 577 F.3d 415, 428 (2d Cir. 2009).

HPD's affirmative acts and willful omissions was the proximate cause of Doe's injuries. Proximate cause is generally a question of fact to be decided by the trier of fact. *Sobilo v. Manassa*, 479 F. Supp. 2d 805, 818 (N.D. Ill. 2007). The test to be applied in determining proximate cause is whether the first wrongdoer might have reasonably anticipated the intervening cause as a natural and probable result of the first party's own negligence. *Suzik v. Sea-Land Corp.*, 1993 U.S. Dist. LEXIS 2004, 9 (N.D. Ill. Feb. 23, 1993)(Ex 62).

The risk of harm was anticipated by Defendants because Defendants knew Teresa Buchanan did not have the best interest of Doe I in mind. Joshua admitted that the risk of retaliation and injury to Doe I was apparent. (Plf Resp ¶ 51, Def. Ex K, Joshua, 124:1-13). Joshua testified:

> Q.· ·And if a little girl is molested by their step-dad and goes to the authorities and the authorities do not prosecute when they have ample evidence to support them, would you agree with me that that can and will result in a lifetime of fear for a minor who is molested at 10-and 11 years old?
> A.   Yes, I believe that.
> Q.   Do people -- do pedophiles -- we can call Mr. Buchanan a pedophile, correct?
> A.   Yes, we can.
> Q.   Isn't it -- based on the statistics and the evidence out there that has been garnered by law enforcement communities, pedophiles tend to continue to be pedophiles, continue to molest and assault little kids, correct?
> A.   That is correct.
> Q.   So the likelihood is that Mr. Buchanan if he was able to remain free was going to continue to molest and assault Jane Doe I, is that correct?
> A.   I think that would be correct. (Plf Resp ¶ 51, Def, Ex K, Joshua, 239:2-240:3)

Joshua testified that he knew Jane Doe I's safety was at risk until Mr. Buchanan was put behind bars. Joshua admitted that risk was apparent to him from 1997 until he retired in 2007.

(Plf Resp ¶ 51, Def. Ex K, Joshua, 284:13-285:16). Furthermore, Joshua testified that Harvey was indifferent to the position that they placed Doe I in by not following through and prosecuting Buchanan. (Plf Resp ¶ 51, Def Ex K, Joshua, 232:13-19).

In light of the physical evidence and Doe's age, this was an open and shut case that required only a bare minimum of investigation. The only evidence needed to convict Robert Buchanan was for Harvey to obtain his buccal swab. (Def. Ex K, Thomas, 255:7-24). Had they done so, Buchanan would have been incarcerated. Defendant's willful and egregious acts cost Doe her childhood and her emotional health to this day. Defendant Andrew Joshua admitted that Doe was placed in more harm by Harvey when Defendants failed to seek felony review/the prosecution of Mr. Buchanan:

> Q. So in failing to prosecute Mr. Buchanan in 1997, is it fair to say that the Harvey Police Department placed Jane Doe I in **more harm --** by allowing -- I am sorry, I am not finished -- by allowing Jane Doe I to go back to that home and Robert Buchanan to also go back to that home?
> A. That would be correct. (Plff SMF ¶ 113, Def Ex K, Joshua, 240: 11-21).

As a result, Plaintiff suffered new harms including, but not limited to (1) retaliation by physical and psychological abuse of Robert Buchanan, and (2) retaliation in the form of psychological abuse by Teresa Buchanan.

Doe I was sexually assaulted from 1997 through 2004, over 100 times from the age of 11 through 18. After it was reported in 1997 to Harvey and nothing was done, Doe had nowhere to turn for help. The police dropped the ball, and prevented DCFS involvement and protection. Life changed for the worse, because of the police's actions. After no charges were filed, Buchanan punished Doe I by manipulation and sexually abusing her. And Teresa, a once caring and loving mother, had a strained relationship with Doe thereafter. (Plf SMF ¶¶ 113-126, Ex 30, Medlin's Report).

As a result, Doe I suffered psychological injuries. She suffers from nightmares, depression and anxiety. She made poor relationship choices – dating a teenage boy throughout high school that was physically abusive and a man who was a convicted felon of sexual assaulting a teenage girl. She had five pregnancies, one of which was an abortion at the age of 16 – whose child could possibly be her stepfather's. After Harvey's failure, she turned to alcohol as a coping mechanism as a child. (Plf SMF ¶¶ 113-126, Ex 30, Medlin's Report). Doe was not the same child who reported the sexual assaults; she suffered much worse harm.

HPD argues that Joshua is entitled to qualified immunity. Doe I has presented sufficient facts to establish Joshua violated the equal protection and due process rights of Doe I, as well as the equal protection rights of Doe II and Doe III. Plaintiff respectfully requests that this Court deny Defendants Motion for Summary Judgment on both equal protection and due process.

## VI.     Illinois Domestic Violence Act

The IDVA was created because the legislature "recognize[d] domestic violence as a serious crime against the individual and society which produces family disharmony in thousands of Illinois families, promotes a pattern of escalating violence which frequently culminates in intra-family homicide, and creates an emotional atmosphere that is not conducive to healthy childhood development." 750 ILCS 60/102(1). The legislature "recognize[d] that the legal system has ineffectively dealt with family violence in the past, allowing abusers to escape effective prosecution or financial liability, and has not adequately acknowledged the criminal nature of domestic violence; that, although many laws have changed, in practice there is still widespread failure to appropriately protect and assist victims." 750 ILCS 60/102(3).

As a result, IDVA was enacted "so that victims are not trapped in abusive situations by fear of retaliation." 750 ILCS 60/102(4). The IDVA clarified "the responsibilities and support

the efforts of law enforcement officers to provide immediate, effective assistance and protection for victims of domestic violence … and Expand[ed] the civil and criminal remedies for victims of domestic violence." 750 ILCS 60/102(5) and (6).

Doe I, an 11 year old child victim of sexual assault by her stepfather, is the exact type of victim the legislature aimed to protect by the IDVA. However, HPD breached their duties under the IDVA with complete reckless disregard for Doe I.

The IDVA specifically provides that it is to be "liberally construed and applied to promote" its purposes. 750 ILC 60/102. Ordinarily, the determination of whether an officer was enforcing the law is a question of fact that must be determined by the trier of fact in light of the circumstances in each case. *Lacey v Village of Palatine*, 904 N.E.2d 18, 28 (2009). Enforcement of the law is "'rarely a single, discrete act, but is instead a course of conduct.'" *Id*. at 20. The IDVA puts an affirmative duty on the police to respond to and investigate complaints of domestic abuse. *Beyer v. City of Joliet*, 2014 IL App (3d) 120710-U, P52 (Ill. App. Ct. 3d Dist. Feb. 13, 2014)(Ex 63), citing *Sneed v. Howell*, 306 Ill. App. 3d 1149 (Ill. App. Ct. 5th Dist.1999). According to IDVA, law enforcement officers shall immediately use all reasonable means to prevent further abuse when they believe a person is a victim of domestic abuse. 750 ILCS.60/304(a) (2002). **"The list of duties in the act is not exclusive and exhaustive**. Although section 304 of the Act enumerates, as set forth above, specific examples of authorized conduct by law enforcement officers in the event of an abusive domestic situation, [the courts] interpret this section to be inclusive rather than exclusive in requiring an officer to use all reasonable methods necessary to prevent further abuse." *People v. Hetzel*, 176 Ill. App. 3d 630, 635 (Ill. App. Ct. 2d Dist.1988)(Ex 64).

HPD argues that there is no open-ended, long-term duty to protect, citing *Lacey* (the court

held the officers were not enforcing IDVA when they closed their investigation and denied the plaintiff's request to reconsider the investigation). Unlike *Lacey*, however, this case was never closed until recently when Buchanan pled guilty to sexual assault of Doe I on May 2, 2013.

This case is similar to *Bond v. Walsh*, 2011 U.S. Dist. LEXIS 119778 (C.D. Ill. Sept. 8, 2011)(Ex 65)(vacated on grounds unrelated to IDVA), which distinguished *Lacey*. The court held that there was a claim for Defendants' violation of IDVA:

> In *Lacey*, police had closed the investigation and were no longer enforcing the IDVA. …
> In the instant case, Plaintiff has alleged no close to the investigation occurred. Rather,
> Plaintiff alleges that in multiple instances, Defendants were aware of abuse perpetrated
> by Omo-Osagie, but failed to take reasonable steps to prevent further abuse. This Court
> concludes that, for the purposes of pleading, Plaintiff has adequately alleged a plausible
> claim against Defendants for violation of IDVA. *Id*. at 25.

Like *Bond*, Plaintiff alleged that HPD was aware of the abuse, but failed to take reasonable steps to prevent further abuse. HPD sat on the evidence – the rape kit -- never completed the investigation, or made any final disposition of the matter until Buchanan was arrested and charged in 2011. (Ex 12; Ex 32). HPD had an ongoing duty to see the case to completion, and the IDVA requirements are applicable until the case is closed.

HPD argues that because Buchanan did not assault Plaintiff again until 1998, they are not liable for the harm that was caused by their failure to abide by the IDVA in 1997. HPD is wrong.

HPD are liable when their initial failures to use all reasonable means under the IDVA to prevent abuse that are the proximate cause of subsequent injury. Certain events triggered HPD's duties under the IDVA in this case. They include: (1) the initial report, (2) the subsequent September 9, 1997 finding of semen in 11 year old Doe I's rape kit, (3) the alleged recantation by Doe I, and (4) the alleged wrongful interference in the investigation by Teresa – which is in

itself a form of abuse.[23] Each of these events triggered Defendants to take reasonable and necessary steps to prevent future abuse. In this case, Defendants' willful and wanton acts and omissions breached their statutory duties to Doe I under the IDVA by failing to take the following reasonable steps (which have been outlined in depth above with respect to other claims): (a) obtain and submit DNA sample from Robert Buchanan; (b) notify DCFS of Teresa Buchanan's alleged interference with the investigation; (c) investigate the alleged recantation by Doe I for undue influence by Robert Buchanan and/or Teresa Buchanan; (d) present the case for felony review to the CCSAO; (e) make written supplemental police reports, which included the victim's, witness's and suspect's statements; (f) offer Doe I information (written in a language appropriate for the victim), which shall include a summary of the procedures and relief available to victims of abuse; (g) provide or arrange for transportation for Doe I to the nearest available circuit judge so the victim may file a petition for an emergency order of protection; and (h) inform Doe I of the victim's right to request that a criminal proceeding be initiated, including specific times and places for meeting with the State's Attorney's office. Had any one of these steps been taken Doe I would not have been injured, because  Buchanan would have been incarcerated. (Plf SMF ¶¶ 101-112, Ptf Resp ¶¶ 2-18).

Moreover, HPD breached the IDVA when it failed to develop, adopt, and implement written policies regarding arrest procedures for domestic violence incidents consistent with the

---

[23]Doe was an "abused child", under the Abused and Neglected Child Act, 325 ILCS 5/3: "Abused child" means a child whose parent or immediate family member, or any person responsible for the child's welfare, or any individual residing in the same home as the child, or a paramour of the child's parent: (a)  inflicts, causes to be inflicted, or **allows to be inflicted** upon such child physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function; (b)  **creates a substantial risk of physical injury** to such child by other than accidental means which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function; (c) commits or **allows to be committed** any sex offense against such child, as such sex offenses are defined in the Criminal Code of 2012 [720 ILCS 5/1-1 et seq.] or in the Wrongs to Children Act [720 ILCS 150/0.01 et seq.], and extending those definitions of sex offenses to include children under 18 years of age. 325 ILCS 5/3.

provisions of the IDVA. The IDVA requires:

> Every law enforcement agency shall develop, adopt, and implement written policies regarding arrest procedures for domestic violence incidents consistent with the provisions of this Act. In developing these policies, each law enforcement agency is encouraged to consult with community organizations and other law enforcement agencies with expertise in recognizing and handling domestic violence incidents. 750 ILCS 60/301.1

HPD failed to develop, adopt, and implement written policies regarding arrest procedures for domestic violence incidents consistent with the provisions of the IDVA. 750 ILCS 60/301.1. HPD produced their policies and procedures in this case; however, the 1997 version of the Harvey Operational Manual is devoid of policies and procedures for dealing with Domestic Assaults, including Rape. (Plf SMF ¶¶ 8-27, 103, 105, Ex 5). HPD's Manual is devoid of policies relating to protective orders, providing victims with the appropriate information on their rights, and any practices and instructions for police officers that would be consistent with their duties under the IDVA. (Plf SMF ¶¶ 8-27, 103, 105, Plf Resp 2, Ex 5). Moreover, in 1997, HPD's officers were not subject to mandatory training on the IDVA. Consequently, Defendants violated Doe I's right under the Act.

These violations resulted in serious and foreseeable injuries to Doe I. As explained above, Joshua admitted that he was well aware of the foreseeable likelihood that Buchanan would retaliate and sexually assault Doe by not seeking to arrest him, securing a protective order, or otherwise providing some measure to protect Doe. It was not surprising that Doe I was injured.

## VII.    Conspiracy under Section 1985

Doe I alleges that Harvey and Joshua engaged in a conspiracy to deny Doe I her civil rights. A party may recover damages if two or more persons conspire for the purpose of depriving the plaintiff of the equal protection of the laws. 42 U.S.C. § 1985(3). To recover under

§ 1985(3), a party must establish: (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the alleged conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens. *Brokaw v. Mercer County*, 235 F.3d 1000, 1024 (7th Cir. Ill. 2000). To establish "purpose" under prong two, a plaintiff must demonstrate racial, ethnic, or other class-based "invidiously discriminatory animus behind the conspirators' actions." *Id.*

A reasonable jury could find that Andrew Joshua, Teresa Buchanan and Robert Buchanan conspired and committed acts to deprive Doe I of equal protection under the law. The existence of a conspiracy, of course, requires "an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means." *James v. Vill. of Willowbrook*, 2012 U.S. Dist. LEXIS 102191, 19 (N.D. Ill. July 19, 2012)(Ex 66). In order to establish a conspiracy, the plaintiff must demonstrate that the state official and a private party reached an understanding to deny the plaintiff their constitutional rights. *House v Belford*, 956 F.2d 711, 721 (7th Cir. 1992).

In this case, Andrew Joshua, Teresa Buchanan and Robert Buchanan conspired to deny Jane Doe equal protection of the law. Despite his clear understanding that Robert Buchanan had sexually assaulted Jane Doe I, Joshua testified Teresa asked him to drop the charges. His response was "You have to live with this." (Plf Resp ¶5, Def. Ex K, Joshua, 229:21-230:13). Moreover, sometime during this period, Robert Buchanan and Andrew Joshua met at a Popeye's restaurant. Joshua did not arrest him or secure a buccal sample. All they did was talk. After the meeting, Joshua and Robert parted ways and never addressed it again.

Consequently, Joshua never sought felony review for charges against Robert Buchanan. Instead, Joshua and Teresa acted to place Doe in harm's way. Joshua told DCFS not to intercede

and never instructed DCFS of Teresa's request (although he admitted that he was required to do so). In addition, Joshua chose not to obtain buccal sample from Buchanan, so that there would be no record of the match that would inevitably result in charges. Teresa took part in the conspiracy by asking for charges to be dropped, and allowing Buchanan to return home. In the end, Robert Buchanan caused further harm by sexually assaulting Doe I over 100 times, violating Plaintiff's constitutional right to her bodily integrity. (Ptf SMF ¶¶ 113-126).

Furthermore, Joshua, Teresa and Robert hid the fact that the investigation had never closed. Doe I believed that her stepfather had not been prosecuted because there was lack of evidence – that the results of a lie detector test where inconclusive. (Plf Resp ¶ 9, Def. Ex E, Doe I, 158:14-158:11). Doe I testified: "When the abuse began again, when it began you felt like you had no other options because you had already gone to your mother, and you had already gone to the last line of defense, the Harvey Police Department." (Plf Resp ¶18, Def. Ex E, Doe I, 182).

As with equal protection and due process, there is no legitimate reason for Joshua to have conspired in this case. It is beyond explanation, why a DNA sample was not sought and why HPD allowed Buchanan to go unchecked. A reasonable jury will infer that HPD acted for the purpose of depriving Doe I of her constitutional rights.

## VIII.  Conclusion

WHEREFORE, Plaintiffs respectfully request that this Honorable Court deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

DINIZULU LAW GROUP, LTD.

By:    s/ Yao O. Dinizulu             
           Yao O. Dinizulu
           Plaintiffs' Attorney

| | |
|---|---|
| Yao O. Dinizulu | Todd L. McLawhorn |
| DINIZULU LAW GROUP, LTD. | SIPRUT PC |
| 221 N. LaSalle, Suite 1100 | 17 N. State, Suite 1600 |
| Chicago, IL 60601 | Chicago, IL 60602 |
| Telephone: (312) 384-1920 | Telephone: (312) 236-0000 |
| Facsimile: (312) 384-1921 | Facsimile: (312) 754-9616 |
| Dinizulu@dinizululawgroup.com | tmclawhorn@siprut.com |
| ARDC No. 6242794 | ARDC No. 6244265 |

## CERTIFICATE OF SERVICE

I, Yao O. Dinizulu, hereby certify that on the 13th day of April, 2015, the foregoing pleading was filed electronically. Notice of this electronic filing was sent to:

> Benjamin M. Jacobi
> Gail Reich
> O'Halloran Kosoff Geitner & Cook, LLC
> 650 Dundee Road, Suite 475
> Northbrook, Illinois 60062
> Telephone: (847) 291-0200
>
> George Jackson III
> Wacker Law Group LLC
> 211 West Wacker Drive, Suite 750
> Chicago, Illinois 60606
> (773) 454-7645
> gjackson@wackerlawllc.com

Respectfully Submitted,

DINIZULU LAW GROUP, LTD.

By:    _/s/Yao O. Dinizulu (6242794)_____
           Attorney for Plaintiff
           DINIZULU LAW GROUP, LTD.
           221 N. LaSalle, Suite 1100
           Chicago, IL 60601

71

Telephone: (312) 384-1920
Facsimile: (312) 384-1921
Dinizulu@dinizululawgroup.com